**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

CITY OF CHICAGO and CITY OF SAINT PAUL,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE;
PAMELA JO BONDI, in her official capacity;
OFFICE OF COMMUNITY ORIENTED
POLICING SERVICES; and CORY D.
RANDOLPH, in his official capacity,

Defendants.

Civil Action No.

---

## <u>COMPLAINT</u>

Plaintiffs City of Chicago and City of Saint Paul file this Complaint to enjoin Defendants from imposing unlawful conditions in Department of Justice ("DOJ") grants that keep our Cities safe. In support of this Complaint, Plaintiffs allege as follows:

1. Since the mid-1990s, Congress has authorized and appropriated more than $21 billion to be distributed as grants to local law enforcement agencies under the Public Safety Partnership and Community Policing Act ("COPS Statute"). Congress appropriated these funds to increase the efficacy of community policing by enhancing cooperation between law enforcement agencies and the communities they serve. DOJ's Office of Community Oriented Policing Services ("COPS Office") is charged with administering grants under the statute, which are known as "COPS Grants."

2. Plaintiffs have long relied on COPS Grants to support their police departments' vital public safety functions. This year, Defendants awarded a COPS Grant to Chicago to recruit

and hire additional police officers, thereby addressing serious staffing shortages. Defendants also awarded a COPS Grant to Saint Paul to support its Downtown Homelessness Initiative, which is Saint Paul's proposal for responding to chronic homelessness in downtown areas.

3. Defendants, however, have inserted unlawful conditions (the "Challenged Conditions") in Plaintiffs' COPS Grants that Plaintiffs must accept to receive funding.

4. The Challenged Conditions could be read to require Plaintiffs to (a) agree not to operate "any … programs having components relating to diversity, equity, and inclusion" that Defendants deem unlawful (the "Discrimination Condition") and (b) agree in advance to comply with all executive orders and memoranda that the President has issued *and* might in the future issue (the "Executive Order Condition"). The Challenged Conditions also require Plaintiffs to (c) certify compliance with an immigration-related statute codified at 8 U.S.C. § 1373 (the "Immigration Condition"); and (d) agree to use funding in a manner that advances Defendants' policy goals but contradicts the purpose of COPS Grants (the "Federal Funding Restriction").

5. Conditioning COPS funding on these new conditions undermines the purposes for which Congress established and appropriated funding for COPS Grants in the first place: to improve community policing. Defendants' imposition of the conditions on Plaintiffs' grants upsets the separation of powers, exceeds the federal government's authority to place conditions on federal funding, and flouts bedrock limits on how federal agencies must consider, reach, and implement their decisions. Neither the Constitution nor Congress empowered Defendants to hold community-policing funding hostage to the Administration's political agenda by imposing the Challenged Conditions on COPS Grants.

6. The result is that local governments awarded federal funding to enable their law enforcement agencies to effectively serve their communities now face an untenable "choice":

either accept conditions that are unconstitutional and contrary to law, or lose federal grant funding used to keep their residents safe.

7.      Plaintiffs bring this suit to challenge the imposition of the Challenged Conditions on their COPS Grants. Plaintiffs seek and are entitled to a declaratory judgment that Defendants' adoption and application of the Challenged Conditions are unlawful, as well as injunctive relief barring Defendants from applying or enforcing the Challenged Conditions or any materially similar conditions in connection with Plaintiffs' grants.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the Constitution and other laws of the United States.

9.      In addition to its other remedial authorities, this Court has authority to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

10.     Venue properly lies within the Northern District of Illinois under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because Plaintiff City of Chicago is in this judicial district; no real property is involved in this action; and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

11.     Plaintiff City of Chicago is a municipal corporation and home-rule unit organized and existing under the constitution and laws of the State of Illinois.

12.     Plaintiff City of Saint Paul is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city.

13.     Defendant Department of Justice is an agency and executive department of the United States government. It has the ultimate responsibility for implementing the COPS Grant

program at issue in this action. DOJ is an "agency" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(b)(1).

14. Defendant Pamela Bondi is the Attorney General of the United States. She is sued in her official capacity, in which she is responsible for overseeing and administering all duties and programs of DOJ, including the COPS Office.

15. Defendant Office of Community Oriented Policing Services is an agency of the federal government within DOJ. The COPS Office administers the COPS Grant program. The COPS Office is also an "agency" within the meaning of the APA, 5 U.S.C. § 701(b)(1). This Complaint refers to DOJ and the COPS Office collectively as the "Agency Defendants."

16. Defendant Cory D. Randolph is the Acting Director of COPS. He is sued in his official capacity, in which he is responsible for administering all duties and programs of COPS.

## FACTUAL ALLEGATIONS

### I. Congress Created COPS Grants to Aid Local Law Enforcement.

17. In 1994, Congress enacted the COPS Statute to, among other objectives, "increase the number of law enforcement officers interacting directly with members of the community" and improve "training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community." Pub. Law No. 103-322 § 10002, 108 Stat. 1796 (1994). Congress "establish[ed] a program of grants and assistance in furtherance of these objectives." *Id.*

18. Congress authorized DOJ to make grants to states, local governments, and others to "increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety." *Id.* § 1701(a).

19.     Congress enumerated purposes for which grants may be made, including (a) "to hire and train new, additional career law enforcement officers for deployment in community-oriented policing," and (b) "to establish collaborative programs that enhance the ability of law enforcement agencies to address the mental health, behavioral, and substance abuse problems of individuals encountered by law enforcement officers in the line of duty." 34 U.S.C. § 10381(b)(2), (b)(20).

20.     The COPS Statute identifies requirements for grant applications, including that applicants must "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." *Id.* § 10382(c)(11).

21.     The COPS Office manages several types of COPS Grants, including the COPS Hiring Program grant, the COPS Community Policing Development Microgrant ("COPS Microgrant"), and the COPS Law Enforcement Mental Health and Wellness Act Program ("LEMHWA") grant.

22.     The COPS Hiring Program "advanc[es] public safety through community policing by funding additional full-time career law enforcement positions to meet law enforcement agencies' community policing strategies." FY2025 Hiring Grant Notice of Funding Opportunity Guide at 1, cops.usdoj.gov/pdf/2025ProgramDocs/chp/nofo.pdf.

23.     The COPS Office describes community policing as "a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as violent crime, nonviolent crime, and fear of crime." *Id.* at 6.

24.     COPS Hiring Program grants accomplish this goal by "provid[ing] funding directly to law enforcement agencies to hire and/or rehire career law enforcement officers in an effort to increase their community policing capacity and crime prevention efforts." *Id.* COPS Hiring Program grants fund the salary and fringe benefits for new or re-hired full-time officers for up to three years. *Id.* at 12.

25.     COPS Microgrant "funds are used to develop the capacity of law enforcement to implement community policing strategies by providing guidance on promising practices through the development and testing of innovative strategies; building knowledge about effective practices and outcomes; and supporting new, creative approaches to preventing crime and promoting safe communities." FY2025 Community Policing Development Microgrants Notice of Funding Opportunity at 1, cops.usdoj.gov/pdf/2025ProgramDocs/cpdmicrogrants/nofo.pdf.

26.     COPS Microgrants accomplish this goal by funding "novel or innovative approaches to problem solving by local … law enforcement agencies that help develop law enforcement's community policing capacity through the implementation of common sense policing strategies." *Id.* at 8. The Notice of Funding Opportunity for COPS Microgrants states that the COPS Office will fund projects in various subcategories including "Officer Recruitment, Hiring and Retention" and "Homelessness and Squatting." *Id.* at 9.

27.     COPS LEMHWA grant "funds are used to improve the delivery of and access to mental health and wellness services for law enforcement officers through the implementation of peer support, training, family resources, suicide prevention, and other promising practices for wellness programs." FY2025 Law Enforcement Mental Health and Wellness ACT (LEMHWA) Implementation Projects Notice of Funding Opportunity at 1, cops.usdoj.gov/pdf/2025ProgramDocs/lemhwa/nofo.pdf.

6

28.     LEMHWA grants accomplish this goal by "providing resources to law enforcement agencies to support mental health and wellness efforts. This priority increases the ability of agencies to create a more compassionate, effective, and resilient workforce that fosters a safer environment for both officers and the communities they serve." *Id.* at 7.

## II.     Plaintiffs Received COPS Grants to Address Critical Public Safety Needs.

29.     In March 2025, Congress passed the Full-Year Continuing Appropriations and Extensions Act, allocating more than $417 million to the COPS Office. *See* Pub. L. No. 119-4, Div. A Tit. III § 1301(5), 139 Stat. 9 (2025).

30.     Pursuant to that appropriation, the COPS Office issued Notices of Funding Opportunity for FY2025 COPS Grants in May 2025.

### A.     Chicago Applied for and Received a COPS Hiring Program Grant.

31.     The Chicago Police Department has applied annually for COPS Grants since 2009, receiving 13 awards exceeding $212 million for 515 entry-level police officer positions.

32.     Chicago police officers funded through COPS Grants have contributed prominently to advance the department's public safety role in Chicago's diverse communities through collaborative community policing programs.

33.     With violent crime as a focus area, COPS-funded Chicago police officers have worked in local districts on initiatives to support Chicago's comprehensive violence reduction plan. This plan addresses gun violence related to criminal gangs and illegal drug sales. It also implements the Chicago Police Department's community policing initiatives aimed at fostering and reinforcing a stronger relationship with community members.

34. In advancing the Chicago Police Department's community policing strategies, COPS-funded officers have helped restore community relationships necessary to collaborate effectively and efficiently to improve public safety outcomes.

35. In FY2024, for example, the COPS Office awarded Chicago $6.25 million in COPS Grants. These funds were critical to implementing the Chicago Police Department's comprehensive community policing strategy, which is designed to make residents an active partner in preventing and reducing crime in all of Chicago's neighborhoods.

36. The Chicago Police Department applied for a FY2025 COPS Hiring Program Grant in July 2025.

37. In October 2025, the COPS Office approved the Chicago Police Department's application for $6.25 million to pay the salaries and fringe benefits of 50 officers.

**B.      Saint Paul Applied for and Received a COPS Microgrant.**

38. The Saint Paul Police Department ("SPPD") has applied for COPS Grants since 2005. COPS Grants help SPPD hire and retain law enforcement officers, provide mental health and wellness resources for law enforcement, and strengthen pathways for recruiting officers with non-traditional backgrounds.

39. Since 2010, SPPD has received over $7.8 million in COPS funding.

40. In FY2023, for example, DOJ awarded Saint Paul $350,000 in COPS Microgrant funds. SPPD used these funds to support 31 police officer candidates to complete educational requirements and to purchase equipment needed to become sworn officers. The funds also went towards overtime pay for sworn officers who served as mentors to these candidates.

41. Additionally, in FY2021, DOJ awarded Saint Paul a LEMHWA grant in the amount of $125,000, which funded wellness programs for SPPD officers, including attendance at peer

support meetings, investigator support meetings, meetings with Chaplains, trainings and continuing education, and hiring a training expert.

42.     The SPPD applied for two FY2025 COPS Microgrants. SPPD applied for $85,502 to support Saint Paul's Downtown Homelessness Initiative and $164,232 to support new police recruit scholarships.

43.     In October 2025, the DOJ approved the SPPD's application for $85,502 for its proposal relating to homelessness.

44.     As of the date of this Complaint, DOJ has not notified SPPD regarding whether its police recruit scholarship award was approved.

45.     The SPPD also applied for a COPS LEMHWA grant in FY2025, but as of the date of this Complaint, DOJ has not notified SPPD regarding whether the award was approved.

**III.     Defendants Inserted Unlawful Conditions in Plaintiffs' COPS Grants.**

46.     The COPS Grant awards reiterate the purpose of the grants, list the terms and conditions to which Plaintiffs must agree to accept the grants, and describe the mechanics under which grant funds must be disbursed, deployed, and documented. The COPS Office required Plaintiffs to accept their COPS Grants by November 24, 2025.

47.     This lawsuit challenges three conditions that Defendants inserted into Plaintiffs' COPS Grants: (a) the Immigration Condition, (b) the Discrimination Condition, and (c) the Executive Order Condition. In addition, the COPS Grant Notices of Funding Opportunity include a Federal Funding Restriction that Plaintiffs challenge as among the "Challenged Conditions."

**A.     The Immigration Condition**

48.     The Immigration Condition—set forth in Condition 2 to Plaintiffs' COPS Grants— provides, in relevant part:

> Compliance with 8 U.S.C. § 1373: Authority to obligate or expend contingent on compliance with this condition. State or local government entity recipients of this award, and any subrecipient of this award at any tier that is an entity of a State or of a unit of local government, must comply with 8 U.S.C. §1373, which provides that such entities may not prohibit, or in any way restrict, any government entity or official from sending to, receiving from, maintaining, or exchanging information regarding citizenship or immigration status, lawful or unlawful, of any individual with components of the U.S. Department of Homeland Security or any other federal, state or local government entity. This includes any prohibitions or restrictions imposed or established by a State or local government entity or official.

49.    As described below, the Immigration Condition implicates ordinances that Plaintiffs have enacted to preserve trust between local law enforcement and the communities they serve and to limit the circumstances under which law enforcement officers devote their scarce resources to assisting the federal government in enforcing federal civil immigration law. Defendants have repeatedly sought to condition federal funding on Plaintiffs' certification that they comply with 8 U.S.C. § 1373 and have even sued Plaintiffs based on allegations that Plaintiffs violate section 1373. Courts in this Circuit have consistently rejected Defendants' efforts. The Immigration Condition is similarly unlawful.

### 1.    Plaintiffs' Laws Promote Community Trust and Public Safety.

50.    Chicago's welcoming city policy began in 1985, when Mayor Harold Washington issued an executive order that prohibited City employees from requesting information about, or otherwise assisting with, the investigation of a person's citizenship or immigration status. *See* Exec. Order No. 85-1, "Equal Access to City Services, Benefits, and Opportunities" (Mar. 7, 1985).

51.    Chicago later codified this policy in its Welcoming City Ordinance, which states that Chicago employees shall not "participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law." Mun. Code of Chi. ("MCC") § 2-173-020(a).

52.    Chicago's Welcoming City Ordinance contains two provisions that are relevant

here. First, subject to exceptions, the Ordinance provides that no City "agency or agent shall … expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status, release date, or contact information." *Id.* § 2-173-020(a)(3). Second, the Ordinance provides: "Unless required to do so by statute, federal regulation, court order, or a lawfully issued judicial warrant, … no agent or agency shall request, maintain, or share the citizenship or immigration status of any person unless such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian." *Id.* § 2-173-030(a).

53.     Nothing in the Welcoming City Ordinance prevents Chicago police from enforcing state and local criminal laws against anyone, undocumented or not. The Ordinance's restrictions apply only to "civil immigration enforcement," *id.* § 2-173-020(a), and allow police to respond to a criminal judicial warrant, *see id.* §§ 2-173-010, 2-173-030(a).

54.     The Chicago Police Department has issued regulations instructing officers that the Welcoming City Ordinance "does not preclude [them] from responding and taking police action …. in response to alleged violations of the Illinois Compiled Statutes or Municipal Code of Chicago," which contain myriad criminal laws. *See* CPD Special Order S06-14-03, Part IV.C, directives.chicagopolice.org/#directive/public/6495?f=citizenship. The regulations state that if officers learn in response to a request for assistance with civil immigration enforcement that an individual is subject to a criminal warrant, police will take the person into custody. *Id.* Part V.F.2. The Welcoming City Ordinance thus leaves Chicago police officers free to assist with criminal immigration enforcement or the investigation of other federal crimes.

55.     Saint Paul is the county seat of Ramsey County, and the second most populous city in Minnesota. The City is highly racially diverse, with a population that is only about 51% White

(non-Hispanic). 18.6% of the residents of Saint Paul are foreign-born, a much higher percentage than the State of Minnesota (8.4%) or the United States (13.6%) as a whole. Non-U.S. citizens represent 8.1% of the population of the City, again a larger percentage than the state (6.5%) or the nation (6.5%) as a whole. Saint Paul has the largest Hmong population of any city in the United States.

56. Given the diversity of its population, Saint Paul has a longstanding commitment to serving and welcoming immigrants in the community. Among other things, the City operates a website dedicated to providing immigrants and new arrivals access to information and connection to resources at https://www.stpaul.gov/immigration-resources. The Saint Paul City Attorney's Office employs a full-time attorney dedicated to assisting with immigration-related issues, and operates an Immigrant and Refugee Program which assists immigrants within the City.

57. In 2004, Saint Paul enacted a separation ordinance at Chapter 44 of its Administrative Code, entitled "Employee Authority in Immigration Matters." The Ordinance was intended to allow all residents full access to city services, regardless of their immigration status. The Ordinance provides, among other things, that:

      a. City employees cannot ask residents about their immigration status, except when required by law;

      b. The City does not use its programs to enforce federal immigration laws; and

      c. City public safety officials cannot use law enforcement authority solely to find undocumented persons or check immigration status.

58. Chapter 44 further states: "Information about immigration status in the possession of or known to city employees and representatives, however received, shall not be maintained or recorded except as otherwise specifically required by law."

12

59.     Plaintiffs' laws seek to build trust between police and immigrant communities, thereby encouraging cooperation with law enforcement and promoting public safety. To fight crime effectively, police must have open lines of communication with all communities, including undocumented residents. Plaintiffs' police departments have long pursued a community policing strategy, and it depends on officers establishing trust with residents in every neighborhood. When those bonds are formed, residents are willing to provide vital information to solve crimes and prevent violence. But the system breaks down if residents fear that speaking to the police will lead to them or their loved ones being deported. That will chill, and may even halt, cooperation with the police.

60.     Thus, in enacting the Welcoming City Ordinance, the Chicago City Council explained that that directing Chicago police to enforce federal civil immigration law would "chill[]" effective law enforcement because "fear of deportation" would lead "witnesses and victims" to avoid cooperation with police. Coun. J. 3-29-06, pp. 74327. The Chicago City Council later reiterated that in a city where one in five residents is an immigrant, "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems." MCC § 2-173-005. The Welcoming City Ordinance thus "promot[es] the safety of all [the City's] residents." *Id.*

61.     Saint Paul's separation ordinance clarifies that local law enforcement has a separate role from federal immigration enforcement. Saint Paul has recognized that people may forego pursuing help from police if they fear immigration repercussions. "The City of Saint Paul wants all of its residents to feel comfortable seeking out city services – including law enforcement – when they are in need. We want everyone to call the police when they are a victim of a crime

without fear they will be asked about their immigration status." Mayor Chris Coleman, *What 'sanctuary city' means, and doesn't mean, in St. Paul*, Twin Cities Pioneer Press (Nov. 20, 2016), www.twincities.com/2016/11/20/chris-coleman-what-sanctuary-city-means-and-doesnt-mean-in-st-paul/. Saint Paul recognizes that "mutual trust is the foundation for safe and strong communities." *Id.*

62. Plaintiffs' policies are well-supported by empirical data. Many studies, confirmed by the experience of local law enforcement, confirm that immigration-related fears prevent witnesses, victims, and others from reporting crimes. For example:

    a. A broad coalition of police chiefs explained that "build[ing] trusting and supportive relations with immigrant communities … is essential to reducing crime and helping victims."[1]

    b. Surveys of law enforcement officers and analyses of victim reporting data conclude that fear of immigration enforcement decreases immigrant victims' likelihood of making police reports and reporting domestic violence, participating in investigations, and working with prosecutors.[2]

    c. One study estimated that policies designed to foster greater trust between immigrant communities and police could cause an additional 90,000 violent incidents per year to be reported to law enforcement nationwide.[3]

---

[1] Press Release, Major Cities Chiefs Ass'n, *U.S. Mayors, Police Chiefs Concerned with Sanctuary Cities Executive Order* (Jan. 25, 2017), www.usmayors.org/2017/01/25/u-s-mayors-police-chiefs-concerned-with-sanctuary-cities-executive-order.
[2] *See* Rafaela Rodrigues et al., *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* at 72-73, National Immigrant Women's Advocacy Project (May 3, 2018).
[3] *See* Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Sociological Rev. 154, 170 (2021), www.congress.gov/118/meeting/house/116200/documents/HHRG-118-JU01-20230713-SD003.pdf.

d.      Another study found: "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties ... controlling for population characteristics."[4]

e.      In a report published with a grant from the COPS Office, the authors identified federal immigration enforcement as detrimental to "local trust-building" because immigrant communities "may attribute immigration raids or other federal immigrant enforcement activities to local police and, therefore, mistrust community policing efforts."[5]

f.      The notion that Plaintiffs' policies encourage crime is a "[m]yth": "[S]tudies have found no support for the idea that immigrants are responsible for more crime" or that "sanctuary policies lead to increased crime."[6]

**2.      The First Trump Administration Tried and Failed to Enforce Section 1373.**

63.      At the outset of his first term, President Trump issued an executive order directing the Attorney General to withhold federal grant funding from jurisdictions that allegedly violate 8 U.S.C. § 1373. *See* Exec. Order No. 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (Jan. 25, 2017). Courts enjoined enforcement of the executive order because the President "exceeded his authority" by "direct[ing] Executive Branch administrative agencies to withhold funding that Congress has not tied to compliance with § 1373." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234-35 (9th Cir. 2018).

---

[4] Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy* 6 (2017), americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy.
[5] Pradine Saint-Fort et al., *Engaging Police in Immigrant Communities: Promising Practices from the Field* at 4 (Oct. 2012), vera-institute.files.svdcdn.com/production/downloads/publications/engaging-police-in-immigrant-communities.pdf?dm=1647369969.
[6] Benjamin Gonzalez et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 9-10, 18-24, Urb. Aff. Rev. (2017), journals.sagepub.com/doi/abs/10.1177/1078087417704974.

64. DOJ then attempted to condition funding under the FY2017 Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG"), which provides federal funding to support state and local law enforcement. These conditions included a requirement that grantees certify compliance with 8 U.S.C. § 1373.

65. Chicago sued then-Attorney General Jefferson Sessions to challenge the section 1373 certification condition and other conditions attached to FY2017 Byrne JAG grants. Judge Harry Leinenweber granted summary judgment for Chicago. *See City of Chi. v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018).

66. Judge Leinenweber held that the section 1373 certification condition was *ultra vires* because the statute authorizing Byrne JAG grants did not permit the Attorney General to impose the condition. In doing so, Judge Leinenweber ruled that a provision in the Byrne JAG statute authorizing the Attorney General to require that grantees certify compliance with "applicable Federal laws" did not encompass section 1373 because section 1373 violates the Tenth Amendment. Judge Leinenweber explained, in part, that section 1373 unconstitutionally:

a. "supplants local control of local officers; the statute precludes Chicago, and localities like it, from limiting the amount of paid time its employees use to communicate with INS." *Id.* at 869.

b. "indirectly constrains local rule-making by precluding city lawmakers from passing laws, like the Welcoming City Ordinance, that institute locally-preferred policies which run counter to Section 1373." *Id.*

c. "redistributes local decision-making power by stripping it from local policymakers and installing it instead in line-level employees who may decide whether or not to communicate with INS," "effect[ing] a federally-imposed restructuring of power

within state government." *Id.* at 870.

      d.    "eliminates the City's ability to control its employees' communications with INS" and thus "prevents Chicago from extricating itself from federal immigration enforcement." *Id.*

67.    Because section 1373 is unconstitutional, Judge Leinenweber concluded, it is not an "applicable Federal law" with which the Attorney General may demand compliance through grant conditions. *Id.* at 875-76.

68.    The Attorney General nevertheless again attached the section 1373 certification condition, among other conditions, to FY2018 Byrne JAG grants. Judge Leinenweber once again held that section 1373 "is unconstitutional under the anticommandeering doctrine, and accordingly, the § 1373 compliance condition is *ultra vires* as the Authority General lacks authority to demand compliance with an unconstitutional statute." *City of Chi. v. Barr*, 405 F. Supp. 3d 748, 762 (N.D. Ill. 2019).

69.    The Seventh Circuit affirmed. *See City of Chi. v. Barr*, 961 F.3d 882 (7th Cir. 2020). The Seventh Circuit declined to address Judge Leinenweber's "compelling analysis of the Tenth Amendment" because Congress did not authorize the Attorney General to condition Byrne JAG grants on compliance with section 1373. *Id.* at 898. The Seventh Circuit explained, in part, that:

      a.    Congress repeatedly rejected bills "'seeking to condition federal funding on compliance with 8 U.S.C. § 1373.'" *Id.* at 902-03.

      b.    The Attorney General's position would permit section 1373 certification conditions on "myriad other grants," allowing the Attorney General to "withhold funding" under those grants as well as to seek "civil penalties" and "criminal prosecution" for allegedly false certifications. *Id.* at 904-05.

c.  The section 1373 certification condition "directly conflicts" with 34 U.S.C. § 10228, which provides: "Nothing in this chapter or any other Act shall be construed to authorize [the federal government] to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." The Attorney General sought to prohibit Chicago "from providing certain instructions and limitations on the actions of its own police force, thus exercising 'direction, supervision, or control' over that police force." *Id.* at 908.

70.  On remand, Judge Leinenweber permanently enjoined the Attorney General from attaching the challenged conditions, including the section 1373 certification condition, on Byrne JAG grants in all future grant years. Judge Leinenweber withdrew his determination that section 1373 is unconstitutional because the Seventh Circuit's decision rendered that determination unnecessary. *See City of Chicago v. Barr*, 513 F. Supp. 3d 828 (N.D. Ill. 2021).

### 3.  The Current Administration Has Again Tried and Failed to Enforce Section 1373.

71.  On the first day of his second term, President Trump issued an executive order directing the Attorney General to take "any lawful actions to ensure that so-called 'sanctuary' jurisdictions … do not receive access to Federal funds." Exec. Order No. 14,159 § 17, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025) ("Invasion Executive Order"). The Invasion Executive Order also directed the Attorney General to "evaluate and undertake any other lawful actions, criminal or civil, that [the Attorney General] deem[s] warranted" against "sanctuary" jurisdictions. *Id.*

72.  In February 2025, Attorney General Bondi issued a memorandum to all DOJ employees (the "Bondi Directive").[7] The Bondi Directive stated: "Sanctuary jurisdictions should

---

[7] Memorandum for all Department Employees from the Attorney General, Sanctuary Jurisdiction Directives

not receive access to federal grants administered by the Department of Justice." The Bondi Directive defined "sanctuary jurisdictions" to "include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws."

73.     The Bondi Directive mandated that U.S. Attorney's Offices "shall investigate" state and local actors that allegedly "impede, obstruct, or otherwise fail to comply with lawful immigration-related directives … for potential prosecution" under section 1373 and other laws. The Bondi Directive also required DOJ's Civil Division to work with a newly established Sanctuary Cities Enforcement Working Group to "take legal action to challenge … local laws, policies, and practices" that allegedly "impede lawful federal immigration operations."

74.     The next day, the federal government sued Chicago, the State of Illinois, Cook County, and others. *See United States v. State of Ill.*, No. 25-1285 (N.D. Ill.). As is relevant here, the complaint alleged that section 1373 preempts provisions in Chicago's Welcoming City Ordinance stating that Chicago employees may not, subject to exceptions, (a) "expend their time responding to ICE inquiries … regarding a person's custody status, release date, or contact information," or (b) "request, maintain, or share the citizenship or immigration status of any person." *Id.*, Dkt. 1 ¶ 66 (citing MCC §§ 2-173-020(a)(1), (a)(3)).

75.     The federal government later filed a similar lawsuit against Saint Paul, the State of Minnesota, and others. *See United States v. State of Minn.*, No. 25-3798 (D. Minn.). As is relevant here, the complaint alleges that section 1373 preempts provisions in Saint Paul's separation ordinance because it "conflicts with and imposes obstacles to the purpose of [section 1373] because it restricts city agencies from sending immigration-status information to DHS." *Id.*, Dkt.

_____

(Feb. 5, 2025), www.justice.gov/ag/media/1388531/dl?inline.

1 ¶ 119.

76.     In April 2025, President Trump issued an executive order asserting that "some State and local officials … violate, obstruct, and defy the enforcement of Federal immigration laws," which the order called "a lawless insurrection" that "often violate[s] Federal criminal laws." Exec. Order No. 14287 § 1, *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761 (Apr. 28, 2025). The executive order directed the Attorney General to (a) publish a list of state and local governments that "obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)" and (b) "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* § 2. The executive order also required federal agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate." *Id.* § 3(a). And the executive order mandated that the Attorney General "shall pursue all necessary legal remedies and enforcement measures to end these violations and bring such jurisdictions into compliance with the laws of the United States." *Id.* § 3(b).

77.     In August 2025, the Attorney General published a list of so-called "sanctuary jurisdictions" that includes Chicago and Minnesota. The Attorney General explained that "sanctuary jurisdictions" include jurisdictions "that limit whether and how local agencies share information about immigration status of detainees with federal authorities."[8]

78.     Courts have repeatedly rejected the current Administration's attempts to enforce 8 U.S.C. § 1373.

79.     In *City & County of San Francisco v. Trump*, the court preliminarily enjoined

---

[8] U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens, www.justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities?utm_medium=email&utm_source=govdelivery.

enforcement of the Invasion Executive Order and Bondi Directive against Plaintiffs and other local governments. 783 F. Supp. 3d 1148 (N.D. Cal. 2025), *appeal filed*, No. 25-3889 (9th Cir.); 2025 WL 2426858 (N.D. Cal. Aug. 22, 2025).

80.     Courts have similarly rejected federal agencies' attempts to condition Plaintiffs' grant funding on Plaintiffs' certification that they comply with section 1373. *See City & Cnty. of S.F. v. Trump*, 2025 WL 1738675 (N.D. Cal. June 23, 2025) (holding that preliminary injunction prohibited the Departments of Homeland Security, Transportation, and Housing and Urban Development from categorically applying section 1373 and other conditions to Plaintiffs' grants); *see also Illinois v. FEMA*, 2025 WL 2716277 (D.R.I. Sept. 24, 2025) (permanently enjoining the Department of Homeland Security from enforcing section 1373 and other grant conditions against Illinois, Minnesota, and their subdivisions).

81.     Finally, Judge Lindsay Jenkins dismissed the federal government's lawsuit against Chicago. *See United States v. Illinois*, 2025 WL 2098688 (N.D. Ill. July 25, 2025), *appeal filed*, No. 25-2904 (7th Cir.). Judge Jenkins held that section 1373's restrictions on local laws prohibiting sharing information regarding someone's "citizenship or immigration status" do not encompass laws that, like MCC § 2-173-020(a)(3), restrict employees from sharing different kinds of information—i.e., about "a person's custody status, release date, or contact information." *Id.* at *10-*13 (citing cases that have "extensively" and uniformly rejected the federal government's position). Because section 1373 and MCC § 2-173-020(a)(3) address different types of information, section 1373 does not preempt MCC § 2-173-020(a)(3). *Id.*

82.     Judge Jenkins next found that a different provision in the Welcoming City Ordinance—MCC § 2-173-020(a)(1)—does address the same information covered by section 1373 because it restricts employees from sharing information about someone's "citizenship or

immigration status." Judge Jenkins nonetheless held that section 1373 does not preempt MCC § 2-173-020(a)(1) because section 1373 lacks preemptive effect in the first place. *Id.* at *13-*16 (citing cases that "have uniformly found" that section 1373 lacks preemptive effect). Judge Jenkins also observed that section 1373 is "in tension with the Tenth Amendment" because the statute "constrain[s] … local rule-making," strips local governments of their ability to "control [their] own employees," and prevents local governments from "opt[ing] out of enforcing federal immigration laws." *Id.* at *16-*17.

83.     Although the Attorney General published the list of "sanctuary jurisdictions" after Judge Jenkins' decision—and although the Attorney General updated the list as recently as October 31, 2025—the list continues to identify Chicago and Minnesota as "sanctuary jurisdictions."

### 4.     The Immigration Condition Is Unlawful.

84.     The Immigration Condition is unlawful for multiple reasons.

85.     First, DOJ lacks statutory authority to impose the Immigration Condition. The COPS Statute does not authorize the Immigration Condition, and section 1373 does not by its terms apply to federal grants. *Compare, e.g.*, 42 U.S.C. § 2000d (prohibiting certain discrimination "under any program or activity receiving Federal financial assistance").

86.     Far from authorizing the Immigration Condition, Congress repeatedly rejected bills "'seeking to condition federal funding on compliance with 8 U.S.C. § 1373'"—including a bill that expressly sought to condition COPS funding. *Barr*, 961 F.3d at 902-03 (citing Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015)).

87.     In July 2025, after the COPS Office sent Notices of Funding Opportunity for COPS Grants, President Trump signed the "One Big Beautiful Bill Act." In a subsection appropriating

funds for Byrne JAG and COPS grants, the Act states: "To be eligible to receive funds made available under this subsection, a State or local government shall be in full compliance, as determined by the Attorney General, with … 8 U.S.C. 1373." Pub. Law No. 119-21 § 100054(5)(C), 139 Stat. 72, 390. The Act does not apply to Plaintiffs' COPS Grants because they are funded under a prior appropriations law. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4, 139 Stat. 9. But the Act's addition of this new eligibility requirement confirms that Congress did not previously authorize DOJ to attach the Immigration Condition to COPS Grants.

88.     Moreover, the Immigration Condition "directly conflicts" with 34 U.S.C. § 10228(a), quoted above, because Defendants seek to use the Immigration Condition to prevent Plaintiffs "from providing certain instructions and limitations on the actions of its own police force, thus exercising 'direction, supervision, or control' over that police force." *Barr*, 961 F.3d at 908.

89.     Second, even if Congress had authorized the Immigration Condition, it would exceed Congress's authority under the Spending Clause.

90.     The Immigration Condition requires Plaintiffs to certify compliance with section 1373 but does not explain DOJ's interpretation of the statute. The federal government sued Chicago based in part on DOJ's position that section 1373 requires Chicago to share information about a person's custody status, release date, or contact information. Judge Jenkins rejected DOJ's position, but DOJ has appealed. Plaintiffs thus face ongoing uncertainty about what DOJ is asking Plaintiffs to certify. *See City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018) (holding that a section 1373 certification condition violated the Spending Clause where "DOJ's evolving interpretations of the [section 1373] certification condition further demonstrate ambiguities that prevent applicants from deciding whether to accept the funds 'cognizant of the

consequences of their participation'"), *vacated in part on other grounds sub nom. City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

91.     Nor is the Immigration Condition germane to the COPS program. *See Barr*, 961 F.3d at 887 ("[t]he Byrne JAG grant was enacted by Congress to support the needs of local law enforcement to help fight crime, yet it now is being used as a hammer to further a completely different policy of the executive branch"). Congress enacted the COPS Statute to "improve cooperative efforts" between local "law enforcement agencies and *members of the community* to address *crime*." Pub. Law No. 103-322 § 10002, 108 Stat. at 1807-08 (emphasis added). By contrast, the Immigration Condition seeks local law enforcement assistance with *federal authorities* enforcing federal *civil* immigration law.

92.     Furthermore, the Immigration Condition prohibits Plaintiffs from restricting any employees—not just police officers—from spending their time providing information to federal civil immigration authorities. There is no conceivable relationship between the COPS program and the conduct of, for example, employees in Plaintiffs' streets-and-sanitation departments.

93.     Far from being germane, the Immigration Condition undermines Congress's purpose in enacting the COPS Statute—to enhance community policing and thereby reduce crime—by seeking local law enforcement assistance with federal civil immigration enforcement. This risks irreparable damage to the trust between local police and immigrant communities that is essential to public safety.

94.     Third, the Immigration Condition violates the APA because, among other reasons, Defendants provided no reasoned explanation for their decision to incorporate the Immigration Condition in COPS Grants. Defendants thus failed to consider (a) Plaintiffs' reasonable reliance on continued receipt of federal funding to hire police officers or (b) Plaintiffs' interest in

maintaining policies that promote public safety by ensuring trust with immigrant communities.

95. Fourth, as Judge Leinenweber explained in his "compelling analysis," *Barr*, 961 F.3d at 898, section 1373 violates the Tenth Amendment. *Sessions*, 321 F. Supp. 3d at 869-70; *see also Illinois*, 2025 WL 2098688, at *16 ("the directives issued in § 1373 are in tension with the Tenth Amendment"). The executive branch may not enforce a grant condition that, like the Immigration Condition, requires compliance with an unconstitutional statute.

96. Finally, even if the Immigration Condition were lawful, section 1373 lacks preemptive effect. *See Illinois*, 2025 WL 2098688, at *13-*16. Section 1373 therefore imposes no obligations on Plaintiffs. Defendants may not enforce a grant condition that, like the Immigration Condition, require compliance with a statute that is (a) unconstitutional and (b) imposes no obligations on Plaintiffs.

**B.     The Discrimination Condition**

97. The Discrimination Condition—set forth in Condition 3 to the COPS Grants— requires each Plaintiff to "certif[y] that it does not operate any program (including any such programs having components relating to diversity, equity, and inclusion) that violates any applicable Federal civil rights or antidiscrimination laws." The Discrimination Condition also requires that each Plaintiff "agrees that its compliance with all applicable Federal civil rights and antidiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for the purposes of the False Claims Act."

98. The Discrimination Condition is unlawful in multiple respects.

99. First, neither the COPS Statute nor any other applicable law authorizes the Discrimination Condition. On the contrary, the Discrimination Condition contradicts Congress's requirement that applicants for COPS Grants "provide assurances that the applicant will, to the

25

extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11).

100.    Second, even if Congress had authorized the Discrimination Condition, it would exceed Congress's authority under the Spending Clause.

101.    The Discrimination Condition is impermissibly ambiguous, failing even to define "diversity, equity, and inclusion" ("DEI").

102.    That the Discrimination Condition purports to prohibit programs that violate "applicable Federal civil rights or antidiscrimination laws" only adds to this ambiguity. The Discrimination Condition could be read as stating, contrary to prevailing law, that all such programs violate Federal anti-discrimination laws. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230–31 (2023) (clarifying that not all discussions of how race affects a person's life, "be it through discrimination, inspiration, or otherwise," are unlawful).

103.    Indeed, the current Administration has suggested that it views all DEI programs to violate federal law.

104.    Since his inauguration, President Trump has issued executive orders targeting programs that advance DEI goals. For example:

a.    In an executive order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," President Trump directed federal agencies to "terminate … 'equity-related grants'"—without defining "equity-related" or even "equity." Exec. Order No. 14151 § 2(b)(i), 90 Fed. Reg. 8339 (Jan. 20, 2025).

b. In an executive order titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("DEI Order"), President Trump directed agency heads to include the Discrimination Condition in every grant award. Exec. Order No. 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025). The DEI Order required the Director of the Office of Management and Budget (OMB) to "[e]xcise references to DEI and DEIA principles, under whatever name," from federal grants for the stated purpose of, among other reasons, "comply[ing] with civil-rights laws." *Id.* § 3(c)(ii). It also directed the OMB Director to "[t]erminate all" programs related to "diversity," "equity," "equitable decision-making," or "advancing equity," as "appropriate," without regard to whether the programs violate federal law. *Id.* § 3(c)(iii).

c. In an executive order titled "Improving Oversight of Federal Grantmaking," President Trump ordered that discretionary grant awards must "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient." Exec. Order No. 14332 § 4(b), *Improving Oversight of Federal Grantmaking*, 90 Fed. Reg. 38929 (Aug. 7, 2025).

105. In February 2025, Attorney General Pamela Bondi informed DOJ employees that the DEI Order "mak[es] clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') 'violate the text and spirit of our longstanding Federal civil-rights laws.'"[9]

106. In July 2025, after Plaintiffs submitted their COPS applications, Attorney General Bondi issued a memorandum titled "Guidance for Recipients of Federal Funding Regarding

---

[9] Att'y Gen'l, Endling Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl [archived at https://perma.cc/B4JZ-PQXZ].

Unlawful Discrimination" (the "Discrimination Guidance Memo").[10] Although the Discrimination Guidance Memo purports to "clarif[y] the application of federal antidiscrimination laws," it suggests that any DEI program is discriminatory. For instance:

a. The Discrimination Guidance Memo asserts that "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." That assertion is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria—even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (cleaned up) (citing *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)).

b. The Discrimination Guidance Memo directs federal funding recipients to "affirm sex-based boundaries rooted in biological differences" to "ensure compliance with federal law," contrary to Supreme Court precedent applying Title VII sex-based protections to transgender people. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 662, 670 (2020).

c. Despite court decisions holding exactly to the contrary, the Discrimination Guidance Memo states that "allow[ing] males, including those self-identifying as 'women,' to access single-sex spaces designed for females … undermine[s] the privacy, safety, and equal opportunity of women and girls."

---

[10] Att'y Gen'l, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (Jul. 29, 2025), https://www.justice.gov/ag/media/1409486/dl [archived at https://perma.cc/UG5N-TJ25]; *see also* Deputy Att'y Gen'l, Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl [archived at https://perma.cc/MFC5-YDGU].

d.    The Discrimination Guidance Memo asserts that practices and policies designed to support historically marginalized groups—including educational programs, scholarships, hiring and application policies—are unlawful and discriminatory. *See id.* at 4-7 (classifying as unlawful hiring practices that "prioritize[s] candidates from 'underrepresented groups' for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups," requirements that candidates demonstrate "cultural competence" or "cross-cultural skills," and policies that "set[] racial benchmarks or mandate[] demographic representation in candidate pools, such as requiring a certain percentage of finalists to be from 'diverse' backgrounds").

107.   Moreover, other conditions in Plaintiffs' COPS Grants require compliance with "federal civil rights and antidiscrimination statutes and regulations." This further suggests that the Discrimination Condition could be read to prohibit all programs that "relat[e] to diversity, equity, and inclusion." There should be no need to include the Discrimination Condition if programs that "relat[e] to diversity, equity, and inclusion" also violate "federal civil rights and antidiscrimination statutes and regulations."

108.   Thus, although Plaintiffs have routinely certified compliance with federal anti-discrimination laws as a condition of federal funding in the past, Defendants have cast doubt on the meaning of such a certification.

109.   The Discrimination Condition is also not germane to the COPS program. Again, far from prohibiting DEI, the COPS Statute requires conduct that could reasonably be classified as DEI. *See* 34 U.S.C. § 10382(c)(11). Moreover, the Discrimination Condition requires compliance with "applicable Federal civil rights or antidiscrimination laws," without limiting that requirement to compliance with laws related to federal funding. *See, e.g.*, 42 U.S.C. § 2000d. And

the Discrimination Condition purports to regulate Plaintiffs' conduct outside of Defendants' federally funded programs by requiring Plaintiffs to certify that they do not operate "any" purportedly unlawful DEI program. The federal government has conceded that a similar condition implemented by another agency requires a grantee to "certify that it does not operate any program that promotes DEI, irrespective of whether the program is federally funded." *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025). Congress did not authorize Defendants to regulate conduct that is unrelated to COPS Grants.

110. Third, the Discrimination Condition violates the APA because, among other reasons, Defendants provided no reasoned explanation for their decision to incorporate the Discrimination Condition in COPS Grants. Defendants thus failed to consider (a) Plaintiffs' reasonable reliance on continued receipt of federal funding to hire police officers or (b) Plaintiffs' interest in maintaining policies that promote public safety by ensuring trust with immigrant communities.

111. Finally, Defendants' unsupported interpretation of federal anti-discrimination law also casts doubt on the following COPS Grant conditions (the "Civil Rights Conditions"):

   a. Condition 8 requires Plaintiffs to comply with "terms and conditions in the applicable award year COPS Office Program Award Owner's Manual" and the Department of Justice Grants Financial Guide. Those documents require compliance with federal anti-discrimination law.[11]

---

[11] *See, e.g.*, 2024 COPS Hiring Program Award Owner's Manual at 8-9, 62, cops.usdoj.gov/pdf/2024AwardDocs/chp/AOM.pdf; 2024 LEMHWA Program Award Owner's Manual, at 22-23, 62 cops.usdoj.gov/pdf/2024AwardDocs/lemhwa/AOM.pdf; 2024 COPS Microgrant Program Award Owner's Manual at 22-23, 62, https://cops.usdoj.gov/pdf/2024AwardDocs/cpd/AOM.pdf; Financial Guide at 5, www.ojp.gov/doj-financial-guide-2024.The 2024 Award Owner's Manuals are available at https://cops.usdoj.gov/programdocuments. Notwithstanding Condition 8's requirement that grantees comply with the Award Owner's Manual for the "applicable award year," the Department of Justice did not provide an Award Owner's Manual for FY2025 with the Grant Awards, and Plaintiffs have been unable to

b.      Condition 9 requires Plaintiffs to comply with "applicable federal civil rights and antidiscrimination statutes and regulations."

c.      Condition 15 requires each Plaintiff to reaffirm its agreement to comply with the assurances and certifications that are part of the application process, including compliance with federal civil rights and antidiscrimination law and the COPS Statute.

112.    In a vacuum, the Civil Rights Conditions do not pose constitutional concerns, and Plaintiffs do not challenge Defendants' authority to include the Civil Rights Conditions in grant agreements. However, Plaintiffs now face significant uncertainty as to what these conditions mean. The Trump Administration's actions demonstrate that Defendants have adopted a contradictory and legally unsupported interpretation of federal civil rights and antidiscrimination statutes and caselaw. This incorrect interpretation is reflected in the Discrimination Condition—which could be read to suggest that any program "having components relating to diversity, equity, and inclusion" violates Federal civil rights or anti-discrimination laws—and casts doubt on the meaning of the Civil Rights Conditions.

113.    This uncertainty is exacerbated because Plaintiffs must stipulate that compliance with anti-discrimination law is material for purposes of the federal False Claims Act. This exposes Plaintiffs to penalties and treble damages for conditions that have been rendered unascertainable by Defendants' unsupported pronouncements on what anti-discrimination and civil rights laws require. Thus, although Plaintiffs do not challenge the Civil Rights Conditions, any relief with respect to the Discrimination Condition should clarify that references to antidiscrimination and

---

locate a FY25 Manual. This further exacerbates the problem that Plaintiffs must agree to terms that they have not seen. Plaintiffs reserve the right to challenge additional unlawful or unconstitutional provisions of the FY2025 Award Owner's Manual once it becomes available.

civil rights statutes (such as in the Civil Rights Conditions) mean those statutes as enacted by Congress and interpreted by the judiciary.

### C. The Executive Order Condition

114.    The Executive Order Condition—set forth in Condition 4 to the COPS Grants—requires Plaintiffs to "comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President."

115.    Executive orders express general policy and/or are addressed to the Executive Branch of the federal government. Executive orders do not impose requirements on federal grant recipients. Nor do executive orders have the power to attach conditions on the receipt of federal funds appropriated by Congress or to reinterpret law contrary to the judiciary.

116.    Beyond this, the Executive Order Condition is unlawful in multiple respects.

117.    First, neither the COPS Statute nor any other law authorizes Defendants to require compliance "with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President."

118.    The requirement that Plaintiffs "comply with all applicable federal laws" includes federal civil rights and anti-discrimination law as well as the COPS Statute. As alleged above, however, Plaintiffs cannot both comply with those laws while at the same time hewing to the Discrimination Guidance Memo's reinterpretation of civil rights and antidiscrimination law.

119.    Second, even if Congress had authorized the Executive Order Condition, it would exceed Congress's authority under the Spending Clause.

120.    The Executive Order Condition could be read to require Plaintiffs to comply not only with existing executive orders having nothing to do with COPS Grants *but also* with executive

orders yet to be issued, executive orders that have been enjoined as unlawful or unconstitutional, or executive orders that contradict the COPS Statute.

121.    What's more, the Executive Order Condition requires compliance with "Presidential Memoranda," a term that is undefined in the COPS Grant awards. In other words, there is no way for Plaintiffs to know whether the Trump Administration considers any particular document to be a Presidential Memoranda with provisions to which Plaintiffs must adhere.

122.    In the first ten months of his current term, President Trump has issued more than 200 executive orders and dozens of directives labeled as "Presidential Memoranda." As discussed above, several of these executive orders target "diversity, equity, and inclusion" programs and advanced the Administration's unsupported interpretation of anti-discrimination law.

123.    The President's executive orders and directives also cover a vast swath of other policies, including on the economy, education, energy, national security, medical policy, and federal government operations. Plaintiffs cannot know the subject matters or scope of future executive orders or "Presidential Memoranda." Nor can Plaintiffs know which current or future executive orders and memoranda will be deemed "applicable" to an awarded grant.

124.    Third, the Executive Order Condition violates the APA because, among other reasons, Defendants provided no reasoned explanation for their decision to incorporate the Executive Order Condition in COPS Grants. Defendants thus failed to consider (a) Plaintiffs' reasonable reliance on continued receipt of federal funding to hire police officers or (b) Plaintiffs' interest in maintaining policies that promote public safety by ensuring trust with immigrant communities.

**D.    The Federal Funding Restriction**

125.    The Notices of Funding Opportunity for Plaintiffs' COPS Grants include a section

titled "Federal Funding Restrictions" that purports to prohibit the use of grant funding for various purposes, including (1) "directly or indirectly" supporting educational institutions that "require [] students to have received a COVID-19 vaccination to attend any in-person education program," (2) "promot[ing] gender ideology," (3) "projects that provide or advance diversity, equity, inclusion, and accessibility or environmental justice programs, services, or activities," and (4) local governments and law enforcement agencies "that have failed to protect public monuments, memorials, and statues."

126. The Federal Funding Restrictions are unlawful in multiple respects.

127. First, Defendants have provided no authority for the Federal Funding Restrictions, nor do they have any basis in the COPS Statute or any connection to providing support for community policing. On the contrary, the restriction on using funds for projects that advance "diversity, equity, inclusion, and accessibility" contradicts the intent of the COPS Statute, which requires applicants for grants to assure they will "seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11).

128. Second, even if Congress had authorized the Federal Funding Restrictions, they would exceed Congress's authority under the Spending Clause.

129. The condition prohibiting the use of grant funds "to promote gender ideology" does not define "gender ideology," make clear what it means to "promote" gender ideology, or explain how the prohibition relates to the COPS program.

130. Similarly, it is unclear what it would mean to "directly or indirectly" support an educational institution that requires COVID-19 vaccines, or how that bears on any of the congressional purposes enumerated in the COPS Statute.

131.    The final condition in the Federal Funding Restrictions—related to a failure to protect public monuments—is similarly ambiguous and untethered to the purpose of the COPS Statute.

132.    Third, the Federal Funding Restrictions violate the APA because, among other reasons, Defendants provided no reasoned explanation for their decision to incorporate the Federal Funding Restrictions in COPS Grants. Defendants thus failed to consider (a) Plaintiffs' reasonable reliance on continued receipt of federal funding to hire police officers or (b) Plaintiffs' interest in maintaining policies that promote public safety by ensuring trust with immigrant communities.

## III.    Plaintiffs Must Either Agree to Unlawful Conditions or Forego Funding Critical to Public Safety.

133.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's choice of accepting illegal conditions accompanied by a heightened risk of False Claims Act claims or forgoing the benefit of grant funds that enhance public safety.

134.    Plaintiffs are especially at risk because Defendants crafted the Challenged Conditions to expose grantees to liability under the False Claims Act, including based on actions that are lawful under the judiciary's authoritative interpretation of federal anti-discrimination law. It is invariably harmful for any entity to face unwarranted threats of criminal investigation or prosecution or lawsuits that could have such significant economic consequences. That is all the more true here, where the threat is tangible, concrete, and imminent, and where the federal Administration itself is proactively moving to substantially increase the risks and stakes.

135.    DOJ has formed a nationwide task force specifically to target grantees that sign these certifications, has described potential liability under the False Claims Act as a "weapon" it will deploy, and has "strongly encouraged" private parties to bring civil suits.

136.    Todd Blanche, the Deputy Attorney General, called the False Claims Act the DOJ's

"primary weapon" in this fight. He announced in May 2025 that DOJ would set up a "Civil Rights Fraud Initiative" that will "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws"—or, more accurately, the Administration's reimagining thereof. The announcement asserts that the False Claims Act "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." It further states that "[t]he Civil Fraud Section and the Civil Rights Division will also engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients." DOJ also "strongly encourages" private lawsuits under the Federal Claims Act.[12]

137. DOJ reaffirmed this threat in June, when Assistant Attorney General Brett Shumate announced intent to dedicate "all available resources" of DOJ's Civil Division "to pursue affirmative litigation combatting unlawful discriminatory practices" and to "aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws."[13]

138. The False Claims Act imposes substantial civil liability on "any person who … knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). Both the federal government and any private citizen may sue a recipient of federal funds for False Claims Act violations. *Id.* § 3730. If found liable, a funding recipient faces

---

[12] Deputy Att'y Gen'l, Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl [archived at https://perma.cc/MFC5-YDGU].

[13] Asst. Att'y Gen'l, Civil Division Enforcement Priorities (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl [archived at https://perma.cc/QL7T-33TH].

potential treble damages. *Id.* § 3729(a). The same conduct may also give rise to criminal liability, including up to five years imprisonment. 18 U.S.C. § 287.

139.    This threat is only underscored by Defendants' requirement that Plaintiffs agree to a condition stating that compliance with antidiscrimination law is "material" for purposes of the False Claims Act.

140.    Plaintiffs therefore face the prospect that, if they use COPS Grants for the purposes for which Congress intended—including to recruit and hire "members of racial and ethnic minority groups and women" to increase their representation in law enforcement—they will face crushing civil and criminal penalties for failing to abide by DOJ's contrary interpretation of federal civil rights and antidiscrimination law.

141.    Highlighting this risk, DOJ has already initiated investigations into Chicago and others for allegedly unlawful DEI practices. For example, in May 2025, DOJ sent a letter to Chicago Mayor Brandon Johnson announcing that DOJ "is opening an investigation to determine whether the City of Chicago, Illinois, is engaged in a pattern or practice of discrimination based on race, in violation of Title VII." The letter explained that the investigation "is based on" Mayor Johnson's alleged remarks highlighting the number of Black officials in the Mayor's administration.[14]

142.    The other Challenged Conditions pose similar risks. By signing the Executive Order Condition, Plaintiffs would effectively be playing a game of chance with critical public safety funding: Plaintiffs will be left to guess which of hundreds of current and future executive orders and Presidential memoranda are "applicable"—without even knowing what those future executive orders and memoranda may cover—and, if they guess wrong, Defendants could pull

---

[14]    Letter from Harmeet K. Dhillon to The Honorable Brandon Johnson, May 19, 2025, https://www.justice.gov/crt/media/1400811/dl?inline.

essential funding or seek to impose legal penalties.

143. Accepting the Federal Funding Restrictions, in turn, would require acceding to curtail the expenditure of funds for purposes that serve Plaintiffs' needs and are consistent with Congress's intent as reflected in the COPS Statute.

144. Finally, DOJ has already sued Plaintiffs based in part on allegations that Plaintiffs' laws violate section 1373. Although Judge Jenkins dismissed the lawsuit against Chicago, the federal government has appealed. And Saint Paul has not yet been served with the similar suit filed by DOJ in the District of Minnesota. Plaintiffs thus face ongoing uncertainty about whether signing the Immigration Condition exposes Plaintiffs to further litigation that could seek treble damages and even criminal penalties.

145. Moreover, attempting to comply with the federal government's interpretation of section 1373—whatever that may be—would undermine public safety. As Judge Leinenweber explained in enjoining conditions that DOJ attached to Byrne JAG grants—including a section 1373 certification condition—"Chicago's compliance with the Conditions would damage local law enforcement's relationship with immigrant communities and decrease the cooperation essential to prevent and solve crimes both within those communities and Chicago at large. Trust once lost is not easily restored, and as such, this is an irreparable harm for which there is no adequate remedy at law." *Sessions*, 321 F. Supp. 3d at 877-78.

## CAUSES OF ACTION

### Count 1 - Separation of Powers Violation

### *All Challenged Conditions; Against All Defendants*

146. Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

147.    The Constitution vests Congress—not the Executive—with "[a]ll" of the federal government's "legislative Powers," which include the power to spend and appropriate federal funds. U.S. Const. art. 1, § 1; *id.* § 8, cl. 1 (spending power); *id.* § 9, cl. 7 (Appropriations Clause).

148.    "The authority to pass laws and the power of the purse rest in the legislative not the executive branch." *Barr*, 961 F.3d at 892; *see also id.* at 887 (executive agencies "cannot pursue the policy objectives of the executive branch through the power of purse").

149.    Accordingly, absent an express delegation, only Congress is entitled to attach conditions to federal funds. While the executive branch has "significant powers . . . the power to wield the purse to alter behavior rests squarely with the legislative branch." *Id.* at 892; *see also id.* ("'[W]hen Congress confers decision making authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform.'" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (emphasis in original) (cleaned up)).

150.    The separation of the legislative, executive, and judicial powers among the three branches is a central and core tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024) (the separation of powers "doctrine is undoubtedly carved into the Constitution's text by its three articles separating powers"); *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) ("the Constitution's rule vesting federal legislative power in Congress is 'vital to the integrity and maintenance of the system of government ordained by the Constitution.'" (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892)).

151.    Consistent with these principles, the Executive Branch acts at the "lowest ebb" of its constitutional power when it "takes measures incompatible with the express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

concurring).

152.     In leveraging its spending power under the Constitution, Congress has not conditioned COPS grant funding on compliance with 8 U.S.C. § 1373, a prohibition on DEI programs, or any of the other policies that Defendants seek or may seek in the future to impose on Plaintiffs through any of the Challenged Conditions or through misapplication of the Civil Rights Conditions. Nor has Congress delegated to Defendants the authority to attach any of the Challenged Conditions unilaterally. On the contrary, the Challenged Conditions contradict Congress's intent.

153.     Congress likewise did not authorize Defendants to condition federal funding on recipients' conduct under programs that Defendants do not fund (e.g., non-federally funded programs) or under laws that do not by their terms apply to federally funded programs.

154.     By imposing the Challenged Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without constitutional authorization.

155.     For these reasons, Defendants' conditioning of Plaintiffs' COPS Grants on compliance with the Challenged Conditions and on Defendants' misapplication of the Civil Rights Conditions violates the constitutional separation of powers.

156.     Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

### Count 2 – *Ultra Vires* Agency Action

### *All Challenged Conditions; Against All Defendants*

157.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

158.     An executive agency "has no power to act … unless and until Congress confers power upon it." *Louisiana Public Service Comm'n*, 476 U.S. 355, 374 (1986).

159.    Defendants' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly … what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

160.    Defendants lack statutory authority to impose the Challenged Conditions.

161.    In imposing the Challenged Conditions, Defendants exceeded the statutory authority that Congress granted. The Challenged Conditions are therefore ultra vires.

162.    The Challenged Conditions will harm Plaintiffs and their residents, including by forcing Plaintiffs to choose between accepting the Challenged Conditions or forgoing critical funding.

163.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Center*, 575 U.S. 320, 326–27 (2015). The Supreme Court allows equitable relief against federal officials who act "beyond those limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 377 U.S. 682, 689 (1949).

**Count 3 – Spending Clause Violation**

*All Challenged Conditions; Against All Defendants*

164.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

165.    Congress's power to attach conditions to federal funding "is of course not unlimited, but is instead subject to several general restrictions." *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987). The Challenged Conditions violate at least two of the Constitution's "general restrictions" on the spending power.

166.    First, the spending power requires recipients to have fair and advance notice of conditions that apply to federal funds so that recipients can "voluntarily and knowingly" decide

41

whether to accept the funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously," because recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As a corollary, the spending power prohibits the federal government from "surprising" grantees "with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

167.    Second, the government may only impose conditions on federal funding that are reasonably related to the federal interest in the project and the project's objectives. *Dole*, 483 U.S. at 207, 208; *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord New York v. United States*, 505 U.S. 144, 167 (1992).

168.    Even if Congress had delegated authority to Defendants to attach the Challenged Conditions to COPS Grants, the Challenged Conditions would nonetheless be unlawful and unenforceable under the Spending Clause. As explained above, the Challenged Conditions are ambiguous, purport to bind grantees to post-acceptance and retroactive conditions, and are not germane to the purposes of the COPS Statute. Each of these flaws applies to each of the Challenged Conditions.

169.    The lack of any reasonable relationship between COPS Grants and the Challenged Conditions is underscored by the facially unlimited reach of the conditions, most of which apply to *all* of Plaintiffs' programs and are not limited to programs funded by COPS grants.

170.    In addition, the Executive Order Condition requires Plaintiffs to comply with "all applicable federal laws," while the Discrimination Condition requires compliance with "any applicable Federal civil rights or antidiscrimination laws." Neither Condition specifies the

"applicable" laws or limits the Conditions to laws that are germane to COPS Grants.

171.     Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

### Count 4 – Administrative Procedure Act Violation – The Challenged Conditions are Arbitrary and Capricious

#### *All Challenged Conditions; Against the Agency Defendants*

172.     Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

173.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

174.     "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

175.     Defendants' incorporation of the Challenged Conditions as requirements for acceptance of COPS Grants is a final agency action.

176.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

177. The Agency Defendants provided no reasoned explanation or basis for their decision to incorporate the Challenged Conditions in COPS Grants, which have no reasonable connection or nexus to those issues.

178. Defendants have ignored essential aspects of the "problem" they purport to address by incorporating the Challenged Conditions in COPS Grant awards, including by failing to (a) assess which of these conditions are lawful and consistent with the authorizing statute and the Constitution; (b) consider Plaintiffs' reasonable and inevitable reliance on now at-risk funds, and (c) consider the potential impacts on public safety of withholding the funding appropriated by Congress.

179. Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the inclusion of the Challenged Conditions in COPS Grants violates the APA because it is arbitrary and capricious; to provide preliminary relief under 5 U.S.C. § 705; and to temporarily restrain, and preliminarily and permanently enjoin Defendants from including the Challenged Conditions in Plaintiffs' COPS Grants without complying with the APA.

180. Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

**Count 5 – Administrative Procedure Act Violation – The Challenged Conditions Are Contrary to the Constitution**
**_All Challenged Conditions; Against the Agency Defendants_**

181. Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

182. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

183. As described above, the Challenged Conditions violate bedrock constitutional

provisions and principles including the separation of powers between the President and Congress and the President and the Judiciary, as well as the spending power.

184.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that each and all of the final agency actions described in paragraph 245 violate the APA because they are contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; provide preliminary relief under 5 U.S.C. § 705; and temporarily restrain, and preliminarily and permanently enjoin, Defendants from imposing the Challenged Conditions without complying with the APA.

185.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

### Count 6 – Administrative Procedure Act – The Challenged Conditions Are In Excess of Statutory Authority
#### All Challenged Conditions; Against the Agency Defendants

186.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

187.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

188.    Defendants may exercise only authority granted to them by statute or the Constitution.

189.    No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally appropriated funds. The Challenged Conditions are not authorized by any statute under which the COPS Grant exists, nor under any other statute, and are in fact contrary to the requirements of the COPS Statute.

190.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C.

§ 2201 that the inclusion of the Challenged Conditions in Plaintiffs' COPS Grants violates the APA because the Challenged Conditions are in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from including the Challenged Conditions in Plaintiffs' COPS Grants without complying with the APA.

191.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

## Count 7: Tenth Amendment Violation

### The Immigration Condition; Against All Defendants

192.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

193.    The Tenth Amendment prohibits the federal government from "requir[ing]" local governments "to govern according to Congress's instructions," *New York v. United States*, 505 U.S. 144, 162 (1992), or "command[ing] the States' officers … to administer or enforce a general regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). Congress transgresses the Tenth Amendment when it "regulat[es] activities undertaken by government entities only," *Sessions*, 321 F. Supp. 3d at 868, rather than "evenhandedly regulat[ing] an activity in which both States and private actors engage." *Murphy v. NCAA*, 584 U.S. 453, 475 (2018); *see Illinois*, 2025 WL 2098688, at *13-*16.

194.    Section 1373 does just that by prohibiting local governments from engaging in a core aspect of governing: controlling the actions of their own employees and retaining control over local law enforcement policy.

195.    Defendants cannot require Plaintiffs to comply with an unconstitutional statute.

Defendants therefore cannot impose the Immigration Condition on Plaintiffs.

196.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

## Count 8: Declaratory Judgment

### *The Immigration Condition; Against All Defendants*

197.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

198.    An actual controversy exists as to whether the Immigration Condition imposes obligations on Plaintiffs by requiring compliance with section 1373.

199.    Defendants maintain that section 1373 is constitutional and has preemptive effect.

200.    In fact, section 1373 violates the Tenth Amendment and lacks preemptive effect.

201.    Accordingly, pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Immigration Condition imposes no obligations on Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1.    A declaration that the Challenged Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

2.    A declaration that Defendants' attachment or incorporation of the Challenged Conditions and materially similar requirements in any documents incorporated by reference into Plaintiffs' COPS Grants is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

3.    A declaration that 8 U.S.C. § 1373 is unconstitutional, and that the Immigration Condition imposes no obligations on Plaintiffs;

47

4.      An order temporarily restraining and preliminarily and permanently enjoining Defendants from attaching, incorporating, imposing, or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any applications submitted by Plaintiffs for COPS Grants or any COPS Grants funds awarded to or received by Plaintiffs;

5.      An order temporarily restraining and preliminarily and permanently enjoining Defendants from attaching, incorporating, imposing, or enforcing the requirement that Plaintiffs comply with the Civil Rights Conditions, federal civil rights law, anti-discrimination law, or the COPS Statute as requiring anything other than compliance with such laws as enacted by Congress and interpreted by the judiciary;

5.      An order pursuant to 5 U.S.C. § 705 that: (i) postpones the effective date of any action by any Defendants to adopt, issue, enforce, or implement the Challenged Conditions or any materially similar terms or conditions pending conclusion of this litigation; (ii) declares the Challenged Conditions void and unenforceable with respect to any application, award, agreement, or subagreement, or other document executed by Plaintiffs that is related to COPS Grants; and (iii) declares that Plaintiffs need only comply with the Civil Rights Conditions, federal civil rights law, antidiscrimination law, and the COPS Statute as enacted by Congress and interpreted by the judiciary;

6.      An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all actions taken by Defendants to: (i) adopt, issue, enforce, or implement the Challenged Conditions or any materially similar terms or conditions; (ii) require, attach, incorporate, implement, or enforce the Challenged Conditions in any application, award, agreement or subagreement, or other document executed by Plaintiffs related to COPS Grants; or (iii) construe the requirements that Plaintiffs comply with the Civil Rights Conditions, federal civil rights law, antidiscrimination law,

and the COPS Statute in any manner other than how such laws have been enacted by Congress and interpreted by the judiciary;

7.     Orders preliminarily and permanently enjoining Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

8.     An award to Plaintiffs of their reasonable attorneys' fees, costs, and other expenses; and

9.     Any other and further relief that this Court may deem just and proper.


Dated: November 12, 2025          Respectfully submitted,


                                  MARY B. RICHARDSON-LOWRY
                                  Corporation Counsel of the City of Chicago

                                  By: /s/ Stephen Kane
                                  Stephen Kane (IL Bar No. 6272490)
                                  Rebecca Hirsch  (IL Bar No. 6279592)
                                  Chelsey Metcalf  (IL Bar No. 6337233)
                                  Laura Geary (IL Bar No. 6351762)
                                  City of Chicago Department of Law
                                  121 North LaSalle Street, Room 600
                                  Chicago, Illinois 60602
                                  Tel: (313) 744-9484
                                  stephen.kane@cityofchicago.org
                                  rebecca.hirsch2@cityofchicago.org
                                  chelsey.metcalf@cityofchicago.org
                                  laura.geary@cityofchicago.org

*Attorneys for Plaintiff City of Chicago*


LYNDSEY OLSON
Saint Paul City Attorney

By: /s/ *Kelsey McElveen*
KELSEY MCELVEEN *
Assistant City Attorney
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone:      (651) 266-8710
Facsimile:       (651) 298-5619
E-Mail:           Kelsey.McElveen@ci.stpaul.mn.us

*Attorneys for Plaintiff City of Saint Paul*

* Application forthcoming for admission pro hac vice