**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| CITY OF CHICAGO and CITY OF SAINT PAUL, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-13863 |
| UNITED STATES DEPARTMENT OF JUSTICE; PAMELA JO BONDI, in her official capacity; OFFICE OF COMMUNITY ORIENTED POLICING SERVICES; and CORY D. RANDOLPH, in his official capacity, | Hon. Jorge L. Alonso |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND STAY OF AGENCY ACTION**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

   I.   Congress Has Long Funded COPS Grants to Promote Community Policing. ................... 3

   II.   Defendants Attached the Challenged Conditions to Plaintiffs' Awards.............................. 4

   III.   The Federal Government Has Repeatedly Tried and Failed to Enforce Section 1373....... 5

   IV.   The Department of Justice Has Threatened Civil and Criminal Penalties Against Grantees That Certify Compliance with Anti-DEI Conditions............................................................ 8

ARGUMENT ...................................................................................................................... 10

   I.   The Court Has Jurisdiction. ............................................................................................ 10

   II.   Plaintiffs Will Likely Succeed on the Merits.................................................................. 12

       A.   Defendants Violated the Separation of Powers and Acted Ultra Vires. ............... 12

       B.   Defendants Violated the Spending Clause........................................................... 14

       C.   Defendants Violated the APA................................................................................ 19

   III.   Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief. ............................... 23

   IV.   The Balance of Hardships and Public Interest Favor Preliminary Relief........................ 24

CONCLUSION.................................................................................................................... 25

## TABLE OF CASES

*Adams v. City of Indianapolis*,
  742 F.3d 720 (7th Cir. 2014) ................................................................................... 26

*American Federation of Teachers v. Department of Education*,
  2025 WL 2374697 (D. Md. Aug. 14, 2025) ................................................................ 18

*American Public Health Association v. National Institutes of Health*,
  2025 WL 1822487 (D. Mass. July 2, 2025) ................................................................ 18

*Arlington Central School District Board of Education v. Murphy*,
  548 U.S. 291 (2006) ................................................................................................... 17

*California v. Environmental Protection Agency*, 72 F.4th 308 (D.C. Cir. 2023) ......................... 20

*California v. United States Department of Transportation*,
  2025 WL 3072541 (D.R.I. Nov. 4, 2025) ............................................................. 12, 13

*Call v. Ameritech Management Pension Plan*,
  475 F.3d 816 (7th Cir. 2007) ..................................................................................... 19

*Chicago Housing Authority v. Turner*,
  2025 WL 2972665 (N.D. Ill. Oct. 20, 2025) ............................................................. 13

*Chicago Women in Trades v. Trump*,
  778 F. Supp. 3d 959 (N.D. Ill. 2025) ........................................... 2, 12, 19, 24, 30, 32

*City & County of San Francisco v. Sessions*,
  349 F. Supp. 3d 924 (N.D. Cal. 2018) ......................................................... 18, 23, 28

*City & County of San Francisco v. Trump*,
  2025 WL 1738675 (N.D. Cal. June 23, 2025) ................................................. 2, 22, 25

*City & County of San Francisco v. Trump*,
  2025 WL 2426858 (N.D. Cal. Aug. 22, 2025) .............................................................. 9

*City & County of San Francisco v. Trump*,
  783 F. Supp. 3d 1148 (N.D. Cal. 2025) ....................................................................... 9

*City & County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ................................................................................... 16

*City of Arlington v. Federal Communications Commission*,
  569 U.S. 290 (2013) ................................................................................................... 14

*City of Chicago v. Barr*,
    405 F. Supp. 3d 748 (N.D. Ill. 2019) ................................................................ 8

*City of Chicago v. Barr*,
    513 F. Supp. 3d 828 (N.D. Ill. 2021) .............................................................. 29

*City of Chicago v. Barr*,
    961 F.3d 882 (7th Cir. 2020)................................ 2, 7, 8, 12, 14, 15, 16, 22, 29, 32

*City of Chicago v. Department of Homeland Security*,
    2025 WL 3043528 (N.D. Ill. Oct. 31, 2025) .................................................. 12

*City of Chicago v. Sessions*,
    264 F. Supp. 3d 933 (N.D. Ill. 2017) .............................................................. 30

*City of Chicago v. Sessions*,
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ........................................... 3, 8, 28, 29, 31

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018)......................................................... 23, 31, 33

*City of Evanston v. Barr*,
    412 F. Supp. 3d 873 (N.D. Ill. 2019) .............................................................. 31

*City of Fresno v. Turner*,
    2025 WL 2721390 (N.D. Cal. Sept. 23, 2025)........................ 19, 21, 24, 25, 30, 31

*City of Los Angeles v. Barr*,
    929 F.3d 1163 (9th Cir. 2019) ...................................................................... 16

*City of Los Angeles v. Sessions*,
    2019 WL 1957966 (C.D. Cal. Feb. 15, 2019)............................................... 28

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ........................................................... 28

*Colorado v. United States Department of Justice*,
    455 F. Supp. 3d 1034 (D. Colo. 2020) ......................................................... 23

*Cook County v. Wolf*,
    962 F.3d 208 (7th Cir. 2020)......................................................................... 11

*Department of Education v. California*,
    604 U.S. 650 (2025)....................................................................................... 13

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011).................................................................... 29, 30

*Federal Communications Commission v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................................. 25

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ................................................................................................. 29

*Housing Authority of City & County of San Francisco v. Turner*,
    2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) ............................................. 2, 12, 15, 20, 21, 24

*Illinois v. Federal Emergency Management Agency*,
    2025 WL 2716277 (D.R.I. Sept. 24, 2025) .................................................. 18, 23, 26

*LeBlanc v. United States*,
    50 F.3d 1025 (Fed. Cir. 1995) ................................................................................. 13

*Martin Luther King, Jr. County v. Turner*,
    2025 WL 2322763 (W.D. Wash. Aug. 12, 2025) ........................................ 2, 20, 24

*McHenry County v. Raoul*,
    44 F.4th 581 (7th Cir. 2022) .................................................................................... 27

*Midwest Operating Engineers v. Dredge*,
    147 F. Supp. 3d 724 (N.D. Ill. 2015) ..................................................................... 26

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ................................................................................................... 25

*Murphy v. National Collegiate Athletic Association*,
    584 U.S. 453 (2018) ............................................................................................ 27, 28

*National Institutes of Health v. American Public Health Association*,
    145 S. Ct. 2658 (2025) ........................................................................................ 13, 14

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................................................. 22

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................................. 11

*Ohio v. Environmental Protection Agency*,
    603 U.S. 279 (2024) ................................................................................................. 25

*Oregon v. Trump*,
    406 F. Supp. 3d 940 (D. Or. 2019) .......................................................................... 28

*Pennhurst State School & Hospital v. Halderman*,
    451 U.S. 1 (1981) ................................................................................................ 17, 24

*President & Fellows of Harvard College v. United States Department of Health & Human Services*, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ............................................................ 14

*Prymer v. Ogden*,
29 F.3d 1208 (7th Cir. 1994) ................................................................................................ 26

*Rhode Island Coalition Against Domestic Violence v. Kennedy*,
2025 WL 2988705 (D.R.I. Oct. 23, 2025) ........................................................................... 21

*South Dakota v. Dole*,
483 U.S. 203 (1987) ....................................................................................................... 17, 22

*State of Washington v. United States Department of Health & Human Services*,
2025 WL 3002366 (D. Or. Oct. 27, 2025) ........................................................................... 21

*Tootle v. Secretary of Navy*,
446 F.3d 167 (D.C. Cir. 2006) ............................................................................................. 13

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018) ............................................................................... 28

*United States v. Illinois*,
2025 WL 2098688 (N.D. Ill. July 25, 2025) ............................................. 3, 9, 18, 26, 27, 28

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ........................................................................................................... 11, 32

v

## INTRODUCTION

Congress enacted the Public Safety Partnership and Community Policing Act ("COPS Statute") to promote public safety by enhancing cooperation between local law enforcement and the communities they serve. Congress has appropriated billions of dollars under the COPS Statute, directing the Department of Justice ("DOJ") to award grants to local governments to hire additional police officers for deployment in community-oriented policing, among other purposes. DOJ's Office of Community Oriented Policing Services ("COPS Office") has since awarded hundreds of millions of dollars in COPS grants to Plaintiffs, enabling Plaintiffs to hire hundreds of additional police officers who work with community members to prevent and solve crime.

This year, the COPS Office again approved COPS grants for Plaintiffs, awarding millions of dollars to hire police officers and to help officers reduce qualify-of-life crimes by working more effectively with unhoused people. But Defendants added new conditions that fundamentally transform the awards. Defendants demand that Plaintiffs certify they comply with an immigration-related statute codified at 8 U.S.C. § 1373; do not operate "any" program "having components relating to diversity, equity, and inclusion" ("DEI") that Defendants deem unlawful; and comply with current and future executive orders and "Presidential Memoranda." Defendants also for the first time restricted grantees from using COPS funds to "promote gender ideology" or for other disfavored purposes. Defendants added these conditions and restrictions while at the same time suing Plaintiffs for allegedly violating 8 U.S.C. § 1373 and announcing their intent to sue grantees for treble damages under the False Claims Act based on anti-DEI certifications.

Plaintiffs Chicago and Saint Paul move for preliminary relief because they are faced with a Hobson's choice: accept Defendants' unlawful terms or forego millions of dollars in critical public safety funds. Plaintiffs must make this choice by December 22, 2025. Plaintiffs therefore

1

seek a preliminary injunction and/or stay prohibiting Defendants from imposing or enforcing the unlawful grant conditions during the pendency of this case.

Plaintiffs satisfy the requirements for preliminary relief. First, Plaintiffs are likely to succeed on the merits. Courts, including the Seventh Circuit, have invalidated substantively identical section 1373 certification conditions imposed against Plaintiffs. *E.g.*, *City of Chi. v. Barr*, 961 F.3d 882 (7th Cir. 2020); *City & Cnty. of S.F. v. Trump*, 2025 WL 1738675 (N.D. Cal. June 23, 2025). Courts in this District and elsewhere have likewise enjoined federal agencies from enforcing substantially similar DEI and executive order grant conditions, including in litigation filed by Plaintiffs. *E.g.*, *Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025) ("*King Cnty.*"), *appeal docketed*, No. 25-6428 (9th Cir.); *Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025) ("*CWIT*"), *appeal docketed*, No. 25-2144 (7th Cir.); *Hous. Auth. of City & Cnty. of S.F. v. Turner*, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025).

The result should be the same here. Defendants violated the separation of powers and acted *ultra vires* by imposing grant conditions that Congress did not authorize. Defendants violated the Spending Clause because the grant conditions are ambiguous and unrelated to the COPS Statute's purpose. Defendants violated the Administrative Procedure Act ("APA") too, failing to explain how the new conditions comport with the COPS Statute. And Defendants cannot enforce the 8 U.S.C. § 1373 certification condition because, as courts in this District have held, the statute is unconstitutional and lacks preemptive effect. *See United States v. Illinois*, 2025 WL 2098688 (N.D. Ill. July 25, 2025); *City of Chi. v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018).

Second, Plaintiffs will suffer irreparable harm absent preliminary relief. Plaintiffs must either accept Defendants' unlawful conditions or forego funding earmarked for hiring additional police officers and reducing quality-of-life crimes, undermining public safety. Defendants have

raised the stakes of this "choice" through their threats to pursue criminal penalties and treble damages under the False Claims Act based on certifications that Defendants deem inaccurate. And the 8 U.S.C. § 1373 certification condition would damage the trust between local police and immigrant communities that is essential to preventing and solving crime.

Third, the balance of the equities and the public interest favor preliminary relief. Plaintiffs' loss of vital public safety funds far outweighs any harm that Defendants would suffer from not being able to use grants as a cudgel to impose the Executive Branch's political agenda.

## BACKGROUND

### I.    Congress Has Long Funded COPS Grants to Promote Community Policing.

Congress enacted the COPS Statute to, among other objectives, "increase the number of law enforcement officers interacting directly with members of the community." Pub. Law No. 103-322 § 10002, 108 Stat. 1796 (1994). The COPS Statute directs the Attorney General to award grants to local governments and others for specified purposes. 34 U.S.C. § 10381(a). Those purposes include "to hire and train" law enforcement officers "for deployment in community-oriented policing," *id.* § 10381(b)(2), and to "enhance the ability of law enforcement agencies to address the mental health, behavioral, and substance abuse problems of individuals encountered by law enforcement officers." *Id.* § 10381(b)(20).

The COPS Office administers two programs that are at issue here. First, the COPS Hiring Program "advanc[es] public safety through community policing by funding additional full-time career law enforcement positions to meet law enforcement agencies' community policing strategies." Maulawin Dec., Ex. 1 at 1. Second, the COPS Community Policing Development Microgrant ("COPS Microgrant") program "develop[s] law enforcement's community policing capacity" in areas such as "Homelessness and Squatting." Bacher Dec., Ex. 1 at 8–9.

Plaintiffs have long relied on COPS Grants to protect their communities. For example, the Chicago Police Department has received more than $212 million from 13 COPS grants awarded since 2009, helping pay for 515 entry-level police officer positions. Maulawin Dec. ¶ 7. These officers have focused on targeting violent crime by developing stronger relationships with community members and thereby encouraging police-resident collaboration. *Id.* ¶¶ 8–10. The Saint Paul Police Department has likewise received millions of dollars in COPS Grants to, among other purposes, hire police officers and provide them with mental-health resources. Bacher Dec. ¶ 12.

## II.     Defendants Attached the Challenged Conditions to Plaintiffs' Awards.

In March 2025, Congress passed the Full-Year Continuing Appropriations and Extensions Act, allocating more than $417 million to the COPS Office. *See* Pub. L. No. 119-4, Div. A Tit. III § 1301(5), 139 Stat. 9 (2025). Pursuant to that appropriation, the COPS Office disseminated Notices of Funding Opportunity for COPS grants in May 2025. *E.g.*, Maulawin Dec. ¶ 11.

The Chicago Police Department applied for a COPS grant under the Hiring Program, requesting $6.25 million to pay the salaries and fringe benefits of 50 police officers. *Id.* ¶¶ 12–16. Saint Paul applied for a COPS grant under the Microgrants Program to support a "Downtown Homelessness Initiative" that would help officers work with unhoused people to decrease quality-of-life offenses. Bacher Dec. ¶¶ 14–15.

In October 2025, the COPS Office approved Chicago's application and awarded a Hiring Program grant. Maulawin Dec., Ex. 2. The COPS Office also awarded a Microgrants Program grant to Saint Paul for its Downtown Homelessness Initiative. Bacher Dec., Ex. 3.

The COPS grants include three identical conditions that Plaintiffs challenge here:

- The "Immigration Condition" provides, in part: "local government entity recipients of this award … must comply with 8 U.S.C. §1373, which provides that such entities may not prohibit,

4

or in any way restrict, any government entity or official from sending to, receiving from, maintaining, or exchanging information regarding citizenship or immigration status, lawful or unlawful, of any individual with components of the U.S. Department of Homeland Security or any other federal, state or local government entity." *E.g.*, Maulawin Dec., Ex. 2 at 5.

- The "Discrimination Condition" requires each Plaintiff to "certif[y] that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws." *Id.* at 5–6. The Condition requires Plaintiffs to agree that their "compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for the purposes of the False Claims Act." *Id.*

- The "Executive Order Condition" requires Plaintiffs to "comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President." *Id.* at 6.

In addition to these conditions, the Notices of Funding Opportunity for Plaintiffs' COPS grants include "Federal Funding Restrictions." *Id.*, Ex. 1 at 15. Those Restrictions prohibit Plaintiffs from using COPS funding (1) to "directly or indirectly" support schools that require students to receive "a COVID-19 vaccination to attend any in-person education program," (2) to "promote gender ideology," (3) for "projects that provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities," and (4) if they "failed to protect public monuments, memorials, and statues." *Id.* These Restrictions—together with the Immigration, Discrimination, and Executive Order Conditions—are the "Challenged Conditions."

## III. The Federal Government Has Repeatedly Tried and Failed to Enforce Section 1373.

The Immigration Condition implicates ordinances that limit the circumstances under which officers devote their scarce resources to assisting the federal government in enforcing federal civil

immigration law. *See* Compl. ¶¶ 50–61 (describing laws). Chicago's Welcoming City Ordinance provides that City employees shall not "participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law." Mun. Code of Chi. ("MCC") § 2-173-020(a). Saint Paul's "separation ordinance" provides that "the city does not operate its programs for the purpose of enforcing federal immigration laws." St. Paul Admin. Code Ch. 44.01.

Plaintiffs' laws seek to build trust between police and immigrant communities, thereby encouraging cooperation with police and promoting public safety. The Chicago City Council explained that directing local police to enforce federal civil immigration law would "chill[]" effective law enforcement because "fear of deportation" would lead "witnesses and victims" to avoid cooperation with police. J. Chi. Council 3-29-06, vol. I, at 74327. The Council later reiterated that in a city where one in five residents is an immigrant, "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems." MCC § 2-173-005. The Welcoming City Ordinance thus "promot[es] the safety of all [the City's] residents." *Id.*

Plaintiffs' policies are well-supported by empirical data. Many studies, corroborated by the experience of local law enforcement, confirm that immigration-related fears prevent witnesses, victims, and others from reporting crimes. *See, e.g.*, Compl. ¶ 62 (citing studies).

President Trump has nevertheless long sought to enforce 8 U.S.C. § 1373 against state and local governments. *See id.* ¶¶ 63–83. During President Trump's first term, DOJ inserted a section 1373 certification condition in grants awarded under the Byrne JAG program, which provides federal funding to support local law enforcement. *See Barr*, 961 F.3d at 888. Chicago sued to challenge the section 1373 certification and other conditions. The district court granted summary judgment for Chicago, holding that section 1373 "is unconstitutional under the anticommandeering

doctrine, and accordingly, the § 1373 compliance condition is *ultra vires* as the [Attorney] General lacks authority to demand compliance with an unconstitutional statute." *City of Chi. v. Barr*, 405 F. Supp. 3d 748, 762 (N.D. Ill. 2019); *accord Sessions*, 321 F. Supp. 3d 855. The Seventh Circuit affirmed, holding that Congress did not authorize the Attorney General to condition Byrne JAG grants on compliance with section 1373. *See Barr*, 961 F.3d at 931.

On the first day of his second term, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ("Invasion Executive Order"). The Invasion Executive Order directed the Attorney General to take "any lawful actions to ensure that so-called 'sanctuary' jurisdictions … do not receive access to Federal funds." *Id.* § 17. The Invasion Executive Order also directed the Attorney General to "evaluate and undertake any other lawful actions, criminal or civil, that [the Attorney General] deem[s] warranted" against "sanctuary" jurisdictions. *Id.*

In February 2025, Attorney General Bondi sent a memo (the "Bondi Directive") to all DOJ employees stating: "Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." Kane Dec., Ex. 1 at 1. The Bondi Directive defined "sanctuary jurisdictions" to "include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373 [or] refuse to certify compliance with § 1373." *Id.* at 2. The Directive mandated that DOJ "shall investigate" state and local actors for potential prosecution under section 1373 and other laws. *Id.* at 3. The Directive also required DOJ to "take legal action to challenge [local] laws, policies, and practices" that allegedly "impede lawful federal immigration operations." *Id.*

A federal court preliminarily enjoined enforcement of the Invasion Executive Order and Bondi Directive against Plaintiffs and others, holding that they likely violate the Constitution and APA. *See City & Cnty. of S.F. v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025), *appeal filed*, No.

25-3889 (9th Cir.); 2025 WL 2426858 (N.D. Cal. Aug. 22, 2025).

Meanwhile, the federal government sued Chicago and others. *See United States v. State of Ill.*, No. 25-1285 (N.D. Ill.). The complaint alleged that section 1373 preempts provisions in Chicago's Welcoming City Ordinance stating that Chicago employees may not, subject to exceptions, (a) "expend their time responding to ICE inquiries … regarding a person's custody status, release date, or contact information," or (b) "request, maintain, or share the citizenship or immigration status of any person." *Id.*, ECF No. 1 ¶ 66. The federal government later filed a similar lawsuit against Saint Paul and others. *See United States v. State of Minn.*, No. 25-3798 (D. Minn.).

The district court dismissed the federal government's lawsuit against Chicago, agreeing with courts that "have uniformly found" that section 1373 does not preempt local laws. *Illinois*, 2025 WL 2098688, at *13. The federal government has appealed. *See* Case No. 25-2904 (7th Cir.). The suit against Saint Paul remains pending.

Finally, President Trump issued an executive order asserting that "some State and local officials … violate, obstruct, and defy the enforcement of Federal immigration laws," which the order called "a lawless insurrection" that "often violate[s] Federal criminal laws." Exec. Order No. 14287 § 1, 90 Fed. Reg. 18761 (Apr. 28, 2025). The executive order directed the Attorney General to publish a list of so-called "sanctuary jurisdictions" and "pursue all necessary legal remedies and enforcement measures" against those jurisdictions. *Id.* §§ 2, 3(b). The Attorney General later published a list of so-called "sanctuary jurisdictions" that includes Chicago and Minnesota. *See* Kane Dec., Ex. 7.

## IV.   The Department of Justice Has Threatened Civil and Criminal Penalties Against Grantees That Certify Compliance with Anti-DEI Conditions.

In an executive order titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("DEI Order"), President Trump directed agency heads to include an anti-DEI term

in every grant award. Exec. Order No. 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025).

The DEI Order required the Director of the Office of Management and Budget ("OMB") to

"[e]xcise references to DEI and DEIA principles" from federal grants to, among other reasons,

"comply with civil-rights laws." *Id.* § 3(c)(ii). It also directed the OMB Director to "[t]erminate

all" programs related to "diversity," "equity," "equitable decision-making," or "advancing equity,"

as "appropriate," without regard to whether the programs violate federal law. *Id.* § 3(c)(iii).

According to the Attorney General, the DEI Order "mak[es] clear that policies relating to

'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility'

('DEIA') 'violate the text and spirit of our … Federal civil-rights laws.'" Kane Dec., Ex. 2 at 1.

In May 2025, the Deputy Attorney General announced a "Civil Rights Fraud Initiative"

that will "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any

recipient of federal funds that knowingly violates civil rights laws." Kane Dec., Ex. 3 at 2. The

memo asserted that the False Claims Act—which permits treble damages, 31 U.S.C.

§ 3729(a)(1)—"is implicated whenever federal-funding recipients or contractors certify

compliance with civil rights laws" while knowingly engaging in "diversity, equity, and inclusion

(DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." Kane Dec.,

Ex. 3 at 1. The memo explained that "[t]he Civil Fraud Section and the Civil Rights Division will

also engage with the Criminal Division." *Id.* at 2. The Department of Justice's Civil Division later

asserted that it would dedicate "all available resources" to "pursue False Claims Act violations

against recipients of federal funds that knowingly violate civil rights laws." *Id.*, Ex. 5 at 1.

The Department of Justice has already initiated investigations for allegedly unlawful DEI

practices, or even for simply highlighting existing diversity, based on the Department's new

interpretation of federal civil rights law. For example, in May 2025, the Department of Justice sent

9

a letter to Chicago Mayor Brandon Johnson announcing "an investigation to determine whether [Chicago] is engaged in a pattern or practice of discrimination based on race, in violation of Title VII." *Id.*, Ex. 4 at 1. The letter explained that the investigation "is based on" Mayor Johnson's alleged remarks highlighting the number of Black officials in the Mayor's administration. *Id.*

## ARGUMENT

A preliminary injunction is warranted where (1) the movant is likely to succeed on the merits, (2) irreparable harm is likely absent preliminary relief, (3) the balance of equities tips in the movant's favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The standard is the same for an application for a stay under section 705 of the APA." *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## I.     The Court Has Jurisdiction.

Plaintiffs' claims "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, are subject to the APA's waiver of sovereign immunity, 5 U.S.C. § 702, and thus are within this Court's jurisdiction. In other federal funding cases, the Administration has argued that the Tucker Act—which confers jurisdiction on the Court of Federal Claims for damages claims founded upon a contract with the United States, 28 U.S.C. § 1491(a)(1)—precludes district-court jurisdiction. But district courts have "with near or total uniformity" exercised jurisdiction over injunctive claims challenging "unlawful grant conditions." *Hous. Auth.*, 2025 WL 3187761, at *9 (citing cases); *see also, e.g.*, *California v. U.S. Dep't of Transp.*, 2025 WL 3072541, at *4– *5 (D.R.I. Nov. 4, 2025); *CWIT*, 778 F. Supp. 3d at 980–82; *cf. Barr*, 961 F.3d 882 (resolving claims challenging grant conditions without addressing the Tucker Act).

The result should be the same here. Plaintiffs allege that Defendants' ***pre*-contract

imposition of the Challenged Conditions violates the Constitution and APA. And Plaintiffs seek a purely equitable remedy—removal of the Challenged Conditions—not money damages. *See City of Chi. v. DHS*, 2025 WL 3043528, at *4–*12 (N.D. Ill. Oct. 31, 2025).

Another judge in this District, operating under a highly compressed TRO schedule, questioned whether jurisdiction existed over a challenge to grant conditions. *See Chi. Hous. Auth. v. Turner*, 2025 WL 2972665, at *3 (N.D. Ill. Oct. 20, 2025). The order relied on decisions finding that APA claims challenging grant terminations were really breach-of-contract claims subject to the Tucker Act. *E.g.*, *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*"); *Dep't of Educ. v. California*, 604 U.S. 650 (2025). Unlike backward-looking grant-termination suits, however, claims challenging grant conditions do not allege a breach of contract "because no such contract (i.e., executed grant agreement) yet exists." *California v. DOT*, 2025 WL 3072541, at *5.

In any event, *NIH* and *Department of Education* did not address constitutional claims. The Court of Federal Claims lacks jurisdiction to resolve Plaintiffs' constitutional claims, *see LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), and "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). Moreover, the *NIH* order stated that district courts likely have jurisdiction over challenges to "policies related to grants." 145 S. Ct. at 2661 (Barrett, J., concurring). Plaintiffs challenge Defendants' policy decision to adopt the Challenged Conditions, giving the Court jurisdiction over their claim. *See President & Fellows of Harvard Coll. v. HHS*, 2025 WL 2528380, at *12 (D. Mass. Sept. 3, 2025).

## II.     Plaintiffs Will Likely Succeed on the Merits.

### A.     Defendants Violated the Separation of Powers and Acted Ultra Vires.

"The authority to pass laws and the power of the purse rest in the legislative not the executive branch." *Barr*, 961 F.3d at 892. Federal agencies are "charged with administering congressional statutes," so "their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). When an agency acts "beyond what Congress has permitted it to do," the action is "ultra vires." *Id.* at 297–98. Defendants violated the separation of powers and acted *ultra vires* because Congress did not authorize Defendants to impose the Challenged Conditions. *See* 34 U.S.C. § 10381 *et seq.*

In fact, the Challenged Conditions contradict Congress's directives in the COPS Statute. For example, Congress required COPS grant applicants to "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." *Id.* § 10382(c)(11). Thus, contrary to the Discrimination Condition, the COPS Statute "requires consideration of diversity." *Hous. Auth.*, 2025 WL 3187761, at *11.

Similarly, far from authorizing the Immigration Condition, Congress repeatedly rejected bills "'seeking to condition federal funding on compliance with 8 U.S.C. § 1373,'" *Barr*, 961 F.3d at 902, including failed attempts to condition COPS funding specifically. *E.g.*, *Enforce the Law for Sanctuary Cities Act*, H.R. 3009, 114th Cong. § 3 (2015). Interpreting the COPS Statute to authorize the Immigration Condition "would thus allow the Executive Branch to override Congress's refusal to endorse section 1373 compliance and would effectively 'legislate' a different result." *Barr*, 961 F.3d at 903. After the COPS Office sent Notices of Funding Opportunity for Plaintiffs' grants, the "One Big Beautiful Bill Act" appropriated funds for COPS and Byrne JAG

grants that are conditioned on "compliance, as determined by the Attorney General, with … 8 U.S.C. 1373." Pub. Law No. 119-21 § 100054(5)(C), 139 Stat. 72, 390. Plaintiffs' COPS grants are funded through a prior appropriations law, but the One Big Beautiful Bill Act further confirms that Congress did not authorize DOJ to attach the Immigration Condition to COPS grants.

Moreover, "the Attorney General has *singled out* § 1373 and required a separate certification of compliance for that statute alone, with penalties for false statements or omissions ranging from civil penalties to criminal prosecution." *Barr*, 961 F.3d at 904. To be sure, unlike the formula Byrne-JAG grants at issue in *Barr*, COPS grants are awarded on a competitive basis. But the penalty for violating the section 1373 condition "is not a penalty set forth by Congress" under either Byrne JAG or the COPS Statute. *Id.* at 905. "The potential for abuse is apparent," allowing Defendants to "hijack[]" the COPS Statute "to further particular policy goals of the Executive, despite the repeated refusal of Congress to impose such a prerequisite itself." *Id.*

In addition, Congress has clarified that no federal law "shall be construed to authorize [the federal government] to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). The "incorporation of § 1373" in the Immigration Condition "directly conflicts" with section 10228 because "the Attorney General seeks to prohibit" Plaintiffs "from providing certain instructions and limitations on the actions of its own police force, thus exercising 'direction, supervision, or control' over that police force." *Barr*, 961 F.3d at 908.[1]

In sum, Defendants' "use of extra-statutory conditions on federal grant awards as a tool to

---

[1] *City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019), is not to the contrary. There, a divided panel applied *Chevron* deference in holding that the COPS Statute allowed DOJ to give additional points to grant applicants that certified they would help federal immigration agents, putting applicants that declined to do so at a "slight competitive disadvantage." *Id.* at 1174. The Supreme Court since overruled *Chevron*, however, and Defendants now demand that grantees Defendants already found qualified for COPS grants sign the Immigration Condition or lose their grants—far more than a "slight competitive disadvantage."

obtain compliance with [their] policy objectives" usurps Congress's "power of the purse" and "strikes at the heart of … the separation of powers." *Barr*, 961 F.3d at 892; *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).

### B. Defendants Violated the Spending Clause.

Even if Congress had delegated authority to Defendants to impose the Challenged Conditions, the Conditions exceed constitutional limits on the Spending Power. Under the Spending Clause, grant conditions must be (1) unambiguous, (2) related to the subject matter of the grant program, and (3) identified before a recipient enters into the grant agreement. *See South Dakota v. Dole*, 483 U.S. 203, 207–208, 211 (1987); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The Challenged Conditions violate these requirements.

### 1. The Challenged Conditions Are Impermissibly Ambiguous.

"[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17; *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (holding that grantees must be able to "clearly understand … the obligations of the [conditions]"). The Challenged Conditions are impermissibly ambiguous.

The Immigration Condition requires Plaintiffs to certify compliance with section 1373 but does not explain Defendants' interpretation of the statute. The federal government sued Plaintiffs, alleging that section 1373 requires Plaintiffs to share information about a person's custody status, release date, or contact information. Judge Jenkins rejected that theory, *Illinois*, 2025 WL 2098688, at *10–*13, but DOJ appealed. Plaintiffs thus face ongoing uncertainty about what DOJ is asking Plaintiffs to certify. *See Illinois v. FEMA*, 2025 WL 2716277, at *2, *14 (D.R.I. Sept. 24, 2025) (holding a section 1373 certification condition violated the Spending Clause because the agency did not "defin[e] what compliance entails"); *City & Cnty. of S.F. v. Sessions*, 349 F. Supp.

14

3d 924, 934, 958 (N.D. Cal. 2018) (citing "DOJ's evolving interpretations of the [section 1373] certification condition" in holding that the condition violated the Spending Clause), *vacated in part on other grounds sub nom. City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

The Discrimination Condition requires Plaintiffs to certify that they do not operate any unlawful programs "having components relating to diversity, equity, and inclusion," but does not define those terms. Because these terms "are so broad and involve inherent value judgments, they leave regulated persons without proper notice of what conduct they must certify they are not engaging in, and they empower the government to enforce the [c]ertification [r]equirement arbitrarily." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 2025 WL 2374697, at *31 (D. Md. Aug. 14, 2025), *appeal filed*, No. 25-2228 (4th Cir.); *see Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 2025 WL 1822487, at *17 (D. Mass. July 2, 2025) (calling the attempt to align with the President's "EOs concerning DEI" a "fool's errand" because "they do not even attempt to define DEI").

Nor does the Discrimination Condition's reference to "applicable Federal civil rights or nondiscrimination laws" eliminate the ambiguity. One court understood a similar reference as a "polic[y]" announcement "rather than as limits to the scope of the new conditions." *City of Fresno v. Turner*, 2025 WL 2721390, at *8 (N.D. Cal. Sept. 23, 2025). That understanding is consistent with Defendants' apparent view that DEI programs are generally illegal. *E.g.*, Kane Dec., Ex. 2 at 1. It also comports with Defendants' retention of separate conditions requiring compliance with specified "federal civil rights and nondiscrimination statutes." Maulawin Dec., Ex. 2 at 6–7. There should be no need for the Discrimination Condition if DEI programs also violate federal anti-discrimination laws. *See Call v. Ameritech Mgmt. Pension Plan*, 475 F.3d 816, 821 (7th Cir. 2007) (rejecting an interpretation that makes a "section superfluous").

In any case, "what might make any given 'DEI' program violate Federal anti-

15

discrimination laws" in Defendants' view "is left entirely to the grantee's imagination." *CWIT*, 778 F. Supp. 3d at 984. The Attorney General offered "guidance" that purports to "clarif[y] the application of federal antidiscrimination laws to [DEI] programs," Kane Dec., Ex. 6 at 1, but that guidance is itself vague and "is inconsistent with Supreme Court precedent." *Hous. Auth.*, 2025 WL 3187761, at *14 (citing example); *see also* Compl. ¶ 106.

The Discrimination Condition's ambiguity is particularly problematic because it requires Plaintiffs to agree that their certification is "material" under the False Claims Act; DOJ has threatened False Claim Act and criminal penalties against grantees that certify compliance with anti-DEI conditions; and DOJ has already initiated investigations for allegedly unlawful DEI practices. The Discrimination Condition thus leaves Plaintiffs "at the mercy of Defendants' interpretation [of those laws], regardless of how those laws are interpreted by the courts," even though Defendants' interpretations are "inconsistent with well-established legal precedent." *King Cnty.*, 2025 WL 2322763, at *12–*13. "Plaintiffs, caught between the statutes promulgated by Congress and interpreted by the Courts, and the Administration's attempts to overwrite those interpretations by fiat, are left in an impossible position." *Hous. Auth.*, 2025 WL 3187761, at *14.

The Executive Order Condition is ambiguous too, requiring Plaintiffs to comply with all "Presidential Memoranda" and executive orders. As an initial matter, "an executive order is not 'law,' within the meaning of the Constitution," *California v. EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023), and none of President Trump's executive orders impose direct obligations on grantees. Beyond this, courts have repeatedly enjoined conditions requiring compliance with executive orders as "impermissibly vague because they incorporate the equally vague language of the EOs themselves" and "do not explain *how* the EOs are applicable to grantees." *Fresno*, 2025 WL 2721390, at *15; *accord R.I. Coal. Against Domestic Violence v. Kennedy*, 2025 WL 2988705, at

16

*9 (D.R.I. Oct. 23, 2025). For example, the President's executive orders do not explain what it means to "promote," "encourage," or "facilitate" "racial preferences," "denial … of the sex binary … or the notion that sex is a chosen or mutable characteristic," or "initiatives that compromise public safety or promote anti-American values." Exec. Order No. 14332 § 4(b), 90 Fed. Reg. 38929, 38931 (Aug. 7, 2025). Plaintiffs are thus "'left to guess whether, and how, a particular EO applies to [their] conduct and risk [] loss of critical federal funding and FCA liability if [they] guess[] incorrectly.'" *Hous. Auth.*, 2025 WL 3187761, at *13. Plaintiffs likewise must guess what "Presidential Memoranda" are because the Executive Order Condition offers no definition.

The Federal Funding Restrictions are also ambiguous. For instance, the Restrictions prohibit using COPS funding to "promote gender ideology" but do not define that term. In fact, "gender ideology" "is likely undefinable" because it "lacks scientific or any other discernable basis" and is thus "too vague to give Plaintiff[s] notice of what [Defendants] expect[] from them." *State of Wash. v. HHS*, 2025 WL 3002366, at *23 (D. Or. Oct. 27, 2025); *accord, e.g.*, *R.I. Coal. Against Domestic Violence*, 2025 WL 2988705, at *9.

## 2. The Challenged Conditions Are Unrelated to the Grants' Purposes.

The Challenged Conditions also violate the Spending Clause's requirement that grant conditions be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citation omitted). This requirement is crucial: absent "some relationship" between spending conditions and "the purpose of the federal spending," "the spending power could render academic the Constitution's other grants and limits of federal authority." *Id.* at 167.

The Immigration Condition is not germane to the COPS program. Congress enacted the COPS Statute to "improve cooperative efforts" between local "law enforcement agencies and

17

*members of the community* to address *crime*." Pub. Law No. 103-322, 108 Stat. at 1807–08 (emphases added). By contrast, the Immigration Condition seeks local law enforcement assistance with *federal authorities* enforcing federal *civil* immigration law. *See Barr*, 961 F.3d at 887 ("[t]he Byrne JAG grant was enacted by Congress to support the needs of local law enforcement to help fight crime, yet it now is being used as a hammer to further a completely different policy of the executive branch"); *City & Cnty. of S.F*, 2025 WL 1738675, at *3 (preliminarily enjoining DHS from applying section 1373 and other conditions to emergency-preparedness grants that have "no nexus to immigration enforcement"); *Illinois v. FEMA*, 2025 WL 2716277, at *14 (same).

Far from being germane, the Immigration Condition contravenes the COPS Statute's purpose by promoting local police assistance with federal civil immigration enforcement. That undermines the "relationship of trust" between police and the immigrant community that is essential to public safety. *City of Chi. v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018).

Furthermore, the Immigration Condition prohibits Plaintiffs from restricting any employees—not just police officers—from spending their time providing information to federal civil immigration authorities. There is no conceivable relationship between the COPS program and the conduct of, for example, employees in Plaintiffs' streets-and-sanitation departments. *See Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 3d 1034, 1055–56 (D. Colo. 2020). The Immigration Condition is even further removed from the COPS Statute's crime-fighting purpose because section 1373 "applies to 'any individual,' including non-criminal immigrants and United States citizens alike." *City & Cnty. of S.F.*, 349 F. Supp. 3d at 961.

Nor is there a reasonable relationship between the COPS Statute and the other Challenged Conditions. On the contrary, the Discrimination Condition contravenes Congress's mandate that grantees use DEI practices in hiring police officers. *See* 34 U.S.C. § 10382(c)(11).

18

The Discrimination Condition is divorced from Congress's purpose for yet another reason: the Condition applies to "any" programs that Plaintiffs operate, even programs that use only non-federal funds. The federal government acknowledged as much in stating that a similar anti-DEI provision applies "irrespective of whether the program is federally funded." *CWIT*, 778 F. Supp.3d at 984. There is no relationship between the purposes behind Congress's appropriation of federal funding for COPS grants and programs that Plaintiffs operate using other funding sources.

### 3. The Executive Order Condition is Not Limited to Existing Orders.

The Spending Clause prohibits Defendants from imposing "'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. The Executive Order Condition does not, however, limit its applicability to existing executive orders or "Presidential Memoranda." Plaintiffs cannot know and understand their obligations if those obligations are imposed after Plaintiffs sign a grant agreement.

### C. Defendants Violated the APA.

### 1. Defendants Exceeded Their Authority and Acted Contrary to Law.

The APA prohibits agency actions that are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory … authority." 5 U.S.C. § 706(2)(A)–(C). Courts have repeatedly held that federal agencies likely violated these prohibitions in implementing conditions like the Challenged Conditions. *E.g.*, *Hous. Auth.*, 2025 WL 3187761, at *18; *Fresno*, 2025 WL 2721390, at *10–*12; *King Cnty.*, 2025 WL 2322763, at *11–*15; *City & Cnty. of S.F.*, 2025 WL 1738675, at *1. For the reasons explained above, the result should be the same here.

### 2. Defendants' Actions are Arbitrary and Capricious.

Agency action is arbitrary and capricious where the action is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). An agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not

19

intended it to consider" nor simply ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies may change existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have considered "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Defendants did not insert the Challenged Conditions in FY 2024 COPS Grants, and in some cases have never done so. The Challenged Conditions therefore "reflect changes in agency position which require not only an explanation of reasoning but also consideration of reliance interests." *Fresno*, 2025 WL 2721390, at *8. Defendants have neither explained how the Challenged Conditions are consistent with the COPS Statute nor why they applied the Discrimination Condition to "any" grantee programs, regardless of whether those programs are federally funded.

Moreover, Plaintiffs have long received COPS grants, which have been critical in adding hundreds of police officers and reducing crime. *See* Maulawin Dec. ¶¶ 7–10; Bacher Dec. ¶ 12. Yet Defendants apparently ignored Plaintiffs' reliance interests in imposing the Challenged Conditions. This "failure to even consider reasons to not impose the contested conditions highlights the arbitrariness of the process." *Illinois v. FEMA*, 2025 WL 2716277, at *12.

### D. The Immigration Condition Imposes No Obligations.

The Court should enjoin Defendants from enforcing the Immigration Condition for another reason: the Immigration Condition requires compliance with section 1373, but that law imposes no obligations on Plaintiffs. That is true for two independent reasons.

First, Judge Jenkins dismissed the federal government's lawsuit against Chicago because section 1373 does not preempt the Welcoming City Ordinance. *See Illinois*, 2025 WL 2098688, at *13–*16. Collateral estoppel "applies to prevent" Defendants from relitigating that determination

in this case. *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014) (reciting elements). Although the federal government has appealed the *Illinois* judgment and may contest Judge Jenkins' ruling in that appeal, "'an appeal does not suspend the operation of a final judgment for collateral estoppel purposes.'" *Prymer v. Ogden*, 29 F.3d 1208, 1213 n.2 (7th Cir. 1994); *see also Midwest Operating Eng'rs v. Dredge*, 147 F. Supp. 3d 724, 736–37 (N.D. Ill. 2015).

Beyond collateral estoppel, Judge Jenkins was correct. In *Murphy v. NCAA*, 584 U.S. 453, 477 (2018), the Supreme Court held that for a federal statute to preempt state law, the statute must "be best read as one that regulates private actors" rather than government entities or officials. *See also McHenry Cnty. v. Raoul*, 44 F.4th 581, 588 (7th Cir. 2022) ("a valid preemption provision is one that regulates private actors"). This rule "derives from the Constitution, which 'confers upon Congress the power to regulate individuals, not States.'" *Illinois*, 2025 WL 2098688, at *14 (quoting *New York*, 505 U.S. at 166). "It also reinforces the anticommandeering doctrine, which preserves dual sovereignty by prohibiting federal command of States as sovereigns (rather than market participants)." *Id.*

Applying this law, courts "have uniformly found that § 1373 is not a preemptive provision." *Id.* at *13 (citing cases). "The plain text of § 1373 only operates on State and local government entities and officials, prohibiting restrictions on their ability to share certain immigration-related information with DHS." *Id.* at *14. "By contrast, § 1373 doesn't alter what private individuals can or cannot do or affect their citizenship or immigration status." *Id.* at *15. There is thus "no way to read § 1373 as regulating anyone other than States and their political subdivisions," which "nullifies § 1373 as a preemption provision." *Id.* at *16.

Second, as Judge Leineweber and many other courts have held, section 1373 violates the

21

Tenth Amendment. *See Sessions*, 321 F. Supp. 3d at 869–73;[2] *see also Illinois*, 2025 WL 2098688, at *16 (section 1373 is "in tension with the Tenth Amendment"). These decisions are correct. In *Murphy*, the Supreme Court applied the anticommandeering doctrine to invalidate a federal statute that prohibited States from enacting a law (one authorizing sports gambling). 584 U.S. at 481. Section 1373 is structured the same way, prohibiting state and local governments from enacting a law (one prohibiting sharing or maintaining citizenship or immigration status information). As in *Murphy*, there is "simply no way to understand" these provisions prohibiting state and local legislation "as anything other than a direct command to the States. And that is exactly what the anticommandeering rule does not allow." *Id.* at 480.

Personnel decisions, moreover, are "of the most fundamental sort" to state sovereignty. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). But by preventing Plaintiffs from restricting certain employee conduct, section 1373 effectively "eliminates [Plaintiffs'] ability to control [their] employees' communications," and thereby "effects a federally-imposed restructuring of power within state government." *Sessions*, 321 F. Supp. 3d at 870. That is untenable because "[a] state's ability to control its officers and employees lies at the heart of state sovereignty." *Id.* at 869.

To be sure, Judge Leinenweber withdrew his declaratory judgment that section 1373 is unconstitutional as unnecessary to provide the City with complete relief. *See City of Chi. v. Barr*, 513 F. Supp. 3d 828, 832–33 (N.D. Ill. 2021). But the Seventh Circuit called Judge Leinenweber's analysis "compelling," and the Seventh Circuit's own analysis supports Judge Leinenweber's

---

[2] *See Oregon v. Trump*, 406 F. Supp. 3d 940, 971 (D. Or. 2019), *aff'd in part, vacated in part sub nom. City & Cnty. of S.F. v. Garland*, 42 F.4th 1078 (9th Cir. 2022); *City of L.A. v. Sessions*, 2019 WL 1957966, at *4 (C.D. Cal. Feb. 15, 2019); *City of Phila. v. Sessions*, 309 F. Supp. 3d 289, 331 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds sub nom. City of Phila. v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019; *City & Cnty. of S.F.*, 349 F. Supp. 3d at 953; *see also United States v. California*, 314 F. Supp. 3d 1077, 1101 (E.D. Cal. 2018) (finding Section 1373 "highly suspect"), *aff'd on other grounds*, 921 F.3d 865 (9th Cir. 2018).

declaratory judgment. *Barr*, 961 F.3d at 898. The Seventh Circuit explained that "[t]he burden of [a section 1373 certification] requirement is not insignificant" because a "local government could not instruct its own employees that they must devote their time to law enforcement tasks that it deems a higher priority rather than respond to those information requests from ICE." *Id.* at 896. "That restriction of the state or local government would constitute direction or control over the communications by the state or local police force." *Id.* at 909. Accordingly, section 1373 "is wholly invalid and cannot be applied to anyone." *Ezell v. City of Chi.*, 651 F.3d 684, 698 (7th Cir. 2011).

### III. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief.

The Challenged Conditions irreparably harm Plaintiffs in three principal ways. First, "irreparable harm is presumed" when defendants violate constitutional provisions that protect "intangible and unquantifiable interests." *Id.* at 699. "The separation of powers is one such interest." *CWIT*, 778 F. Supp. 3d at 993. "By protecting against 'the concentration of power' that 'would allow tyranny to flourish,' it is 'one of the most vital of the procedural protections of individual liberty found in our Constitution.'" *Id.* (quoting *Barr*, 961 F.3d at 892). Defendants have committed "a clear separation of powers violation" while also violating the Spending Clause. *Id.* "Thus, no further showing of irreparable injury or inadequacy of legal remedies is required." *Id.*

Second, Defendants have required Plaintiffs to either accept the Challenged Conditions or lose funding earmarked for vital public safety services. This "Hobson's choice" is irreparable injury. *City of Chi. v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017). "Even if Plaintiffs chose to try to comply with the Grant Conditions," the "uncertainty as to whether the Defendant agencies will consider [the] conditions satisfied creates irreparable injury not just in the form of constitutional injury." *Fresno*, 2025 WL 2721390, at *19. Rather, "the uncertainty also interferes with Plaintiffs' ability to budget, plan for the future, and properly serve their residents." *Id.*

23

(cleaned up); *see also City of Evanston v. Barr*, 412 F. Supp. 3d 873, 886–87 (N.D. Ill. 2019).

Absent COPS funding, Saint Paul could not implement its plan to address chronic homelessness, harming unhoused people. Bacher Dec. ¶¶ 20, 24. Losing COPS funding would also harm public safety while further burdening Plaintiffs' existing officers. *See* Maulawin Dec. ¶¶ 19, 21. Plaintiffs face strained budgets already, such that using other funds to replace these grants may not be feasible. *Id.* ¶ 20. And the uncertainty created by the Challenged Conditions undermines Plaintiffs' ability to do long-term planning for Plaintiffs' public-safety programs. *Id.* ¶ 21.

Third, the Immigration Condition "would damage local law enforcement's relationship with immigrant communities and decrease the cooperation essential to prevent and solve crimes both within those communities and [Plaintiffs' cities] at large." *Sessions*, 321 F. Supp. 3d at 877. Plaintiffs "have concluded that the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein—and those localities are clearly in the best position to determine the security needs of their own communities." *Sessions*, 888 F.3d at 291. "Such trust, once destroyed by the mandated cooperation and communication with the federal immigration authorities, would not easily be restored." *Id.*

## IV. The Balance of Hardships and Public Interest Favor Preliminary Relief.

When deciding whether to grant an injunction, courts "balance the competing claims of injury … the effect on each party of the granting or withholding of the requested relief … [and] pay particular regard [to] the public consequences." *Winter*, 555 U.S. at 24 (cleaned up). Injunctions protecting the separation of powers "'are always in the public interest.'" *CWIT*, 778 F. Supp. 3d at 993; *see Barr*, 961 F.3d at 918 (affirming ruling that "the public interest was served by an injunction in that it acts as a check on the executive's encroachment of congressional power that violates the separation of powers"). And where (as here) the movant establishes a likelihood

of success on a constitutional claim, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *CWIT*, 778 F. Supp. 3d at 993 (quoting *Am. Civil Liberties Union v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012)).

Beyond this, Defendants' actions force Plaintiffs to either (a) accept conditions that Plaintiffs believe to be unlawful, risking treble-damages suits and even criminal penalties if Defendants disagree with Plaintiffs' certifications, or (b) forego critical funding, impairing Plaintiffs' budgets and undermining public safety. By contrast, "a preliminary injunction will not prevent the government from enforcing existing anti-discrimination laws" or any other existing laws. *CWIT*, 778 F. Supp. 3d at 993. Moreover, other federal agencies have complied with court orders preliminarily enjoining those agencies from enforcing similar grant conditions on Plaintiffs and others, undercutting the notion that a preliminary injunction would cause any significant hardship to Defendants here. Defendants can simply "distribute the funds without mandating the conditions—as has been done for[ever]." *Sessions*, 888 F.3d at 291.

## CONCLUSION

Plaintiffs request that the Court grant Plaintiffs' motion for a preliminary injunction and a stay pursuant to 5 U.S.C. § 705.

Dated: November 17, 2025   Respectfully submitted,

           Mary B. Richardson-Lowry
           Corporation Counsel of the City of Chicago

           By: */s/ Stephen Kane*
           Stephen Kane (IL Bar No. 6272490)
           Chelsey Metcalf (IL Bar No. 6337233)
           Rebecca Hirsch (IL Bar No. 6279592)
           Laura Geary (IL Bar No. 6351762)
           City of Chicago Department of Law

121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (313) 744-9484
stephen.kane@cityofchicago.org
chelsey.metcalf@cityofchicago.org
rebecca.hirsch2@cityofchicago.org
laura.geary@cityofchicago.org

LYNDSEY OLSON
Saint Paul City Attorney

By:  /s/ *Kelsey McElveen*
KELSEY MCELVEEN *
Assistant City Attorney
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone:     (651) 266-8710
Facsimile:      (651) 298-5619
E-Mail:          Kelsey.McElveen@ci.stpaul.mn.us
*Attorneys for Plaintiff City of Saint Paul*

* Admitted pro hac vice

26