**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CITY OF CHICAGO and CITY OF SAINT PAUL,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE;
PAMELA JO BONDI, in her official capacity;
OFFICE OF COMMUNITY ORIENTED
POLICING SERVICES; and CORY D.
RANDOLPH, in his official capacity,

Defendants.

Civil Action No. 1:25-cv-13863

Hon. Jorge L. Alonso

**DECLARATION OF STEPHEN KANE**

I, Stephen Kane, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      I am a Deputy Corporation Counsel in the City of Chicago's Department of Law,
which is counsel of record for Plaintiff City of Chicago in this action. I make this declaration of
my own personal knowledge. If called on to do so, I could and would testify to the matters stated
here.

2.      Attached as Exhibit 1 is a memorandum issued by Attorney General Pamela Bondi
titled "Sanctuary City Directives," dated February 5, 2025, and publicly available at
www.justice.gov/ag/media/1388531/dl?inline.

3.      Attached as Exhibit 2 is a memorandum issued by Attorney General Pamela Bondi
titled "Ending Illegal DEI and DEIA Discrimination and Preferences," dated February 5, 2025,
and publicly available at www.justice.gov/ag/media/1388501/dl.

4.      Attached as Exhibit 3 is a memorandum issued by Deputy Attorney General Todd
Blanche titled "Civil Rights Fraud Initiative," dated May 19, 2025, and publicly available at

www.justice.gov/dag/media/1400826/dl.

5.      Attached as Exhibit 4 is a letter from Assistant Attorney General Harmeet K. Dhillon to Chicago Mayor Brandon Johnson, dated May 19, 2025, and publicly available at www.justice.gov/crt/media/1400811/dl?inline.

6.      Attached as Exhibit 5 is a memorandum issued by Assistant Attorney General Brett Shumate titled "Civil Division Enforcement Priorities," dated June 11, 2025, and publicly available at www.justice.gov/civil/media/1404046/dl.

7.      Attached as Exhibit 6 is a memorandum issued by Attorney General Pamela Bondi titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination," dated July 29, 2025, and publicly available at www.justice.gov/ag/media/1409486/dl.

8.      Attached as Exhibit 7 is a document on the United States Department of Justice's website titled "U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities From Criminal Aliens," publicly available at www.justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities?utm_medium=email&utm_source=govdelivery.


I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.


Executed on November 17, 2025, in Chicago, Illinois.


_____
Stephen Kane

# EXHIBIT 1



# Office of the Attorney General
## Washington, D. C. 20530

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:          THE ATTORNEY GENERAL

SUBJECT:       SANCTUARY JURISDICTION DIRECTIVES[1]

      Unlawful border crossings and illegal migration into the United States have reached record levels, resulting in a substantial and unacceptable threat to our national security and public safety. To protect the American people from the effects of unlawful mass migration, President Trump has prioritized securing our Nation's borders and enforcing federal immigration laws. In furtherance of that objective, the Department of Justice will ensure that, consistent with law, "sanctuary jurisdictions" do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.[2] In carrying out this directive, each component shall comply with any notice and procedural requirements in the award, agreement, or other instrument.

## I.     End Funding to State and Local Jurisdictions That Unlawfully Interfere with Federal Law Enforcement Operations

      Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice. The Department will exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations. *See New York v. Dep't of Justice*, 951 F.3d 84, 111 (2d Cir. 2020) ("Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so.").

      Federal law provides that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

[2] This memorandum rescinds, effective today, any inconsistent previous memoranda, policies, or guidance documents of the Department of Justice.

individual." 8 U.S.C. § 1373(a).  So-called "sanctuary jurisdictions" include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws.  Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a).  Within 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies.

Additionally, to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration.  The Department will also seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions.

## II.       Identify and Evaluate All Funding Agreements with Non-Governmental Organizations That Provide Support to Illegal Aliens

All Department components that provide federal funding to non-governmental organizations shall immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens.  For any such agreement, each component shall, to the extent consistent with applicable statutes, regulations, court orders, and terms:

(1) Pause any further distribution of funds for 60 days after complying with any notice and procedural requirements.

(2) Identify non-governmental organization(s) receiving funding from the Department and describe the support or services provided.  The component shall direct each organization to report whether the disbursed funds: (a) were provided in accordance with applicable laws; (b) resulted in the provision of any funds or services to removable or illegal aliens; (c) resulted in or were the subject of waste, fraud, or abuse; and (d) promoted or facilitated violations of our immigration laws.  The component shall further direct each organization to certify that it will not use any remaining funds to promote or facilitate the violation of Federal immigration law.

(3) Compile information set forth at (2) above and submit it to the Associate Attorney General within 45 days of this memorandum.

Upon completion of this process, the Associate Attorney General, in consultation with the Deputy Attorney General, shall determine which (if any) agreements to terminate and whether to resume funding of any remaining agreements, consistent with applicable statutes, regulations, and terms.

Effective immediately, consistent with applicable law, the Department of Justice shall not enter into any new contract, grant, or other agreement to provide Federal funding to non-

governmental organizations that support or provide services, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable or illegal aliens.

### III. Pursue Enforcement Actions Against Jurisdictions That Facilitate Violations of Federal Immigration Laws or Impede Lawful Federal Immigration Operations

Actions that impede federal efforts to enforce immigration law threaten public safety and national security. State and local jurisdictions must comply with applicable immigration-related federal laws. State and local actors may not impede, obstruct, or otherwise fail to comply with lawful immigration-related directives pursuant to the President's Article II authority to ensure national security, the Immigration and Nationality Act, or other authorities.

All litigating components of the Department of Justice and each U.S. Attorney's Office shall investigate incidents involving any such misconduct and shall, where supported by the evidence, prosecute violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373. All declination decisions with respect to any effort to obstruct or fail to comply with a lawful immigration-related directive from the Executive Branch shall be promptly reported pursuant to Justice Manual § 1-13.130.

The Civil Division shall, in coordination with the Sanctuary Cities Enforcement Working Group, identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations. Where appropriate, the Civil Division shall take legal action to challenge such laws, policies, or practices. Attorneys tasked to the Sanctuary Cities Enforcement Working Group shall regularly report to the Associate Attorney General and the Deputy Attorney General their progress regarding the review of state and local laws, policies, and practices, and shall promptly report any decisions not to pursue enforcement actions against state and local jurisdictions found to be facilitating violations of federal immigration laws or impeding lawful federal immigration operations.

**EXHIBIT 2**



**Office of the Attorney General**
**Washington, D. C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                    THE ATTORNEY GENERAL

SUBJECT:                 ENDING ILLEGAL DEI AND DEIA DISCRIMINATION
                         AND PREFERENCES

The Department of Justice is committed to enforcing all federal civil rights laws and ensuring equal protection under the law. As the United States Supreme Court recently stated, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). On January 21, 2025, President Trump issued Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), making clear that policies relating to "diversity, equity, and inclusion" ("DEI") and "diversity, equity, inclusion, and accessibility" ("DEIA") "violate the text and spirit of our longstanding Federal civil-rights laws" and "undermine our national unity." *Id.* at 8633.

To fulfill the Nation's promise of equality for all Americans, the Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds.[1]

I.       **Ending Illegal DEI And DEIA Discrimination and Preferences**

By March 1, 2025, consistent with Executive Order 14173, the Civil Rights Division and the Office of Legal Policy shall jointly submit a report to the Associate Attorney General containing recommendations for enforcing federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including policies relating to DEI and DEIA. The report should address:

- Key sectors of concern within the Department's jurisdiction;

---

[1] This memorandum is intended to encompass programs, initiatives, or policies that discriminate, exclude, or divide individuals based on race or sex. It does not prohibit educational, cultural, or historical observances—such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate diversity, recognize historical contributions, and promote awareness without engaging in exclusion or discrimination.

- The most egregious and discriminatory DEI and DEIA practitioners in each sector of concern;

- A plan including specific steps or measures to deter the use of DEI and DEIA programs or principles that constitute illegal discrimination or preferences, including proposals for criminal investigations and for up to nine potential civil compliance investigations of entities that meet the criteria outlined in section 4(b)(iii) of Executive Order 14173;

- Additional potential litigation activities (including interventions in pending cases, statement of interest submissions, and amicus brief submissions), regulatory actions, and sub-regulatory guidance; and

- Other strategies to end illegal DEI and DEIA discrimination and preferences and to comply with all federal civil-rights laws.

## II.     Guidance to Institutions Receiving Federal Funds

Educational agencies, colleges, and universities that receive federal funds may not "treat some students worse than others in part because of race." *Students for Fair Admissions*, 600 U.S. at 304 (Gorsuch, J., concurring).  Consistent with the January 21, 2025, Executive Order, the Department of Justice will work with the Department of Education to issue directions, and the Civil Rights Division will pursue actions, regarding the measures and practices required to comply with *Students for Fair Admissions*.

**EXHIBIT 3**

U.S. Department of Justice

Office of the Deputy Attorney General

---

The Deputy Attorney General                    *Washington, D.C. 20530*

May 19, 2025

MEMORANDUM FOR          OFFICE OF THE ASSOCIATE ATTORNEY GENERAL
                        CIVIL DIVISION
                        CIVIL RIGHTS DIVISION
                        CRIMINAL DIVISION
                        EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS
                        ALL UNITED STATES ATTORNEYS

FROM:                   THE DEPUTY ATTORNEY GENERAL *[signature]*

SUBJECT:                Civil Rights Fraud Initiative

Under Attorney General Bondi's leadership, "[t]he Department of Justice is committed to enforcing federal civil rights laws and ensuring equal protection under the law." Attorney General Memorandum, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025). One of the most effective ways to accomplish this objective is through vigorous enforcement of the False Claims Act, 31 U.S.C. § 3729 et seq., against those who defraud the United States by taking its money while knowingly violating civil rights laws.

The False Claims Act is the Justice Department's primary weapon against government fraud, waste, and abuse. Liability results in treble damages and significant penalties. It is implicated when a federal contractor or recipient of federal funds knowingly violates civil rights laws—including but not limited to Title IV, Title VI, and Title IX, of the Civil Rights Act of 1964— and falsely certifies compliance with such laws. Accordingly, a university that accepts federal funds could violate the False Claims Act when it encourages antisemitism, refuses to protect Jewish students, allows men to intrude into women's bathrooms, or requires women to compete against men in athletic competitions. Colleges and universities cannot accept federal funds while discriminating against their students.

The False Claims Act is also implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin. While racial discrimination has always been illegal, the prohibition on such policies became clear after the Supreme Court stated that "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 205 (2023).

President Trump reinforced that principle in Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), explaining that racist policies "violate the text and spirit of our long-standing Federal civil-rights laws." Nevertheless, many corporations and schools continue to adhere to racist policies and preferences—albeit camouflaged with cosmetic changes that disguise their discriminatory nature.

The federal government should not subsidize unlawful discrimination. To that end, I am standing up the Civil Rights Fraud Initiative. This Initiative will utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates federal civil rights laws. This Initiative will be co-led by the Civil Division's Fraud Section, which enforces the False Claims Act, and the Civil Rights Division, which enforces civil rights laws. Each division will identify a team of attorneys to aggressively pursue this work together. Each of the 93 United States Attorney's Offices will identify an Assistant United States Attorney to advance these efforts.

To ensure a comprehensive approach, the Civil Fraud Section and the Civil Rights Division will engage in regular coordination meetings and share relevant information about potential violations. The Civil Fraud Section and the Civil Rights Division will also engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients, including the Department of Education, the Department of Health and Human Services, the Department of Housing and Urban Development, and the Department of Labor. The Civil Fraud Section and the Civil Rights Division will also establish partnerships with state attorneys general and local law enforcement to share information and coordinate enforcement actions.

The Department recognizes that it alone cannot identify every instance of civil rights fraud. Congress likewise has recognized as much and, as a result, has authorized private parties to protect the public interest by filing lawsuits and litigating claims under the False Claims Act—and, if successful, sharing in any monetary recovery. *See* 31 U.S.C. § 3730. The Department strongly encourages these lawsuits. The Department also encourages anyone with knowledge of discrimination by federal-funding recipients to report that information to the appropriate federal authorities so that the Department may consider the information and take any appropriate action. Please visit https://www.justice.gov/civil/report-fraud for more information.

# EXHIBIT 4



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530*

May 19, 2025

The Honorable Brandon Johnson
Office of the Mayor
121 N. LaSalle Street
Chicago City Hall, 4th Floor
Chicago, IL 60602

Re:    Investigation of the Employment Practices of the City of Chicago, Illinois, Pursuant to
Section 707 of Title VII of the Civil Rights Act of 1964, as Amended

Dear Mayor Johnson:

The Department of Justice is opening an investigation to determine whether the City of Chicago, Illinois, is engaged in a pattern or practice of discrimination based on race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). It is the responsibility of the Attorney General of the United States to enforce the provisions of Title VII with respect to state and local government employers. The Attorney General has delegated the authority to investigate compliance with these provisions to the Assistant Attorney General of the Civil Rights Division. *See* 28 C.F.R. § 0.50(a).

Title VII prohibits discrimination on the basis of race. *See* 42 U.S.C. § 2000e-2. When the Attorney General has reasonable cause to believe that a state or local government employer is engaged in a pattern or practice of discrimination in violation of Title VII, it is the Attorney General's responsibility to take appropriate action to eliminate that violation, including seeking injunctive relief. *See* 42 U.S.C. § 2000e-6(a).

Our investigation is based on information suggesting that you have made hiring decisions solely on the basis of race. In your remarks made yesterday at the Apostolic Church of God in Woodlawn, you "highlight[ed] the number of Black officials in [your] administration."[1] You then went on to list each of these individuals, emphasizing their race:

- "Business and economic neighborhood development, the deputy mayor is a Black woman."
- "Department of planning and development is a Black woman."
- "Infrastructure, deputy mayor is a Black woman."

---

[1]    *See, e.g.*, *'Could he be more racist?': Chicago mayor Brandon Johnson slammed for 'only hiring black people' comment in viral speech*, MSN (May 19, 2025), https://www.msn.com/en-in/news/world/could-he-be-more-racist-chicago-mayor-brandon-johnson-slammed-for-only-hiring-black-people-comment-in-viral-speech/ar-AA1F3p5b?ocid=BingNewsVerp.

The Honorable Brandon Johnson
Page 2

- "Chief operations officer is a Black man."
- "Budget director is a Black woman."
- "Senior advisor is a Black man."

You then said that you were "laying" these positions "out" to "ensure that our people get a chance to grow their business[.]"

Considering these remarks, I have authorized an investigation to determine whether the City of Chicago is engaged in a pattern or practice of discrimination as set forth above. If these kind of hiring decisions are being made for top-level positions in your administration, then it begs the question whether such decisions are also being made for lower-level positions.[2]

It is important to note that we have not reached any conclusions about the subject matter of the investigation. We intend to consider all relevant information, and we welcome your assistance in helping to identify what that might be. We would appreciate your cooperation in our investigation.

Upon receipt of this correspondence, please contact us at (202) 514-3847 so that we can set up a mutually agreeable date and time to discuss the parameters of this investigation, including the scope of information that we will be seeking from you.

Thank you for your cooperation.

Sincerely,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Jesus A. Osete               The Honorable Andrea R. Lucas
       Deputy Assistant Attorney General   Acting Chair
       Civil Rights Division           Equal Employment Opportunity Commission

---

[2]     Pursuant to 29 C.F.R. § 1601.6, we have provided this information to the Equal Employment Opportunity Commission for its consideration in filing a Commissioner's Charge.

**EXHIBIT 5**



**U.S. Department of Justice**
Civil Division

---

*Office of the Assistant Attorney General*     *Washington, DC 20044*

June 11, 2025

**MEMORANDUM**

**TO:**       All Civil Division Employees

**FROM:**    Brett A. Shumate
             Assistant Attorney General

BRETT SHUMATE
Digitally signed by BRETT SHUMATE
Date: 2025.06.11 12:27:50 -04'00'

**SUBJECT:**   Civil Division Enforcement Priorities

President Trump and Attorney General Bondi have directed the Civil Division to use its enforcement authorities to advance the Administration's policy objectives. This memorandum describes those policy objectives and directs Civil Division attorneys to prioritize investigations and enforcement actions advancing these priorities.

## 1. Combatting Discriminatory Practices and Policies

On January 21, 2025, President Trump issued Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), which established "the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work." *Id.* § 2. To this end, the President "order[ed] all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.* As part of these efforts, Attorney General Bondi has directed that the Department align its "litigating positions with [the] requirement of equal dignity and respect." Memorandum from Attorney General, *Eliminating Internal Discriminatory Practices*, at 2 (Feb. 5, 2025).

Consistent with these directives, the Civil Division will use all available resources to pursue affirmative litigation combatting unlawful discriminatory practices in the private sector. In particular, the Civil Division is authorized to bring suit under the False Claims Act for treble damages and penalties against any person who knowingly submits or causes the submission of false claims to the government. 31 U.S.C. § 3729 *et seq.* This includes entities that receive federal funds but knowingly violate civil rights laws. In support of these efforts, the Deputy Attorney General recently announced the Civil Rights Fraud Initiative. The Civil Division is committed to advancing the Initiative and will aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws. The Civil Division will work with the Civil Rights Division, relators, other whistleblowers, and federal agencies to advance these efforts.

### 2. Ending Antisemitism

On January 29, 2025, President Trump issued Executive Order 14,188, *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847 (Feb. 3, 2025), which established the "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold accountable the perpetrators of unlawful anti-Semitic harassment and violence," *id.* § 2, and encouraged the "Attorney General … to employ appropriate civil-rights enforcement authorities … to combat anti-Semitism," *id.* § 3(c). The Executive Order also reaffirmed Executive Order 13,899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 16, 2019).

The Attorney General has established Joint Task Force October 7 ("JTF 10-7") and directed components to "prioritize seeking justice for victims of the October 7, 2023 terrorist attack in Israel" as well as "combatting antisemitic acts of terrorism and civil rights violations in the homeland." Memorandum from Attorney General, *Establishment of Joint Task Force October 7*, at 1 (Feb. 5, 2025). To assist these enforcement efforts, the Civil Division will prioritize investigations and enforcement actions against entities that make claims for federal funds but knowingly violate federal civil rights laws by participating in or allowing antisemitism.

### 3. Protecting Women and Children

The President has issued several Executive Orders protecting women and children. On January 20, the President issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025), which established the "policy of the United States to recognize two sexes, male and female." *Id.* § 2. On February 3, President Trump issued Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Feb. 3, 2025), which directed the Attorney General to, among other things, "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* § 8(c).

Following these directives, Attorney General Bondi directed the Civil Division to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Memorandum from Attorney General, *Preventing the Mutilation of American Children*, at 3-4 (April 22, 2025). The Attorney General also directed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation." *Id.* at 4.

The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food,

Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq*. In addition, the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes.

### 4. Ending Sanctuary Jurisdictions

On President Trump's first day in office, he issued multiple directives to secure the southern border. *See* Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). To ensure that States and local governments promote the enforcement of our nation's immigration laws, he also issued Executive Order 14,287, *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761 (April 28, 2025). This built on the President's previous Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (January 25, 2017). Moreover, Attorney General Bondi has directed the Civil Division to "identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations" and "take legal action to challenge such laws, policies, or practices," where appropriate. Memorandum from Attorney General, *Sanctuary Jurisdiction Directive*, at 3 (Feb. 5, 2025). Consistent with this directive, the Civil Division shall prioritize affirmative litigation to invalidate any State or local laws preempted by Federal law.

### 5. Prioritizing Denaturalization

The Department of Justice may institute civil proceedings to revoke a person's United States citizenship if an individual either "illegally procured" naturalization or procured naturalization by "concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). The benefits of civil denaturalization include the government's ability to revoke the citizenship of individuals who engaged in the commission of war crimes, extrajudicial killings, or other serious human rights abuses; to remove naturalized criminals, gang members, or, indeed, any individuals convicted of crimes who pose an ongoing threat to the United States; and to prevent convicted terrorists from returning to U.S. soil or traveling internationally on a U.S. passport. At a fundamental level, it also supports the overall integrity of the naturalization program by ensuring that those who unlawfully procured citizenship, including those who obtained it through fraud or concealment of material information, do not maintain the benefits of the unlawful procurement.

The Civil Division shall prioritize and maximally pursue denaturalization proceedings in all cases permitted by law and supported by the evidence. To promote the pursuit of all viable denaturalization cases available under 8 U.S.C. § 1451 and maintain the integrity of the naturalization system while simultaneously ensuring an appropriate allocation of resources, the Civil Division has established the following categories of priorities for denaturalization cases:

1. Cases against individuals who pose a potential danger to national security, including those with a nexus to terrorism, espionage, or the unlawful export from the United States of sensitive goods, technology, or information raising national security concerns;

2. Cases against individuals who engaged in torture, war crimes, or other human rights violations;

3. Cases against individuals who further or furthered the unlawful enterprise of criminal gangs, transnational criminal organizations, and drug cartels;

4. Cases against individuals who committed felonies that were not disclosed during the naturalization process;

5. Cases against individuals who committed human trafficking, sex offenses, or violent crimes;

6. Cases against individuals who engaged in various forms of financial fraud against the United States (including Paycheck Protection Program ("PPP") loan fraud and Medicaid/Medicare fraud);

7. Cases against individuals who engaged in fraud against private individuals, funds, or corporations;

8. Cases against individuals who acquired naturalization through government corruption, fraud, or material misrepresentations, not otherwise addressed by another priority category;

9. Cases referred by a United States Attorney's Office or in connection with pending criminal charges, if those charges do not fit within one of the other priorities; and

10. Any other cases referred to the Civil Division that the Division determines to be sufficiently important to pursue.

These categories are intended to guide the Civil Division in prioritizing which cases to pursue; however, these categories do not limit the Civil Division from pursuing any particular case, nor are they listed in a particular order of importance. Further, the Civil Division retains the discretion to pursue cases outside of these categories as it determines appropriate. The assignment of denaturalization cases may be made across sections or units based on experience, subject-matter expertise, and the overall needs of the Civil Division.

**EXHIBIT 6**



# Office of the Attorney General
## Washington, D. C. 20530

July 29, 2025

MEMORANDUM FOR ALL FEDERAL AGENCIES

FROM:           THE ATTORNEY GENERAL

SUBJECT:        GUIDANCE FOR RECIPIENTS OF FEDERAL FUNDING
                REGARDING UNLAWFUL DISCRIMINATION

## I.     INTRODUCTION

One of our Nation's bedrock principles is that all Americans must be treated equally. Not only is discrimination based on protected characteristics illegal under federal law, but it is also dangerous, demeaning, and immoral. Yet in recent years, the federal government has turned a blind eye toward, or even encouraged, various discriminatory practices, seemingly because of their purportedly benign labels, objectives, or intentions. No longer. Going forward, the federal government will not stand by while recipients of federal funds engage in discrimination.

This guidance clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ("DEI") programs.[1] Entities receiving federal funds, like all other entities subject to federal antidiscrimination laws, must ensure that their programs and activities comply with federal law and do not discriminate on the basis of race, color, national origin, sex, religion, or other protected characteristics—no matter the program's labels, objectives, or intentions. In furtherance of that requirement, this guidance identifies "Best Practices" as non-binding suggestions to help entities comply with federal antidiscrimination laws and avoid legal pitfalls; these are not mandatory requirements but rather practical recommendations to minimize the risk of violations.

Entities that receive federal financial assistance or that are otherwise subject to federal anti-discrimination laws, including educational institutions, state and local governments, and public and private employers, should review this guidance carefully to ensure all programs comply with their legal obligations.

---

[1] DEI programs go by other names as well, such as Diversity, Equity, Inclusion, and Accessibility ("DEIA") and Diversity, Equity, Inclusion, and Belonging ("DEIB").

## II.    EXECUTIVE SUMMARY

This guidance emphasizes the significant legal risks of initiatives that involve discrimination based on protected characteristics and provides non-binding best practices to help entities avoid the risk of violations. Key points include:

- **Statutory nondiscrimination requirements:** Federal law prohibits discrimination based on protected characteristics like race, sex, color, national origin, or religion.

- **Legal pitfalls of DEI Programs:** The use of terms such as "DEI," "Equity," or other euphemistic terms does not excuse unlawful discrimination or absolve parties from scrutiny regarding potential violations.

- **Prohibition on Protected Characteristics as Criteria:** Using race, sex, or other protected characteristics for employment, program participation, resource allocation, or other similar activities, opportunities, or benefits, is unlawful, except in rare cases where such discrimination satisfies the relevant level of judicial scrutiny.

- **Importance of Sex-Separated Intimate Spaces and Athletic Competitions:** Compelling employees to share intimate spaces with the opposite sex or allowing men to compete in women's athletic competitions would typically be unlawful.

- **Unlawful Proxy Discrimination:** Facially neutral criteria (e.g., "cultural competence," "lived experience," geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics.

- **Scrutiny of Third-Party Funding:** Recipients of federal funds should ensure federal funds do not support third-party programs that discriminate.

- **Protection Against Retaliation:** Individuals who object to or refuse to participate in discriminatory programs, trainings, or policies are protected from adverse actions like termination or exclusion based on that individual's opposition to those practices.[2]

## III.    KEY FEDERAL ANTIDISCRIMINATION PROVISIONS AND LAW

Federal antidiscrimination laws prohibit discrimination on the basis of protected characteristics, including race, color, religion, sex, and national origin. The U.S. Supreme Court has consistently held that policies or practices based upon protected characteristics are subject to

---

[2] Unlawful retaliation occurs when a federally funded entity takes adverse actions against employees, participants, or beneficiaries because they engage in protected activities related to opposing DEI practices they reasonably believe violate federal antidiscrimination laws.

rigorous judicial scrutiny. Race-based classifications are subject to strict scrutiny, requiring a compelling governmental interest and narrowly tailored means to achieve that interest.[3] Sex-based classifications are subject to heightened scrutiny, requiring an exceedingly persuasive justification and substantial relation to an important governmental objective.[4] Discrimination based on other protected characteristics, such as religion, is also evaluated under analogous standards.[5] Entities receiving federal funds must comply with applicable civil rights laws, including:

- **Title VI of the Civil Rights Act of 1964:** Prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. This includes most educational institutions, healthcare providers, and state and local government agencies.

- **Title VII of the Civil Rights Act of 1964:** Prohibits employment discrimination based on, or motivated by, race, color, religion, sex, or national origin, in any terms, conditions, or privileges of employment, including hiring, promotion, demotion, termination, compensation, job transfers, training, or access to employment privileges and benefits.

- **Title IX of the Education Amendments of 1972:** Prohibits discrimination based on sex in education programs or activities receiving federal financial assistance. Title IX protections extend beyond athletics and include addressing sexual harassment, sex-based harassment, admissions policies, and equal access to resources and programs.

---

[3] *See, e.g.*, *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 214 (2023) (holding racial classifications by public institutions are subject to strict scrutiny and racial classifications by private institutions can serve as basis for revoking funding under Title VI); *Ricci v. DeStefano*, 557 U.S. 557, 579 (2009) ("[E]xpress, race-based decision-making violates Title VII's command that employers cannot take adverse employment actions because of an individual's race."); *see also Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (holding grant program with race and sex preferences is unlawful under Equal Protection Clause).

[4] *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 531 (1996).

[5] *See, e.g.*, *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 479 (2020) ("The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status . . . . [S]trict scrutiny applies . . . because Montana's no-aid provision discriminates based on religious status"); *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969) (holding discriminating against individual for exercising fundamental constitutional rights is subject to heightened scrutiny), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (relying on Equal Protection principles in holding intentional discrimination against exercise of religion is subject to strict scrutiny).

- **Equal Protection Clause of the Fourteenth Amendment:** Prohibits States from denying any person the equal protection of the laws, relevant in the context of discrimination claims involving state or local government actions.

## IV.    UNLAWFUL DISCRIMINATORY POLICIES AND PRACTICES

The following is a non-exhaustive list of unlawful practices that could result in revocation of grant funding. Federal funding recipients may also be liable for discrimination if they knowingly fund the unlawful practices of contractors, grantees, and other third parties.

### A.    Granting Preferential Treatment Based on Protected Characteristics

#### 1.    What Constitutes Unlawful Preferential Treatment?

Preferential treatment occurs when a federally funded entity provides opportunities, benefits, or advantages to individuals or groups based on protected characteristics in a way that disadvantages other qualified persons, including such practices portrayed as "preferential" to certain groups. Such practices violate federal law unless they meet very narrow exceptions.

#### 2.    Examples of Unlawful Practices

**Race-Based Scholarships or Programs:** A university's DEI program establishes a scholarship fund exclusively for students of a specific racial group (e.g., "Black Student Excellence Scholarship") and excludes otherwise qualified applicants of other races, even if they meet academic or financial need criteria. This extends to any race-exclusive opportunities, such as internships, mentorship programs, or leadership initiatives that reserve spots for specific racial groups, regardless of intent to promote diversity. Such race-exclusive programs violate federal civil rights law by discriminating against individuals based solely on their race or treating people differently based on a protected characteristic without meeting the strict legal standards required for race-conscious programs.

**Preferential Hiring or Promotion Practices:** A federally funded entity's DEI policy prioritizes candidates from "underrepresented groups" for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups, where the preferred "underrepresented groups" are determined on the basis of a protected characteristic like race.

**Access to Facilities or Resources Based on Race or Ethnicity:** A university's DEI initiative designates a "safe space" or lounge exclusively for students of a specific racial or ethnic group.

**B.      Prohibited Use of Proxies for Protected Characteristics**

**1.      What Constitutes Unlawful Proxies?**

Unlawful proxies occur when a federally funded entity intentionally uses ostensibly neutral criteria that function as substitutes for explicit consideration of race, sex, or other protected characteristics. While these criteria may appear facially neutral, they become legally problematic under any of the following circumstances:

- They are selected because they correlate with, replicate, or are used as substitutes for protected characteristics.

- They are implemented with the intent to advantage or disadvantage individuals based on protected characteristics.

**2.      Examples of Potentially Unlawful Proxies**

**"Cultural Competence" Requirements:** A federally funded university requires job applicants to demonstrate "cultural competence," "lived experience," or "cross-cultural skills" in ways that effectively evaluate candidates' racial or ethnic backgrounds rather than objective qualifications. This includes selection criteria that advantage candidates who have experiences the employer associates with certain racial groups. For instance, requiring faculty candidates to describe how their "cultural background informs their teaching" may function as a proxy if used to evaluate candidates based on race or ethnicity.

**Geographic or Institutional Targeting:** A federally funded organization implements recruitment strategies targeting specific geographic areas, institutions, or organizations chosen primarily because of their racial or ethnic composition rather than other legitimate factors.

**"Overcoming Obstacles" Narratives or "Diversity Statements":** A federally funded program requires applicants to describe "obstacles they have overcome" or submit a "diversity statement" in a manner that advantages those who discuss experiences intrinsically tied to protected characteristics, using the narrative as a proxy for advantaging that protected characteristic in providing benefits.

**C.      Segregation Based on Protected Characteristics**

**1.      What Constitutes Unlawful Segregation?**

Segregation based on protected characteristics occurs when a federally funded entity organizes programs, activities, or resources—such as training sessions—in a way that separates or restricts access based on race, sex, or other protected characteristics. Such practices generally violate federal law by creating unequal treatment or reinforcing stereotypes, regardless of the stated goal (e.g., promoting inclusion or addressing historical inequities). Exceptions are narrow

Case: 1:25-cv-13863 Document #: 12-1 Filed: 11/17/25 Page 27 of 34 PageID #:128

Memorandum for All Federal Agencies                                                     Page 6
Subject: Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination

and include only cases where federal law expressly permits race-based remedies for specific, documented acts of past discrimination by the institution itself, or in specialized contexts such as correctional facilities where courts have recognized compelling institutional interests.

While compelled segregation is generally impermissible, failing to maintain sex-separated athletic competitions and intimate spaces can also violate federal law. Federally funded institutions that allow males, including those self-identifying as "women," to access single-sex spaces designed for females—such as bathrooms, showers, locker rooms, or dormitories—undermine the privacy, safety, and equal opportunity of women and girls. Likewise, permitting males to compete in women's athletic events almost invariably denies women equal opportunity by eroding competitive fairness. These policies risk creating a hostile environment under Title VII, particularly where they compromise women's privacy, safety, or professional standing, and can violate Title IX by denying women access to the full scope of sex-based protections in education. To ensure compliance with federal law and to safeguard the rights of women and girls, organizations should affirm sex-based boundaries rooted in biological differences.

## 2.    Examples of Unlawful Practices

**Race-Based Training Sessions:** A federally funded university hosts a DEI training program that requires participants to separate into race-based groups (e.g., "Black Faculty Caucus" or "White Ally Group") for discussions, prohibiting individuals of other races from participating in specific sessions. In contrast, a "Faculty Academic Support Network" open to all faculty interested in promoting student success avoids reliance on protected characteristics and complies with federal law.

**Segregation in Facilities or Resources:** A college receiving federal funds designates a "BIPOC-only study lounge," facially discouraging access by students of other races. Even if access is technically open to all, the identity-based focus creates a perception of segregation and may foster a hostile environment. This extends to any resource allocation—such as study spaces, computer labs, or event venues—that segregates access based on protected characteristics, even if intended to create "safe spaces." This does not apply to facilities that are single-sex based on biological sex to protect privacy or safety, such as restrooms, showers, locker rooms, or lodging.

**Implicit Segregation Through Program Eligibility:** A federally funded community organization hosts a DEI-focused workshop series that requires participants to identify with a specific racial or ethnic group (e.g., "for underrepresented minorities only") or mandates sex-specific eligibility, effectively excluding others who meet objective program criteria. Use of Protected Characteristics in Candidate Selection

## 3.    What Constitutes Unlawful Use of Protected Characteristics?

Unlawful use of protected characteristics occurs when a federally funded entity or program considers race, sex, or any other protected trait as a basis for selecting candidates for employment

(e.g., hiring, promotions), contracts (e.g., vendor agreements), or program participation (e.g., internships, admissions, scholarships, training). This includes policies that explicitly mandate representation of specific groups in candidate pools or implicitly prioritize protected characteristics through selection criteria, such as "diverse slate" requirements, diversity decision-making panels, or diversity-focused evaluations. It also includes requirements that contracting entities utilize a specific level of working hours from individuals of certain protected characteristics to complete the contract. Such practices violate federal law by creating unequal treatment or disadvantaging otherwise qualified candidates, regardless of any intent to advance diversity goals.

### 4. Examples of Unlawful Practices

**Race-Based "Diverse Slate" Policies in Hiring:** A federally funded research institute adopts a policy requiring that all interview slates for faculty positions include a minimum number of candidates from specific racial groups (e.g., at least two "underrepresented minority" candidates), rejecting otherwise qualified candidates who do not meet this racial criterion. This extends to any policy that sets racial benchmarks or mandates demographic representation in candidate pools, such as requiring a certain percentage of finalists to be from "diverse" backgrounds.

**Sex-Based Selection for Contracts:** A federally funded state agency implements a DEI policy that prioritizes awarding contracts to women-owned businesses, automatically advancing female vendors or minority-owned businesses over equally or more qualified businesses without preferred group status. This includes any contract selection process that uses sex or race as a tiebreaker or primary criterion, such as policies favoring "minority- or women-owned" businesses without satisfying the appropriate level of judicial scrutiny.

**Race- or Sex-Based Program Participation:** A federally funded university's internship program requires that 50% of selected participants be from "underrepresented racial groups" or female students, rejecting equally or more qualified applicants who do not meet these demographic criteria. This extends to any program—such as scholarships, fellowships, or leadership initiatives—that uses race, sex, or any other protected characteristic as a selection criterion, even if framed as addressing underrepresentation.

### D. Training Programs That Promote Discrimination or Hostile Environments

### 1. What Constitutes Unlawful DEI Training Programs?

Unlawful DEI training programs are those that—through their content, structure, or implementation—stereotype, exclude, or disadvantage individuals based on protected characteristics or create a hostile environment. This includes training that:

- Excludes or penalizes individuals based on protected characteristics.

- Creates an objectively hostile environment through severe or pervasive use of presentations, videos, and other workplace training materials that single out, demean, or stereotype individuals based on protected characteristics.

### 2.    Examples of Unlawful Practices

**Trainings That Promote Discrimination Based on Protected Characteristics:** A federally funded school district requires teachers to complete a DEI training that includes statements stereotyping individuals based on protected characteristics—such as "all white people are inherently privileged," "toxic masculinity," etc. Such trainings may violate Title VI or Title VII if they create a hostile environment or impose penalties for dissent in ways that result in discriminatory treatment.[6]

### E.    Recommendations on Best Practices

**Ensure Inclusive Access:** All workplace programs, activities, and resources should be open to all qualified individuals, regardless of race, sex, or other protected characteristics. Avoid organizing groups or sessions that exclude participants based on protected traits. Some sex separation is necessary where biological differences implicate privacy, safety, or athletic opportunity.

**Focus on Skills and Qualifications:** Base selection decisions on specific, measurable skills and qualifications directly related to job performance or program participation. For example, rather than asking about "cultural competence," assess specific skills such as language proficiency or relevant educational credentials. Criteria like socioeconomic status, first-generation status, or geographic diversity must not be used if selected to prioritize individuals based on racial, sex-based, or other protected characteristics.

**Prohibit Demographic-Driven Criteria:** Discontinue any program or policy designed to achieve discriminatory outcomes, even those using facially neutral means. Intent to influence demographic representation risks violating federal law. For example, a scholarship program must not target "underserved geographic areas" or "first-generation students" if the criteria are chosen to increase participation by specific racial or sex-based groups. Instead, use universally applicable criteria, such as academic merit or financial hardship, applied without regard to protected characteristics or demographic goals.

**Document Legitimate Rationales:** If using criteria in hiring, promotions, or selecting contracts that might correlate with protected characteristics, document clear, legitimate rationales unrelated to race, sex, or other protected characteristics. Ensure these rationales are consistently applied and are demonstrably related to legitimate, nondiscriminatory institutional objectives.

**Scrutinize Neutral Criteria for Proxy Effects:** Before implementing facially neutral criteria, rigorously evaluate and document whether they are proxies for race, sex, or other protected

---

[6] Federal law allows for workplace harassment trainings that are focused on preventing unlawful workplace discrimination and that do not single out particular groups as inherently racist or sexist.

characteristics. For instance, a program targeting "low-income students" must be applied uniformly without targeting areas or populations to achieve racial or sex-based outcomes.

**Eliminate Diversity Quotas:** Focus solely on nondiscriminatory performance metrics, such as program participation rates or academic outcomes, without reference to race, sex, or other protected traits. And discontinue policies that mandate representation of specific racial, sex-based, or other protected groups in candidate pools, hiring panels, or final selections. For example, replace a policy requiring "at least one minority candidate per slate" with a process that evaluates all applicants based on merit.

**Avoid Exclusionary Training Programs:** Ensure trainings are open to all qualified participants, regardless of protected characteristics. Avoid segregating participants into groups based on race, sex, or other protected characteristics. Trainings should not require participants to affirm specific ideological positions or "confess" to personal biases or privileges based on a protected characteristic.

**Include Nondiscrimination Clauses in Contracts to Third Parties and Monitor Compliance:** Incorporate explicit nondiscrimination clauses in grant agreements, contracts, or partnership agreements, requiring third parties to comply with federal law, and specify that federal funds cannot be used for programs that discriminate based on protected characteristics. Monitor third parties that receive federal funds to ensure ongoing compliance, including reviewing program materials, participant feedback, and outcomes to identify potential discriminatory practices. Terminate funding for noncompliant programs.

**Establish Clear Anti-Retaliation Procedures and Create Safe Reporting Mechanisms:** Implement and communicate policies that prohibit retaliation against individuals who engage in protected activities, such as raising concerns, filing complaints, or refusing to participate in potentially discriminatory programs. Include these policies in employee handbooks, student codes of conduct, and program guidelines. Provide confidential, accessible channels for individuals to report concerns about unlawful practices.

## V.    CONCLUSION

Entities are urged to review all programs, policies, and partnerships to ensure compliance with federal law, and discontinue any practices that discriminate on the basis of a protected status. The recommended best practices provided in this guidance are non-binding suggestions to assist entities in avoiding legal pitfalls and upholding equal opportunity for all. By prioritizing nondiscrimination, entities can mitigate the legal, financial, and reputational risks associated with unlawful DEI practices and fulfill their civil rights obligations.

**EXHIBIT 7**

# U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities From Criminal Aliens

justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities

May 23, 2025



The U.S. Department of Justice has designated the below initial list as Sanctuary Jurisdictions, based on actions and policies that materially impede enforcement of federal immigration statutes and regulations. These designations were made after a thorough review of documented laws, ordinances, and executive directives by the listed jurisdictions. This initial list of designated Sanctuary Jurisdictions will be reviewed regularly, to include additional jurisdictions and remove jurisdictions that have remediated their policies, practices, and laws. Each state, county, and city will have an opportunity to respond to its placement on the list.

## Sanctuary Jurisdiction characteristics include:

1. *Public Declarations:* Cities, states, or counties that publicly declare themselves a sanctuary jurisdiction or equivalent, with the intent to undermine federal immigration enforcement.
2. *Laws, Ordinances, Executive Directives:* Cities, states, or counties that have laws, ordinances, regulations, resolutions, policies, or other formalized practices that obstruct or limit local law enforcement cooperation with U.S. Immigration and Customs Enforcement (ICE).

3. *Restrictions on Information Sharing:* Cities, states, or counties that limit whether and how local agencies share information about immigration status of detainees with federal authorities.

4. *Funding Restrictions:* Cities, states, or counties that prohibit local funds or resources from being used to support federal immigration enforcement efforts.

5. *Non-cooperation with Federal Immigration Enforcement:* Cities, states, or counties that provide training to city employees and police on enforcing sanctuary policies and declining to respond to ICE requests for information.

6. *Limits on ICE Detainers:* Cities, states, or counties that refuse to honor ICE detainer requests unless there is a warrant signed by a judge.

7. *Jail Access Restrictions:* Cities, states, or counties that restrict ICE agents' ability to interview detainees absent detainee consent.

8. *Immigrant Community Affairs Offices:* Cities, states, or counties that create dedicated offices to engage and advise illegal alien communities on evading federal law enforcement officers.

9. *Federal Benefit Programs:* Cities, states, or counties that circumvent federal laws prohibiting the provision of federal benefits to illegal aliens and provide them with access to benefits, including health care assistance, legal aid, food and housing assistance, and other subsidies. This includes cities, states, or counties that establish stand-alone benefit programs or equivalents.

## States:

- California
- Colorado
- Connecticut
- Delaware
- District of Columbia
- Illinois
- Minnesota
- New York
- Oregon
- Rhode Island
- Vermont
- Washington

## Counties:

- Cook County, IL
- San Diego County, CA
- San Francisco County, CA

## Cities:

- Albuquerque, NM
- Berkeley, CA
- Boston, MA
- Chicago, IL
- Denver, CO
- East Lansing, MI
- Hoboken, NJ
- Jersey City, NJ
- Los Angeles, CA
- New Orleans, LA
- New York City, NY
- Newark, NJ
- Paterson, NJ
- Philadelphia, PA
- Portland, OR
- Rochester, NY
- Seattle, WA
- San Francisco City, CA

Updated October 31, 2025