## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CITY OF CHICAGO, *et al.* <br><br>          Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, *et al.*, <br><br>          Defendants. | Case No. 1:25-cv-13863 <br> Hon. Jorge L. Alonso |

### FEDERATION FOR AMERICAN IMMIGRATION REFORM'S PROPOSED BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Jonathon P. Hauenschild*
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
(202) 328-7004
jhauenschild@fairus.org
* *Pro hoc vice* admission pending

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

**CORPORATE DISCLOSURE STATEMENT**

*Amicus curiae* the Federation for American Immigration Reform (FAIR) is a 501(c)(3) not for profit charitable organization incorporated in the District of Columbia. FAIR has no parent corporation. It does not issue stock.

# CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES........................................................................................ iii

STATEMENT OF INTEREST..................................................................................... 1

SUMMARY OF THE ARGUMENT ............................................................................ 1

ARGUMENT .............................................................................................................. 2

I.      THE CITIES' SANCTUARY POLICIES.......................................................... 2

II.     THE CITIES' POLICIES ARE UNLAWFUL................................................... 4

    A.   The Cities' policies stand as an obstacle to the purposes of Congress ............................... 4

    B.   The Cities' policies are otherwise conflict preempted......................................................... 8

    C.   The Tenth Amendment does not protect the Cities' sanctuary policies ........................... 10

III.    BECAUSE THEIR POLICIES ARE UNLAWFUL, THE CITIES ARE INCAPABLE OF MEETING THE REQUIREMENTS FOR EITHER STANDING OR INJUNCTIVE RELIEF . 12

CONCLUSION....................................................................................................... 13

# TABLE OF AUTHORITIES

**CASES**

*502 S. Mich. Ave. Assocs., Ltd. v. Shannon,*
    549 F.3d 1119 (7th Cir. 2008) ................................................. 5

*Arizona v. United States,*
    567 U.S. 387 (2012) ................................................. 4, 5, 6, 11

*Boomer v. AT&T Corp.,*
    309 F.3d 404 (7th Cir. 2002) ................................................. 5

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948) ................................................. 4

*Chirac v. Lessee of Chirac,*
    15 U.S. (2 Wheat.) 259 (1817) ................................................. 11

*City of New York v. United States,*
    179 F.3d 29 (2d Cir. 1999) ................................................. 6, 7, 8

*Coalition for Competitive Electricity v. Zibelman,*
    906 F.3d 41 (2d Cir. 2018) ................................................. 10

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ................................................. 5

*Frank Bros. v. Wis. DOT,*
    409 F.3d 880 (7th Cir. 2005) ................................................. 5

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992) ................................................. 5

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................. 10

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ................................................. 4, 11

*Hernandez v. Mesa,*
    589 U.S 93 (2020) ................................................. 4, 11

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ................................................. 5, 6

*Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ................................................. 12, 13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992).................................................................................. 12

*New York v. United States,*
    505 U.S. 144 (1992).................................................................................. 10

*Oneok, Inc. v. Learjet, Inc.,*
    575 U.S. 373 (2015)............................................................................. 5, 10

*Petr v. BMO Harris Bank N.A.,*
    95 F.4th 1090 (7th Cir. 2024)..................................................................... 5

*Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.,*
    324 U.S. 806 (1945).................................................................................. 13

*Savage v. Jones,*
    225 U.S. 501 (1912)..................................................................................... 5

*Spencer v. Kemna,*
    523 U.S. 1 (1998)...................................................................................... 13

*Tafflin v. Levitt,*
    493 U.S. 455 (1990)...................................................................................11

*Texaco P.R., Inc. v. Dep't of Consumer Affairs,*
    60 F.3d 867 (1st Cir. 1995)....................................................................... 13

*Trump v. Hawaii,*
    585 U.S. 667 (2018)...............................................................................4, 11

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950)...............................................................................4, 11

*United States v. Singh,*
    979 F.3d 697 (9th Cir. 2020).....................................................................11

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898)...................................................................................11

**STATUTES**

8 U.S.C. § 1101 ................................................................................................. 9

8 U.S.C. § 1324 ............................................................................................. 8, 9

8 U.S.C. § 1357(g) ............................................................................................ 8

8 U.S.C. § 1373 ............................................................................................ 6, 7

8 U.S.C. § 1644 ........................................................................................................... 7

**OTHER AUTHORITIES**

Chicago Mun. Code § 2-173-020 ................................................................................. 3

Chicago Mun. Code § 2-173-030 ................................................................................. 3

Chicago Mun. Code § 2-173-042 ................................................................................. 3

St. Paul. Admin Code § 44.02 ..................................................................................... 4

St. Paul. Admin Code § 44.03 ..................................................................................... 4

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. X ............................................................................................... 10

U.S. CONST. Art. I, Sec. 8, Cl. 4 ................................................................................. 4

## STATEMENT OF INTEREST[1]

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to inform the public about the effects of both unlawful and lawful immigration, and to defend American citizens, American workers, and the nation's environment by limiting overall immigration, enhancing border security, and ending illegal immigration. FAIR has been involved in more than 100 legal cases since 1980, either as a party or *amicus curiae*, with the aim of protecting all Americans against the substantial harms of mass migration and illegal immigration.

## SUMMARY OF THE ARGUMENT

Plaintiffs City of Chicago and City of St. Paul (collectively "the Cities") ask this Court to protect their sanctuary policies with an injunction. But because these policies, in a variety of ways, are unlawful, the Cities lack standing to seek such an injunction, and they also cannot meet the standards for injunctive relief.

Plaintiffs aver that they have standing because the President's Executive Orders and related agency actions defunding sanctuary cities interfere with their independence and will harm cities by "forcing Plaintiffs to choose between accepting the Challenged Conditions or forgoing critical funding." Complaint, ECF 1, at ¶ 162. *See also id*. at ¶ 6, Motion for Preliminary Injunction, ECF 12, at pp. 1-4 ("PI Motion"). Plaintiffs further allege that they rely on federal funding to hire police officers, advance "the department's public safety role in Chicago's diverse

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than amicus curiae, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

communities through collaborative community policing programs," and "provide mental health and wellness resources for law enforcement[] and strengthen pathways for recruiting officers with non-traditional backgrounds." Complaint. at ¶¶ 31-33, 38. *See also* PI Motion, pp. 23-24. By Plaintiffs' own admission, though, the only "interests" being threatened by Defendants' actions are in maintaining unlawful sanctuary policies that prevent them from meeting federal funding requirements. Complaint, at ¶¶ 53-61 85-96, PI Motion, pp. 1-2, 23-24.

The Cities' sanctuary policies are unlawful. By standing as obstacles to congressional purposes behind several federal laws, and by compelling local officials to violate federal anti-harboring provisions, they violate the Supremacy Clause of the United States Constitution. Furthermore, the Cities' claims that the Tenth Amendment protects their sanctuary policies are not well founded. The Constitution, through the Supremacy Clause, prohibits to states the power to enact laws preempted by valid federal laws, and therefore does not reserve to plaintiffs the power to enact their sanctuary policies.

Because Plaintiffs' claimed harms would consist either in the discontinuation of unlawful policies or the loss of funding due to their continuation, they cannot show the requisite injury to a legally protected interest necessary for standing. There is no cognizable interest in the continuation of unlawful government policies; nor is an injury, such as a loss of funding, caused by the continuation of such policies cognizable. For the same reason, Plaintiffs cannot show the irreparable harm necessary to support injunctive relief.

## ARGUMENT

## I.    THE CITIES' SANCTUARY POLICIES

Through various ordinances, both Cities purposely obstruct and interfere with federal immigration actions in violation of federal law.

Chicago's Welcoming City Ordinance prohibits, among other things, any city agent or agency from requesting "information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or immigration status of any person," or disclosing "information regarding the citizenship or immigration status of any person unless required to do so by legal process." Chicago Mun. Code §§ 2-173-020, 2-173-030. The Ordinance also excludes immigration detainers and civil immigration processes from the definition of "court decisions" and "legal processes." *Id*. at § 2-173-042. Chicago prohibits its officials from arresting or detaining individuals based on civil immigration violations or administrative warrants issued by immigration courts. *Id*. Chicago reports on the number of Immigration Detainers it receives and how many it honors. During first three quarters of 2025, the City reported receiving 482 immigration detainers and honored none.[2]

In its Administrative Code, the City of St. Paul states that its sanctuary policies are intended to prevent the city from operating "its programs for the purpose of enforcing federal immigration laws." St. Paul. Admin Code § 44.01. A former mayor admits that the purpose of the policy is to "resist any attempt by the federal government to tell us how to police our community or turn our officers into ICE agents."[3] Among other prohibitions, city employees cannot "inquire into the immigration status of any person or request any documents or information verifying the immigration status of any individual" other than I-9 forms to verify employment eligibility. *Id*. at

---

[2] City of Chicago, *Welcoming City Ordinance Q3 Reporting* (July 1, 2025 – Sept. 30, 2025) https://igchicago.org/wp-content/uploads/2025/10/24370-WelcomingCity_2025_Q3-2025.pdf; City of Chicago, *Welcoming City Ordinance Q2 Reporting* (April 1, 2025 – June 30, 2025) https://igchicago.org/wp-content/uploads/2025/07/23811-Welcoming-City-Report-Q2-2025.pdf; City of Chicago, *Welcoming City Ordinance Q1 Reporting* (Jan 1, 2025 – March 31, 2025), https://igchicago.org/wp-content/uploads/2025/04/23155-Welcoming-City-Report-Q1-2025.pdf (accessed December 10, 2025).

[3] Tom Steward, *Is St. Paul Still a Sanctuary City*, American Experiment, Nov. 25, 2016, https://www.americanexperiment.org/is-st-paul-still-a-sanctuary-city/.

3

§ 44.02(a). Notably, for purposes of this lawsuit, city law enforcement may not arrest or detain individuals for violations of "federal civil immigration laws." *Id*. at § 44.03.

## II.    THE CITIES' POLICIES ARE UNLAWFUL

The federal government's authority over immigration and naturalization flows both from the Constitution's text and constitutional provisions empowering it to regulate foreign commerce, foreign relations, and national security. *See, e.g.*, U.S. CONST. Art. I, Sec. 8, Cl. 4, *Trump v. United States*, 603 U.S. 593, 607 (2024) (holding that immigration falls within the president's "important foreign relations responsibilities" as delegated to him by the Constitution), *Hernandez v. Mesa*, 589 U.S 93, 104 (2020) (noting that governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"), *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (recognizing that immigration related decisions "implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances"); *Arizona v. United States*, 567 U.S. 387 (2012); *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948).

The Cities' policies violate the Supremacy Clause of the U.S. Constitution by 1) standing as obstacles to the accomplishment of congressional purposes behind federal immigration law; and 2) compelling local officials to commit the federal crime of harboring removable aliens.

### A.   *The Cities' policies stand as an obstacle to the purposes of Congress*

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this clause, Congress

has the power to preempt state laws. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015) *Arizona*, 567 U.S. at 399 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)); *see also Hines v. Davidowitz*, 312 U.S. 52 (1941), *Petr v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1102 (7th Cir. 2024).

Preemption may be either express or implied, and implied preemption includes both field preemption and conflict preemption. *Petr*, 95 F.4th at 1102, *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992), *502 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1124-25 (7th Cir. 2008). Conflict preemption occurs "where it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) (internal quotation marks and citations omitted). Conflict preemption also takes place when state, or local, laws "interfere with, or are contrary to federal law." *Id*. "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912), quoted in *Hines*, 312 U.S. at 67 n.20. The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. And preemption occurs when "state law differs from federal law in such a way that achievement of the congressional objective is frustrated." *Frank Bros. v. Wis. DOT*, 409 F.3d 880, 894 (7th Cir. 2005) (citation modified).

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding 8 U.S.C. § 1373 constitutional).

By design, the Cities' policies frustrate federal immigration law in one of its central purposes—the federal-state cooperation Congress intended to foster in immigration enforcement. As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411.[4] For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),[5] which includes 8 U.S.C. § 1373, Congress intended unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. The Senate Judiciary Committee Report accompanying IIRIRA makes this general intent clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

---

[4] *See also Hines*, 312 U.S. at 66.
[5] Division C of Pub. L. No. 104-208 (2012).

S. Rep. No. 104-249, at 19-20 (1996), *quoted in City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress intended a cooperative effort among local, state, and federal law enforcement to enforce immigration law.

A review of additional federal immigration provisions further underscores this intent. Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[6] Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," Section 434 of PRWORA, codified at 8 U.S.C. § 1644, is nearly identical to § 1373 and forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRIRA, the Conference Report accompanying PRWORA made clear Congress's intent in passing Section 434: to bar any restriction on local police in their communications with federal immigration officers. The scope includes the whereabouts of illegal aliens, which obviously includes notice of their release from detention.

> The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien or the presence, whereabouts, or activities of illegal aliens. It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS. The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS.

---

[6] Pub. L. No. 104-193 (1996), as amended through Pub. L. No. 118-42.

7

> The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) at 383 (1996), *quoted in City of New York*, 179 F.3d at 32.

Another federal statute fosters cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

*B. The Cities' policies are otherwise conflict preempted*

Under the Cities' sanctuary policies, if an immigration officer seeks to place a detention notice (or detainer) on a removable alien, neither Chicago nor St. Paul will honor it. By thus shutting off its city law enforcement personnel from communicating with immigration officials about release dates of removable aliens, the policies compel local officials to violate the federal anti-harboring statute, 8 U.S.C. § 1324, which reads as follows:

**Bringing in and Harboring Certain Aliens**

**(a) Criminal penalties.—**

(1) (A) Any person who—
…
(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; . . .

8

(v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—
…
(ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

Federal law defines "person" when used in Title II as "an individual or an organization." 8 U.S.C. § 1101(b)(3). "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects." 8 U.S.C. § 1101(a)(28). Thus, § 1324 applies to municipal corporations and unincorporated areas alike, which, under this sweeping definition, are organizations, and thus persons.

By preventing local law enforcement from providing the information or cooperation that federal officials request in the course of enforcing federal immigration laws, the Cities' policies compel local officials to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii). For example, when federal officials seek to arrest or detain a removable alien in city custody when that alien is released, and asks for the release date, and local authorities refuse to cooperate, as mandated by the Cities' bans on detainer compliance, the local authorities are thereafter "shielding" the alien's presence, and therefore the alien, "from detection." Also, if federal officials arrive at a city jail seeking to assume custody of a removable alien on the alien's release date, the local officials' refusal to detain the alien in order to transfer custody, mandated by the Cities' policies, inevitably will help conceal the alien's whereabouts from federal officials. Even

if state or local officials claim that receiving a Form I-247A (INS Immigration Detainer Notice of Action form notifying them enforcement of an alien's removability)[7] from federal officers does not give it the requisite knowledge of an alien's unlawful presence, the form includes a probable cause determination by the U.S. Department of Homeland Security that the alien is removable, thus at the very least making law enforcement's noncompliance in "reckless disregard" of the alien's unlawful presence.

Accordingly, the Cities' sanctuary policies compel local law enforcement to violate the federal anti-harboring statute. In doing so, they make obedience to both federal and state law an impossibility, and they are, therefore, conflict preempted. *E.g., Oneok, Inc.,* 575 U.S. at 377; *Coalition for Competitive Electricity v. Zibelman*, 906 F.3d 41, 55 (2d Cir. 2018).

C. *The Tenth Amendment does not protect the Cities' sanctuary policies*

Plaintiffs attempt to justify their sanctuary policies under the Tenth Amendment, suggesting that a preliminary injunction should be granted on this basis. *E.g.* Complaint at ¶¶ 66, 69, 192-96, PI Motion at pp. 21-22. The Tenth Amendment, however, reserves only "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. CONST. amend. X. Thus, when a party invokes the Tenth Amendment against a federal enactment, courts must ask whether the law (or action) in question was enacted "within the powers granted [the United States] under the Constitution." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), *see also*, *New York v. United States*, 505 U.S. 144, 155 (1992) ("In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I."). If Congress acts within its constitutional powers, through the Supremacy Clause, "Congress may impose its will on the States." *Gregory*, 501 U.S. at 460. *See also Tafflin*

---

[7] Sample form available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

*v. Levitt*, 493 U.S. 455, 458 (1990) (holding that States possess "sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause"). In other words, no state has a power reserved in the Tenth Amendment to take measures preempted by federal laws that conform to the Constitution, because the Constitution, through the Supremacy Clause, prohibits any such power to the states.

The power to regulate immigration is an attribute of sovereignty and derives from constitutional provisions empowering the federal government to regulate foreign commerce, foreign relations, and national security. *See, e.g.*, *Hernandez*, 589 U.S at 104 (recognizing that governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"), *Trump v. Hawaii*, 585 U.S. at 702 (holding that immigration related decisions "implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances"); *Arizona*, 567 U.S. at 395 ("The Constitution grants the federal government an 'undoubted power over the subject of immigration and the status of aliens'"); *Harisiades*, 342 U.S. at 588-89 ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of republican form of government"); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. at 542-43 (holding that the right to control immigration and naturalization "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.").

Thus, the power to regulate both naturalization and immigration is delegated by the Constitution to the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 701 (1898), *citing Chirac v. Lessee of Chirac*, 15 U.S. (2 Wheat.) 259 (1817) ("The power, granted to

11

Congress by the Constitution, 'to establish an uniform rule of naturalization,' was long ago adjudged by this court to be vested exclusively in Congress"). Because the Constitution delegates power over naturalization and immigration to the federal government, and the Cities' policies are preempted by federal law made pursuant to that power, the Tenth Amendment does not reserve the power to make those policies to the Cities.

### III.    BECAUSE THEIR POLICIES ARE UNLAWFUL, THE CITIES ARE INCAPABLE OF MEETING THE REQUIREMENTS FOR EITHER STANDING OR INJUNCTIVE RELIEF

Plaintiff Cities claim several "harms" for which they seek relief, including their respective sovereignty, risking public safety, and—the admitted crux of the suit and motion for preliminary injunction—the alleged *potential* loss of various types of grants. The Cities cite little authority supporting their claims of harm, instead stating in largely conclusory fashion that the Government's policy threatens "irreparable harm" no matter which decision they make. They aver that they must either follow the immigration conditions or not implement "plans to address chronic homelessness, harm unhoused people," "harm public safety," or "damage local law enforcement's relationship with immigrant communities." PI Motion at pp. 23-24.

The elements for standing in the federal courts are first, injury in fact, second, a causal connection between the injury and the conduct complained of, and third, a likelihood that the conduct complained of be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact is "an invasion of a legally protected interest." *Id*. at 560. The Cities have no legally protected interest here. It is well established that litigants lack standing to seek prospective relief if they will only be injured if they engage in illegal conduct. *See, e.g., Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (finding that a victim of an illegal police chokehold lacked standing where his likelihood of further injury was premised on a repetition of his unlawful traffic violation); *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (finding that

12

plaintiffs lacked standing because they planned to induce future injury by unlawful civil disobedience); *Spencer v. Kemna*, 523 U.S. 1, 13 (1998) (finding that plaintiff lacked standing where his injury would only arise if he were punished for future unlawful conduct).

For the same reason the Cities cannot show injury to a legally protected interest requisite for standing, they cannot show irreparable harm requisite for injunctive relief: its harm will only occur because of their own unlawful sanctuary policies. *See Lyons*, 461 U.S. at 111 (holding that irreparable harm was not shown for the same reasons injury for standing purposes was not shown). Indeed, it is a maxim of equity, especially important in cases such as this one involving the public interest, that "he who comes into equity must come with clean hands." *Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945), *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 880 (1st Cir. 1995). Here, the Cities' hands are decidedly unclean, for they maintain, and seek an injunction by this Court to protect, sanctuary policies that are unlawful and unconstitutional.

## CONCLUSION

For the foregoing reasons, the Cities' motion for preliminary injunction should be denied.

Dated: December 12, 2025           Respectfully submitted,

                                        s/ Jonathon P. Hauenschild
                                        Jonathon P. Hauenschild*
                                        Federation for American Immigration Reform
                                        25 Massachusetts Ave., NW, Suite 330
                                        Washington, DC 20001
                                        (202) 328-7004
                                        jhauenschild@fairus.org
                                        * *Pro hoc vice* admission pending

                                        Counsel for *Amicus Curiae*
                                        Federation for American Immigration Reform