**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO and CITY OF ST. PAUL,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE; PAMELA JO BONDI, in her official capacity; OFFICE OF COMMUNITY ORIENTED POLICING SERVICES; and CORY D. RANDOLPH, in his official capacity,<br><br>Defendants. | Civil Action No. 1:25-cv-13863<br><br>Hon. Jorge L. Alonso<br><br>**DECLARATION OF SCOTT HVIZDOS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND STAY OF AGENGY ACTION** |

**DECLARATION OF SCOTT HVIZDOS**

I, Scott Hvizdos, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      This declaration is based on my own personal knowledge, experience, and review of relevant business records. If I were called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

2.      I am the Grants Specialist for the Saint Paul Police Department ("SPPD"). I have been in that position since 2020.

3.      I am responsible for managing and applying for grants on behalf of SPPD.

4.      On June 30, 2025, I submitted an application to the COPS Office for a CPD Microgrant to obtain grant funding for SPPD's Downtown Homelessness Initiative. I submitted the application via JustGrants.

5.      My electronic submission contained various attachments including a letter to the United States Department of Justice from Assistant City Attorney Alex Dumke of the Saint Paul City Attorney's Office. The subject line of the letter reads "Grant Application Conditions in Violation of Federal Injunctions and Constitutional Law."

6.      The attachment is shown as a pdf hyperlink on page labeled 27/27 in the lower right-hand corner of Defendants' Randolph Exhibit 1.G.

7.      A true and correct copy of the letter I attached to my electronic submission is attached hereto as Exhibit A

Dated:  Dec 17, 2025

/s _Scott Hvizdos_
_____
SCOTT HVIZDOS

2

# EXHIBIT A



**OFFICE of the city attorney**

**Lyndsey M. Olson, CITY ATTORNEY**

 Civil Division, 15 Kellogg Blvd. West, 400 City Hall

Saint Paul, MN 55102

Tel:  651-266-8710 | Fax: 651-298-5619

To:  United States Department of Justice
Subject:  Grant Application Conditions in Violation of Federal Injunctions and Constitutional Law
Applicable to:  CPD Microgrant I Grant Program

Date:  June 30, 2025

Dear U.S. Department of Justice Agency Grant Officer / Legal Counsel:

The City of Saint Paul (City) has reviewed and completed the application materials for the DOJ CPD Microgrant I Grant Program. The City is submitting this addendum to be read jointly with the grant application. The application process necessitates the inclusion of this addendum as the process only allows singular answers and prohibits complete and accurate responses. Accordingly, this addendum is necessary to alert you to the Agency's violation of current court orders and preserve the City's legal remedies.

The grant application violates the Preliminary Injunction issued on April 24, 2025, as clarified by the Court's subsequent Orders dated May 9, 2025 and June 23, 2025, in the matter of *City of San Francisco v. Trump*, File No. 25-CV-1350 (N.D. Cal), to which the City is a party. The Court enjoined the federal government from conditioning the award of federal funds on matters unrelated to immigration enforcement, including requiring local jurisdictions to cooperate with Executive Orders or federal mandates concerning immigration. The June 23, 2025, Clarifying Order further confirms that these limitations apply to all federal grant conditions, including those administered by the U.S. Department of Justice. The purpose of the grant (to reduce the number of chronically unhoused people by improving communication and cooperation between the local law enforcement and agencies that carry out outreach, access and referrals) bears no relation to immigration enforcement and is therefore within the scope of the injunction.

Additionally, courts consistently have found that the Executive Orders and threatened actions related to funding are likely unconstitutional and illegal under the Separation of Powers doctrine, the Fifth Amendment's Due Process Clause, and the Tenth Amendment. The conditions on Federal Funding related to the Executive Orders are unconstitutionally vague under the Spending Clause and the Administrative Procedures Act ("APA").

The City is explicitly providing you notice through this addendum that it cannot agree to the following certifications, notwithstanding anything to the contrary in the application, which are in plain violation of the Preliminary Injunction and Clarifying Orders:

*By signing this application, I certify (1) to the statements contained in the list of certifications\*\* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances\*\* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001).*

*Applicant Eligibility: Is your agency in compliance with 8 U.S.C. §1373, which provides that State and local government entities may not prohibit, or in any way restrict, any government entity or official from sending to, receiving from, maintaining, or exchanging information regarding citizenship or immigration status, lawful or unlawful, of any individual with components of the U.S. Department of Homeland Security or any other federal, state or local government entity.*

*CERTIFICATION OF REVIEW AND REPRESENTATION OF COMPLIANCE:*

*By checking the box, the applicant indicates he or she understands that:*

1. *the applicant will comply with all legal, administrative, and programmatic requirements that govern the applicant for acceptance and use of federal funds as outlined in the applicable COPS Office Grant Application Resource Guide, the COPS Office Award Owner's Manual, the DOJ Grants Financial Guide, Assurances, Certifications, all Executive Orders, and applicable Presidential Memoranda, program regulations, laws, orders, and circulars;*
2. *the applicant understands that as a general rule COPS Office funding may not be used for the same item or service funded through another funding source; and*
3. *the applicant and any required or identified official partner(s) listed in this application mutually agreed to this partnership prior to submission.*

We ask that you delete these requirements from the grant application and continue to process our application. The City reserves all legal rights to challenge the Agency's position with respect to the application terms, including but not limited to seeking sanctions and penalties for contempt of court, as well as seeking relief through additional legal actions. The City requests that the Agency accept the City of Saint Paul's application, including the removal of the above language, in conformity with the Preliminary Injunction and June 23, 2025 Clarifying Order, attached hereto.

Sincerely,

*Alexander Dumke*

Alex Dumke

Assistant City Attorney
Saint Paul City Attorney's Office
15 W. Kellogg Blvd, 400 City Hall
Saint Paul, MN 55102

Attachments:

Preliminary Injunction San Francisco v. Trump
Clarifying Order 5/9/2025
Clarifying Order 6/23/25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

           Plaintiffs,

      v.

DONALD J. TRUMP, et al.,

           Defendants.

Case No. 25-cv-01350-WHO

**ORDER GRANTING PRELIMINARY INJUNCTION[1]**

Re: Dkt. No. 61

In 2017, President Donald Trump issued Executive Order 13,768 ("EO 13,768"), titled "Enhancing Public Safety in the Interior of the United States," which was directed at so-called "sanctuary jurisdictions." The City and County of San Francisco and County of Santa Clara sued, arguing that Section 9 of EO 13,768 was unconstitutional. I found that they had pre-enforcement standing, that they were likely to succeed on the merits because Section 9(a) of EO 13,768 was unconstitutional, and that they faced irreparable harm absent an injunction. I enjoined Section 9(a) of EO 13,768. The Ninth Circuit affirmed. *Cnty. of Santa Clara v. Trump, et al.*, 250 F. Supp. 3d 497 (N.D. Cal. Apr. 25, 2017) (Preliminary Injunction Order), *aff'd*, 897 F.3d 1225 (9th Cir. 2018).

Here we are again. Shortly after taking office in 2025, President Trump issued Executive Orders 14,159 ("Protecting the American People Against Invasion") ("EO 14,159") and 14,218 ("Ending Taxpayer Subsidization of Open Borders") ("EO 14,218") (together, the "2025 Executive Orders"), the language and purpose of which mirror EO 13,768. Like EO 13,768, EO

---

[1] This is a summary order because of the exigencies it addresses. I will enter an order that discusses the issues and my reasoning in more detail at a later date.

14,159 directs the United States Attorney General and the United States Department of Homeland Security ("DHS") Secretary to withhold federal funds from "sanctuary jurisdictions," cities and counties that limit the use of local resources to enforce federal immigration law.  EO 14,218 directs every federal agency to ensure that "federal payments" to localities do not "by design or effect" "abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."

Neither Executive Order provides a definition for "sanctuary jurisdiction."  But a memo from Attorney General Pamela Bondi on February 5, 2025, (the "Bondi Directive"), along with various memoranda and public comments about the orders and their force, provide a clear picture of what jurisdictions qualify, and of the 2025 Executive Orders' intended purpose: to end or severely curtail federal funding for cities, counties and states that the Trump administration deems to be sanctuary jurisdictions.

The plaintiffs in this case—San Francisco, Santa Clara, and fourteen other cities and counties from around the country that maintain policies placing them within the definition of "sanctuary jurisdictions" (hereafter the "Cities and Counties")[2]— have moved for a preliminary injunction to block the 2025 Executive Orders and Bondi Directive to the extent that they mandate the withholding of the Cities and Counties' federal funding because they are sanctuary jurisdictions.  The Cities and Counties seek to preliminarily enjoin the defendants[3] and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, from taking any action to withhold, freeze, or condition federal

---

[2] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul ("St. Paul"), and City of Santa Fe ("Santa Fe").

[3] Defendants are Donald J. Trump, President of the United States; the United States; the United States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States; the United States Department of Homeland Security; and Kristi Noem in her official capacity as Secretary of the Department of Homeland Security.

Case 3:25-cv-01350-WHO   Document #23-1   Filed 11/17/25   Page 3 of 7   Page ID #:738

funds based on (1) Section 17 of Executive Order 14,159; [4] (2) Section 2(a)(ii) of Executive Order 14,218; and (3) the Bondi Directive to jurisdictions on the basis that they have policies limiting (i) the honoring of civil immigration detainer requests; (ii) cooperation with administrative warrants for purposes of immigration enforcement; (iii) sharing of information with federal immigration authorities other than immigration or citizenship status; (iv) the use of local law enforcement to arrest or detain individuals solely for civil immigration violations; or (v) the use of local resources to assist with civil immigration enforcement activities.

Issuance of a preliminary injunction is warranted if the movant establishes (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of relief; (3) that the balance of equities tips in the movant's favor; and (4) that granting relief is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in the Ninth Circuit evaluate these factors on a "sliding scale" such that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest." *Arc. of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (cleaned up). As government entities are parties to this case, the final two factors merge. *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

The Government challenges the Cities and Counties' motion on justiciability. It argues that the Cities and Counties lack standing and that their claims are not ripe because the 2025 Executive Orders and the Bondi Directive merely provide guidance for executive agencies reviewing federal funding to sanctuary jurisdictions, and because the Cities and Counties have not yet suffered a loss of funds. This is essentially the same argument it made in 2017. Indeed, this case is on all fours with *Cnty. of Santa Clara v. Trump, et al.*, 250 F. Supp. 3d 497 (N.D. Cal. Apr. 25, 2017) (Preliminary Injunction Order), *aff'd*, 897 F.3d 1225 (9th Cir. 2018), where I and the Ninth Circuit rejected the same justiciability arguments, finding that the plaintiffs had a well-

---

[4] The plaintiffs seek to enjoin the first sentence in Section 17 regarding the withholding of funding from sanctuary jurisdictions but not the second sentence of Section 17, which addresses civil and criminal enforcement.

founded fear of enforcement of Section 9(a) of EO 13,768. The Government asserts that the use in Section 17 of EO 14,159 of the phrase "evaluate and undertake any lawful actions" in directing the Attorney General and DHS Secretary to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds" makes it different than EO 13,768, which directed the same executive agencies to, "to the extent consistent with law . . . ensure that [sanctuary jurisdictions] … are not eligible for Federal grants." But this is a distinction without a difference. Section 17 of EO 14,159, like Section 9(a) of EO 13,768, "unambiguously command[s] action," *see City & Cnty. of S.F.*, 897 F.3d at 1239, and neither Executive Order's savings clause insulates it from judicial review, *see id.*

The Cities and Counties have pre-enforcement standing just as San Francisco and Santa Clara did in 2017. They each have policies that place them within the scope of the funding freeze that the 2025 Executive Orders and Bondi Directive (and other executive agency directives like it) seek to implement. Their well-founded fear of enforcement is even stronger than it was in 2017: it stems from the plain language of EO 14,159 and EO 14,218, the Bondi Directive, numerous directives from executive agencies ordering the withholding of funds to localities like the plaintiffs, and legal action that the Government has already initiated against sanctuary jurisdictions in Illinois and New York, in addition to recent statements from high ranking government officials and the litigation over these issues in the first Trump administration.

Precedent in the Ninth Circuit and the orders of this court show why the Cities and Counties have established that they are likely to prevail on the merits of at least their separation of powers, Spending Clause, and Fifth and Tenth Amendment claims. The challenged sections in the 2025 Executive Orders and the Bondi Directive that order executive agencies to withhold, freeze, or condition federal funding apportioned to localities by Congress, violate the Constitution's separation of powers principles and the Spending Clause, as explained by the Ninth Circuit in the earlier iteration of this case in 2018; they also violate the Fifth Amendment to the extent they are unconstitutionally vague and violate due process. *See City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234– 35 (9th Cir. 2018); *Cnty. of Santa Clara v. Trump, et al.*, 250 F. Supp. 3d 497, 530– 32, 534–36 (N.D. Cal. Apr. 25, 2017). The 2025 Executive Orders' directives to withhold or

4

freeze federal funding to sanctuary jurisdictions also violate the Tenth Amendment because they impose coercive condition intended to commandeer local officials into enforcing federal immigration practices and law. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 533. And as the order that will follow this one makes plain, the Cities and Counties have also shown a likelihood of success on the merits of their Administrative Procedure Act ("APA") claim: the Bondi Directive's order to freeze all DOJ funds is likely arbitrary and capricious, contrary to the Constitution and an ultra vires final agency action under the APA. 5 U.S.C. § 706(2).

The Cities and Counties have also demonstrated a likelihood of irreparable harm. The threat to withhold funding causes them irreparable injury in the form of budgetary uncertainty, deprivation of constitutional rights, and undermining trust between the Cities and Counties and the communities they serve. *See City & Cnty. of S.F.*, 897 F.3d at 1244 (budgetary harms); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (constitutional harms); *City of Los Angeles v. Sessions*, 2018 WL 6071072, at \*3 (C.D. Cal. Sept. 13, 2018) (community harms), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019). Lastly, the balance of the equities favors the Cities and Counties, and the requested relief is in the public interest. *City & Cnty. of S.F.*, 897 F.3d at 1244. Having established all of the *Winter* factors, the Cities and Counties are entitled to a preliminary injunction.

## PRELIMINARY INJUNCTION

Now, therefore, it is ORDERED that:

1. Defendants[5] and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them ARE HEREBY RESTRAINED AND ENJOINED from directly or indirectly taking any action to withhold, freeze, or condition federal

---

[5] Defendant President Donald J. Trump is not enjoined by this Order with respect to the "performance of his official duties." *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (citation and quotation marks omitted). However, the injunction does run against any federal agency or official, including the other named defendants and any other agency or individual acting in concert with or as an agent of the President or other defendants to implement the enjoined provisions of Executive Orders 14,159 and 14,128 and the Bondi Directive. *See Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) ("Injunctive relief, however, may run against executive officials"), *rev'd on other grounds, Trump v. Hawaii*, 583 U.S. 941 (2017); *see also* Fed. R. Civ. Proc. 65(d)(2) (preliminary injunction may reach "other persons who are in active concert or participation with" the enjoined parties).

5

United States District Court
Northern District of California

funds from the Cities and Counties based on (1) the first sentence of Section 17 of Executive Order 14,159, (2) Section 2(a)(ii) of Executive Order 14,218, or (3) the Preamble and Section I of the February 5, 2025 Memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives" on the basis that the Cities and Counties have policies that limit (i) the honoring of civil immigration detainer requests; (ii) cooperation with administrative warrants for purposes of immigration enforcement; (iii) sharing of information with federal immigration authorities other than immigration or citizenship status; (iv) the use of local law enforcement to arrest or detain individuals solely for civil immigration violations; or (v) the use of local resources to assist with civil immigration enforcement activities.

2.      Defendants are instructed to provide written notice of this Order to all federal departments and agencies by April 28, 2025.  The written notice shall instruct those agencies that they may not take steps to withhold from, freeze, or condition funds to the Cities and Counties based on the first sentence of Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive Order 14,218, or the Preamble and Section I of the February 5, 2025, Memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives."

3.      This Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706.

**IT IS SO ORDERED.**

Dated: April 24, 2025



William H. Orrick
United States District Judge

6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 25-cv-01350-WHO

**ORDER CLARIFYING PRELIMINARY INJUNCTION**

Re: Dkt. No. 128

How will the litigation over sanctuary cities and federal funding unfold during the next four years? That is the unasked question that President Trump's Executive Order 14,287, 90 Fed. Reg. 18765 ("Protecting American Communities from Criminal Aliens") (hereafter, "EO 14,287"), which is aimed at so-called "sanctuary" jurisdictions, and the Cities and Counties[1] Motion to Enforce, or in the Alternative, to Modify Preliminary Injunction (hereafter, the "Motion to Enforce"), bring to mind. To answer it, and rule on the Motion to Enforce, I return to first principles.

First, the litigation may not proceed with the coercive threat to end all federal funding hanging over the Cities and Counties' heads like the sword of Damocles. That threat was explicit in the first sentence of Section 17 of Executive Order 14,159, in Section 2(a)(ii) of Executive Order 14,218, and in the Preamble and Section I of the February 5, 2025, memo from the Attorney General defendant Pamela Bondi (the "Bondi Directive"), and that is why they are enjoined. *See*

---

[1] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul ("St. Paul"), and City of Santa Fe ("Santa Fe").

Dkt. No. 111 (Preliminary Injunction).

Second, the Government must proceed within the bounds of the Constitution. That is the reason that I asked Government counsel at the hearing on April 23, 2025, to confirm: (1) that Congress has the spending power and the Executive Branch and its agencies cannot place new conditions on already appropriated funds; (2) that the President does not have unilateral authority to refuse to spend funds appropriated by Congress; (3) that conditions on federal funds must be unambiguous and timely; (4) that conditions on federal funds must bear relation to the funds at issue; and (5) that the total financial incentive for compliance with federal immigration law cannot be coercive. The Government agreed that those principles apply. *See* April 23, 2025, Preliminary Injunction Hearing Tr. [Dkt. No. 117] at 3:14-5:20.

Third, while complying with the first two principles, the Government is entitled to identify particular grants and funding programs that it believes should be conditioned upon compliance with immigration-related objectives, and to litigate its position. The Preliminary Injunction does not reach the litigation filed by the Government against Illinois, New York or Colorado, for example, nor does it prohibit efforts to enforce a condition regarding the Byrne JAG Act or other specific programs with a plausible nexus to "sanctuary" policies.

With that, I turn to the Motion to Enforce.

## BACKGROUND

On April 24, 2025, I issued the Preliminary Injunction in this case, enjoining the defendants[2] and their officers, agents, servants, employees, and attorneys, and any other persons in active concert or participation with them, from taking any action to withhold, freeze, or condition federal funds from the Cities and Counties based on the first sentence of Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive Order 14,218, or the Preamble and Section I of the February 5, 2025, memo from the Attorney General defendant Pamela Bondi (the "Bondi

_____

[2] Defendants are Donald J. Trump, President of the United States; the United States; the United States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States; the United States Department of Homeland Security; and Kristi Noem in her official capacity as Secretary of the Department of Homeland Security.

2

United States District Court
Northern District of California

Directive"). Dkt. No. 111 (Preliminary Injunction). On May 3, 2025, I issued a longer order expanding upon my reasoning for issuing the Preliminary Injunction. Dkt. No. 126 (Further Order).

On April 28, 2025, four days after I issued the Preliminary Injunction, President Trump issued a *new* Executive Order, EO 14,287, which also concerns sanctuary jurisdictions and their receipt of federal funds. Because EO 14,287 issued after the Preliminary Injunction, I did not consider it in my decision making or in the more detailed analysis provided in the Further Order. A week after President Trump issued EO 14,287, the Cities and Counties filed the Motion to Enforce, arguing that EO 14,287 repackages its predecessors' unconstitutional funding threats.[3]

It is well-settled that district courts have the power to supervise compliance with an injunction and to "modify a preliminary injunction in consideration of new facts." *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002); *State v. Trump*, 871 F.3d 646, 654 (9th Cir. 2017); *accord* Fed. R. Civ. P. 62(c)-(d). "A party seeking modification . . . of an injunction bears the burden of establishing that a significant change in facts or laws warrants revision . . . of the injunction." *Sharp v. Weston*, 233 F.3d 1166. 1170 (9th Cir. 2000); *Trump*, 871 F.3d at 654.

## DISCUSSION

At this early moment in the case, it is incumbent upon me to clarify the core purpose of the Preliminary Injunction: to ensure that litigation over how federal funding is allocated to the Cities and Counties is not driven by coercion and remains within the parameters of the United States Constitution. Executive Orders 14,159 and 14,218, which were the subject of the Preliminary Injunction, threatened to withhold *all* federal funding from sanctuary jurisdictions if they did not adapt their policies and practices to conform with the federal government's preferences. That

---

[3] After the Cities and Counties filed the Motion to Enforce (and accompanying Motion to Shorten Time for Expedited Briefing and Hearing on the Motion to Enforce), I told the parties that if they could stipulate to the plaintiffs' requested relief at least until the matter could be fully briefed on a normal briefing schedule, I would hold a hearing on June 11, 2025. Otherwise, I set an expedited briefing schedule and a hearing for May 8, 2025, at 3 p.m. Pacific time. At a Case Management Conference on May 6, 2025, the parties informed me that no such stipulation would be entered. The Government timely submitted its expedited response to the Cities and Counties' Motion to Enforce. *See* Dkt. No. 132 (Response). I held a hearing on May 8, 2025, at 3 p.m. Pacific time, at which counsel for both the Cities and Counties' and the Government was heard.

United States District Court
Northern District of California

coercive threat (and any actions agencies take to realize that threat) is unconstitutional, so I enjoined its effect.  To be clear: While the *letter* of the Preliminary Injunction refers to specific sections of EO 14,159, EO 14,218, and the Bondi Directive, its *spirit* enjoins the kind of coercion that was evident, at the time of the Preliminary Injunction's issuance, in the language of those sections.  The Government cannot avoid liability down the line by "hewing to the narrow letter of the injunction" while "simultaneously ignoring its spirit[.]" *Inst. Of Cetacean Research v. Sea Shepard Conserv. Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014).  The Preliminary Injunction in this case reaches any subsequent Executive Order or Government action that poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a "sanctuary" jurisdiction.

At the same time, the Preliminary Injunction was not designed to freeze litigation over the propriety of "sanctuary" policies or immigration-related conditions on particular government grants and contracts.  The Ninth Circuit, for example, has held that the Department of Justice may include immigration-related factors when considering certain grants.  Response [Dkt. No. 132] at 9; *City of Los Angeles. v. Barr*, 929 F.3d 1163, 1178 (9th Cir. 2019) (discussing conditions on DOJ grants issued through DOJ's competitive federal grant program under the Public Safety Partnership and Community Policing Act).

With this in mind, I turn to the differences between EO 14,287 and the Orders already specifically enjoined.  While addressing the same topic and seemingly targeting the same ultimate goal (ending or severely curtailing the issuance of federal funds to States and localities that limit the use of local resources for aiding in federal civil immigration enforcement), there are material differences between the challenged sections of EO 14,287 and the sections of EO 14,159 and EO 14,218 that I enjoined.

Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218 both direct the Attorney General and DHS Secretary to withhold *all* federal funds from localities deemed to be "sanctuary" jurisdictions.  Section 17 of EO 14,159 directs the Attorney General and DHS Secretary to "evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions . . . *do not receive access to Federal funds*."  EO 14,159, Section 17 (emphasis added).  And Section

4

2(a)(ii) of EO 14,218 similarly directs the head of "each executive department or agency" to "ensure . . . that Federal payments to States and localities do not . . . facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies[.]" EO 14,218, Section 2(a)(ii).  These provisions' respective broad scopes drove my conclusion under binding Ninth Circuit authority to issue the Preliminary Injunction.  *See* Further Order at pp. 35-36 (Section I(A)(2)(b)).  In so finding, I rejected the Government's arguments that those orders merely provided guidance for executive agencies conducting evaluations of localities' federal funding as a disingenuous read of their plain language, and I rejected its arguments that the Orders' savings clauses insulated them from judicial review; to give such weight to those clauses would require looking past the Orders' clear and specific language directing unlawful action, which I cannot do. *See* Further Order at pp. 47-49 (Section II(A)).

Executive Order 14,287 is different from EO 14,159 and EO 14,218 in some ways. Section 2 of EO 14,287 calls for the Attorney General, in coordination with the DHS Secretary, to publish a list of States and local jurisdictions they have identified as "sanctuary" jurisdictions[4], and to notify[5] those jurisdictions of their status on the list.  In contrast with Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218, nothing in Section 2 of EO 14,287 directs executive agency heads to withhold from, freeze, or condition all federal funding to sanctuary jurisdictions on their compliance with federal immigration law; it directs them to *identify* those jurisdictions that qualify as sanctuary jurisdictions and *notify* them of their inclusion on that list.  This will at least resolve the ambiguity of what jurisdictions the Government considers to be "sanctuary" jurisdictions and put those States and localities that qualify on notice.  *See* Further Order at p. 50, n.7.[6]  There is nothing improper about Section 2.

---

[4] Section 2(a) directs the Attorney General, in coordination with the DHS Secretary, to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)." EO 14,287, Section 2(a).

[5] Section 2(b) directs the same agency heads to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.*, Section 2(b).

[6] At the hearing on May 8, 2025, counsel for the Cities and Counties clarified that the plaintiffs' Motion to Enforce only seeks to enjoin Section 2 of EO 14,287 to the extent that it informs the

5

Section 3 of EO 14,287 is closer to the enjoined sections of EO 14,159 and EO 14,218.  It lays out "Consequences for Sanctuary Jurisdiction Status."  Section 3(a) provides that "with respect to sanctuary jurisdictions that are designated under section 2(a)" of EO 14,287, "the head of each executive department or agency . . . in coordination with the Director of the Office of Management and Budget and as permitted by law, shall identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination as appropriate." *Id.*, Section 3(a).  And Section 3(b) says that, after notice under Section 2(b), the Attorney General and DHS Secretary "shall pursue all necessary legal remedies and enforcement measures to end these violations and bring such jurisdictions into compliance with the laws of the United States." *Id.*, Section 3(b).  While the Government asserts that Section 3 does not direct actual termination or suspension of funds, a "Fact Sheet" published by the White House alongside EO 14,287 explains that President Trump signed EO 14,287 "to enforce federal law with respect to sanctuary jurisdictions," states that sanctuary jurisdictions that do not comply with federal law "may lose federal funding," and quotes President Trump's Truth Social post declaring his intent to "end" sanctuary jurisdictions.  *See* Tilak Decl. Ex. 2 (White House Fact Sheet entitled "Cracking Down on Sanctuary Jurisdictions," published April 28, 2025).

That said, some aspects of Section 3 may resolve some of the problems I described pertaining to the overbreadth of EO 14,159 and EO 14,218.  Identification of the funds the Government believes are at issue would, if done in a constitutionally targeted way, provide clarity. The requirement to identify funds for potential rescission, by itself, is not inappropriate, following an evaluation of the type of funding involved to determine if there is a nexus between the funding stream, the jurisdiction's policies, and the desired immigration-related conditions, as the Government is constitutionally obligated to do before it acts.  *See* Further Order at pp. 50-51 (Section II(B)).

What *would* be inappropriate is if the criterion for identification of funds for "suspension or termination" was *the fact that* the so-called "sanctuary" jurisdictions received them.  If the

_____

action called for in Section 3(a) of the same Order.

6

Government were to take the unconstitutional approach of flagging *all* federal funds (or funds unrelated to sanctuary policies) to those States and localities the Attorney General and DHS Secretary determined to be "sanctuary" jurisdictions as being "appropriate" for suspension or termination, it would violate Constitution in the same way that the enjoined sections of EO 14,159 and EO 14,218 do. *That* approach would violate the Preliminary Injunction.

The Government argues that EO 14,287 only calls for the publication of a list, the notification of jurisdictions on that list of their presence on it, and identification of funds for possible suspension or termination, but that it "does not direct for actual termination or suspension." Response at 7. Executive Order 14,287 does not direct executive agencies to freeze *all* federal funds to jurisdictions like the Cities and Counties. But the context surrounding this Executive Order and its predecessors raises the threat that the Government will employ these executive actions to unconstitutionally coerce the Cities and Counties (and other jurisdictions like them) into changing their policies and practices to conform with the second Trump Administration's preferences.

President Trump's actions, communications, and representations about sanctuary jurisdictions have made it perfectly clear that his ultimate goal is their elimination; directives from executive agencies in his administration have put finer points on his (often informal) expressions. *See* Further Order at pp. 5-7 (discussing actions and communications surrounding EO 14,159 and EO 14,218 that gave rise to the Cities and Counties' reasonable fear of enforcement). Since I issued the Preliminary Injunction, the Executive Branch has compounded the concern that it will wield the latest Executive Order to cut off (or coercively *threaten* to cut off) *all* federal funds from so-called "sanctuary" jurisdictions; the White House "Fact Sheet" published alongside EO 14,287, proclaiming that through EO 14,287, President Trump is "following through on his promise to rid the United States of sanctuary cities," and quoting a Truth Social post from the President wherein he stated that he was "[w]orking on papers to withhold all Federal Funding for any City or State that allows these Death Traps [referring to sanctuary cities] to exist!!!" does not inspire confidence in the Government's representation that it will limit its implementation of EO 14,287 to "identification" of funds for "suspension or termination."

7

The Preliminary Injunction is not intended to hamstring the Government's lawful evaluation of federal funds to States and localities that have sanctuary policies. It seems relatively easy to identify categories of funds that have little or nothing to do with sanctuary policies (such as healthcare, transportation, emergency relief and so forth), that would have an unlawfully coercive effect on the Cities and Counties if those categories of funds were identified for suspension or termination; to do so would violate the Preliminary Injunction. As the Government's counsel acknowledged, the Preliminary Injunction reaches the Government's proscribed conduct whether it is based on EO 14,287 or on some as yet unpublished Executive Order.

In light of all these considerations, I clarify that neither Executive Order 14,287 nor any other Government action that postdates the Preliminary Injunction can be used as an end run around the Preliminary Injunction Order. *See Inst. Of Cetacean Research*, supra. The language "based on the first sentence of Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive Order 14,218, or the Preamble and Section I of the February 5, 2025, memo from the Attorney General defendant Pamela Bondi (the "Bondi Directive")" shall be read to apply to *any* Executive Order or agency directive that purports to attempt to cut off federal funding from States or localities that meet the Government's definition of "sanctuary" jurisdiction in the wholesale, overly broad and unconstitutional manner threatened by Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218.

So that there is no failure of communication, the defendants are instructed to provide written notice of this Order Clarifying Preliminary Injunction to all federal departments and agencies by May 16, 2025.

**IT IS SO ORDERED.**

Dated: May 9, 2025

William H. Orrick
United States District Judge

United States District Court
Northern District of California

8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 25-cv-01350-WHO<br><br>**ORDER REGARDING DISPUTES OVER PROPRIETY OF STANDARD CONDITIONS ON FEDERAL GRANTS**<br><br>Re: Dkt. No. 143 |

On April 24, 2025, I issued an Order Granting Preliminary Injunction to enjoin the defendants[1] from taking any action to withhold from, freeze, or condition federal funds to the Cities and Counties[2] (the plaintiffs in this case) based on (1) the first sentence of Section 17 of Executive Order 14,159, (2) Section 2(a)(ii) of Executive Order 14,218, or (3) the Preamble and Section I of the February 5, 2025, Memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives." Dkt. No. 111 (Order Granting Preliminary Injunction). I described in detail in my Further Order Regarding Preliminary Injunction on May 3, 2025, the many ways in

---

[1] Defendants are Donald J. Trump, President of the United States; the United States; the United States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States; the United States Department of Homeland Security; and Kristi Noem in her official capacity as Secretary of the Department of Homeland Security. The Preliminary Injunction enjoins the defendants and their officers, agents, servants, employees, and attorneys, as well as any other persons in active concert or participation with them.

[2] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul ("St. Paul"), and City of Santa Fe ("Santa Fe").

which those Executive Orders and threatened actions were likely unconstitutional and illegal under the Separation of Powers doctrine, the Fifth Amendment's Due Process Clause, the Tenth Amendment, and the Administrative Procedure Act ("APA"). Dkt. No. 126 (Further Order). In the Order Clarifying Preliminary Injunction on May 9, 2025, I emphasized that other Executive Orders and actions by government agencies could not evade the strictures of the Preliminary Injunction simply because they used different language or occurred after the Preliminary Injunction went into effect. Dkt. No. 136 (Order Clarifying Preliminary Injunction). It "reaches any subsequent Executive Order or Government action that poses the same coercive threat." *Id.* 4.[3]

In their joint letter brief dated June 13, 2025, the parties clashed over whether grant conditions imposed by the Department of Homeland Security ("DHS"), the Department of Transportation ("DOT"), and the Department of Housing and Urban Development ("HUD") fall within the scope of the Preliminary Injunction insofar as they implement the enjoined sections of Executive Order 14,159 ("EO 14,159") and Executive Order 14,218 ("EO 14,218") to impose immigration-related conditions upon grants to sanctuary jurisdictions. Dkt. No. 143 (Joint Letter Brief). I would have thought the answer was obvious. The identified provisions in the DHS and DOT Standard Terms may not be applied in the blunderbuss way that Secretaries Noem and Duffy have directed.[4] Conditions placed on congressional spending must have some nexus with the purpose of the implicated funds. *See* Further Order at 50-51; *see also Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. Apr. 25, 2017), *aff'd*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234–35 (9th Cir. 2018). They impose ill-defined immigration conditions upon

---

[3] Defendants filed a Notice of Appeal of the Preliminary Injunction, the Further Order, and the Order Clarifying Preliminary Injunction on June 19, 2025. Dkt. No. 146 (Notice of Appeal).

[4] I previously explained that the Preliminary Injunction was "not designed to freeze litigation over the propriety of 'sanctuary' policies or immigration-related conditions on particular government grants and contracts." Dkt. No. 136 (Order Clarifying Preliminary Injunction) 4. There may be individual law enforcement grant programs, for example, that have a sufficient relationship to the sanctuary jurisdiction policies that immigration-related conditions may be legal. That is a different matter altogether than efforts like the Executive Orders and challenged standard terms and conditions to coerce the Cities and Counties to change their so-called sanctuary policies.

grants that have no evident nexus with the plaintiffs' so-called "sanctuary" policies.

The Preliminary Injunction enjoins the DHS and DOT standard terms and conditions from applying to grants issued to the plaintiff Cities and Counties that are implemented by DHS and DOT. The HUD Continuum of Care grant terms and conditions appear to be inconsistent with the Preliminary Injunction as well.

The plaintiffs also ask that I order the defendants to produce copies of the court-ordered notice that they have provided to federal agencies. Given the defendants' apparent unwillingness to comply or confusion about their obligations under the Preliminary Injunction, the defendants shall provide the Cities and Counties copies of the notices as requested no later than July 2, 2025.

## I.   DHS STANDARD TERMS

On April 18, 2025, DHS issued standard terms and conditions (the "DHS Standard Terms") that apply to "all new federal awards" in Fiscal Year 2025 and include numerous immigration conditions that reflect the enjoined language of EO 14,218. *See* Dkt. No. 143, Attachment B. Section IX of the DHS Standard Terms (entitled "Communication and Cooperation with [DHS] and Immigration Officials") requires grant recipients to certify five different immigration conditions, the language of each of which evidences their connection to the enjoined Orders. *Compare* Dkt. No. 143, Attachment B (DHS Standard Terms, Section IX), *with* EO 14,159, Section 17 (directing the Attorney General and DHS Secretary to condition Federal funds to so-called "sanctuary" jurisdictions on compliance with federal immigration law), *and* EO 14,218 Section 2 (directing agency and executive department heads to "ensure . . . that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation.").[5]

Although the DHS Standard Terms apply to "all new federal awards," the defendants contend that the conditions will only apply based on individualized assessments of different federal grants. I do not credit that representation for at least two reasons.

---

[5] In the Further Order, I referenced the DHS Standard Terms and HUD Continuum of Care grants, among other things, as evidence that the federal government had already taken steps to try to implement EO 14,159 and EO 14,218. *See* Further Order 5-7.

United States District Court
Northern District of California

First, the promise—articulated in both the defendants' letter brief and in a June 11, 2025, DHS website update[6]—echoes the savings clauses I already rejected as insufficient to insulate the 2025 Executive Orders from judicial scrutiny. *See* Further Order 41, 47-48. Here, as there, the "clear and specific language" of the DHS Standard Terms communicates DHS's intent to apply those terms to "all new federal awards." Even if I were to interpret the June 11, 2025, DHS website update as a formal savings clause (which I am not inclined to do, given the relative informality of a sentence on a website compared to adopted agency terms and conditions), when read in context, the clause cannot be given effect because to do so would "override clear and specific language" found in the DHS Standard Terms. *See* Further Order 48 (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018)).

Second, DHS's conduct belies its representation. DHS has already acted as though the immigration conditions in its Standard Terms may be applied to grants with no nexus to immigration or so-called "sanctuary" policies. A March 20, 2025, memo from a senior FEMA administrator to DHS Secretary Noem is a good example. In the memo, FEMA sought approval of its review process and parameters of its grant programs "to align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions." Dkt. No. 143, Attachment D (March 20, 2025, FEMA memo). The memo, which DHS Secretary Noem approved, acknowledges that immigration conditions may be applied to the Emergency Management Performance Grant ("EMPG"), State Homeland Security Grant Program ("HSGP"), and Urban Area Security Initiative ("UASI") grants. *Id.*

Declarations from various city officials submitted alongside the Cities and Counties' Preliminary Injunction Motion indicate that these grants are used for emergency preparedness, which has no nexus to immigration enforcement. *See* Declaration of Brendan McClusky [Dkt. No. 61-5] ¶¶ 8-11 (describing how King County relies on EMPG, HSGP, and UASI grants to prepare the region against terrorist attacks); Declaration of Patricia Cole-Tindall [Dkt. No. 61-6] ¶¶ 14-19

---

[6] The DHS website states that "[n]ot all of DHS's Standard Terms and Conditions apply to every DHS grant program[]." DHS Website, https://www.dhs.gov/publication/dhs-standard-terms-and-conditions, last updated June 11, 2025, last accessed June 18, 2025.

United States District Court
Northern District of California

(describing how the King County Sheriff's Office employs UASI Grants, which are awarded to "assist high-threat, high-density Urban Areas efforts to build, sustain, and deliver the capabilities necessary to prevent, prepare for, protect against, and respond to acts of terrorism," to train aviation aircrews, conduct joint agency drills and use small unmanned aerial systems (SUAS) which are important anti-terrorism tools); Declaration of Maria Oberg [Dkt. No. 71] ¶ 4(k) (describing how the City of San Jose uses the UASI grant to help local agencies "prepare for and respond to terrorism").

The DHS Standard Terms are exactly what the Preliminary Injunction is designed to prohibit. This is not to say that the terms cannot be imposed on individual grants with a meaningful nexus to sanctuary jurisdiction policies. The defendants point to the Targeted Violence and Terrorism Prevention Grant Program ("TVTP") as an example of the type of grant the Preliminary Injunction should not reach. Dkt. No. 143 at 6. DHS authorizes and appropriates funds for TVTP annually; TVTP grant awards are discretionary and competitive, and they lack statutory award criteria. Litigation may be necessary to determine whether the challenged immigration conditions are appropriate to that grant program, and nothing in the Preliminary Injunction Order precludes defendants from trying to impose them on an individual basis. And that is precisely the point: on a case-by-case basis, the Trump administration may attempt to apply immigration conditions as long as there exists a substantive relationship between the conditions and the grant upon which they are to be imposed. But defendants cannot pretend, as they do now, that they are assessing the relationship between immigration conditions on federal funding and the programs those funds enable in a manner that is consistent with the Constitution and the APA, when the defendants apply those conditions to FEMA or, as will be seen below, the DOT infrastructure projects. Applying immigration conditions to all new federal awards without regard to whether those awards enjoy a real nexus to so-called "sanctuary" policies violates the Preliminary Injunction.

## II.     DOT STANDARD TERMS

On April 24, 2025, Secretary of Transportation Secretary Sean Duffy issued a letter (the "Duffy Letter") that announced DOT's policy of providing federal funding only to recipients that

United States District Court
Northern District of California

"cooperate with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." Dkt. No. 143, Attachment E.  The Duffy Letter utilizes language found in EO 14,159. *Compare id.*, *with* EO 14,159, Section 17 (directing the Attorney General and DHS Secretary to ensure that so-called "sanctuary" jurisdictions, which "seek to interfere with the lawful exercise of Federal law enforcement operations," "do not receive access to Federal funds.").  The DOT has since included that language in standard terms and template grant agreements employed across various operating administrations, including the Federal Transit Administration ("FTA"), Federal Highway Administration ("FHWA"), Federal Aviation Administration ("FAA"), and Federal Railroad Administration ("FRA").  *See* Dkt. No. 143, Attachments F-I (collectively, the "DOT Standard Terms.").

The DOT Standard Terms have made their way into specific grant programs and agreements that the Cities and Counties have received, including grants with no conceivable nexus to sanctuary policies. *See id.*, Attachments J-L.  The conditions apply to transportation infrastructure grants; they apply to grants related to railroad crossing studies, bridge improvements, and airport repairs. *See e.g.*, Dkt. No. 143, Attachment K ("Better Utilizing Infrastructure to Leverage Development Grant Agreement," which has a stated purpose to "fund an eligible project that will have a significant local or regional impact and improve transportation infrastructure[]"), *id.*, Attachment L ("Strengthening Mobility and Revolutionizing Transportation," or "SMART" grant, which has a stated purpose of providing grants to improve transportation efficiency and safety); *see also e.g., id.*, Attachments F-I.

The defendants raise the same argument in defense of the DOT Standard Terms as they do with respect to the DHS Standard Terms: They insist that the immigration conditions will only apply where there is statutory authority.  But that is obviously untrue.  DOT has included these conditions across a vast array of programs and grants, *see e.g.* Dkt. No. 143, Attachments F-L:  it

is apparent that they are being applied without meaningful regard to statutory authority.[7]  These conditions exist to strongarm the Cities and Counties to abandon their policies or face critical infrastructure degradation.

I am not the only judge to think so.  In the United States District Court for the Western District of Washington, the Hon. Barbara Rothstein recently held that the immigration conditions in the DOT Standard Terms are likely unconstitutional and arbitrary and capricious under the APA.  *See Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368, at \*17 (W.D. Wash. June 3, 2025) ("*King County*").  That injunction applies to six plaintiffs in this action who are also parties to that action: Martin Luther King Jr. County, City and County of San Francisco, County of Santa Clara, City of Minneapolis, City of Portland, and the City of San Jose.  Ten other plaintiffs here are not protected by the *King County* injunction.  They are by this one.

The defendants speculate that there may be programs for which immigration conditions like those found in the DOT Standard Terms are appropriate.  They did not provide an example.  If there is one, the challenged immigration conditions may be applied.  But just because the conditions may apply on a case-by-case basis to *some* grants does not justify their present overbroad application to seemingly *any* grant.

## III.    HUD CONTINUUM OF CARE GRANTS

The HUD grant agreements that the plaintiffs highlight also use language from the enjoined executive orders; the HUD Continuum of Care ("CoC") grant agreements include language like EO 14,218, stating that "[n]o state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." Dkt. No. 143, Attachment M, p. 2.  The immigration conditions found in the HUD CoC grant agreements differ from their DOT and DHS counterparts in that they apply to the use of already awarded funds, they do not condition the receipt of funds.

---

[7] As for the defendants' argument that those terms are now beyond the scope of the Preliminary Injunction because they have been incorporated into particular grant programs, *see* Dkt. No. 143 at 7, to accept that argument would be to hamstring the Preliminary Injunction.

Case 3:25-cv-01350-WHO   Document #:143   Filed 42/17/25   Page 28 of 29   PageID #:9757

Congress enacted the McKinney-Vento Homeless Assistance Act to "meet the critically urgent needs of the homeless of the Nation" by providing "funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. §11301(b)(2)-(3).  Congress, through the Act, provides federal funding to several programs, including the Continuum of Care program, which is designed to "assist individuals (including unaccompanied youth) and families experiencing homelessness" by providing services "to help such individuals move into transitional and permanent housing, with the goal of long-term stability."[8]  HUD is responsible for administering the CoC program.

The 2024 HUD CoC grant agreements at issue state that "[n]o state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." Dkt. No. 143, Attachment M.  As the thoughtful opinion of Judge Rothstein in *King County* illustrates, the defendants have no more shown a nexus between immigration enforcement and the kind of services that the HUD CoC grants provide— safety-net services for cities' most vulnerable populations, including the homeless, veterans, and unaccompanied youth—than they have shown a nexus here between immigration enforcement and the DHS and DOT programs. *See King County*, 2025 WL 1582368, at \*17.

The programs that HUD CoC grants fund do not promote illegal immigration or attempt to shield individuals in the country illegally from deportation. Judge Rothstein's opinion is persuasive and likely on all fours with the situation here.  Unlike the DHS and DOT conditions, the HUD CoC grants are for an individual program where the funding has already been received by the Cities and Counties.  The defendants have not yet attempted to show the required nexus. They may file a brief and supporting declarations on the merits of their assertion that the conditions are substantively related to the HUD CoC grants and should not be enjoined by July 11,

---

[8] *Continuum of Care (CoC) Program Eligibility Requirements*, HUD Exchange, https://www.hudexchange.info/programs/coc/coc-program-eligibility-requirements/, last accessed June 19, 2025.

United States District Court
Northern District of California

2025. The Cities and Counties may reply by July 25, 2025, and I will rule thereafter.

## IV. NOTICE DISCLOSURE

The Cities and Counties also ask that I order the defendants to disclose a copy of the court-ordered notice they issued to all federal departments and agencies regarding the April 24, 2025, Preliminary Injunction Order and the May 9, 2025, Further Order. Dkt. No. 143 at 1-3. Defendants have thus far rejected the plaintiffs' request, stating that since I did not order them to provide copies of the notice to the plaintiffs, their confirmation that the notices did go out is sufficient.

Because the federal government continues to act inconsistently with my prior orders, the Cities and Counties' request to know what notice was sent to agencies of the federal government is reasonable. The defendants are now ORDERED to provide the plaintiffs with copies of the notices disseminated to all federal departments and agencies by July 2, 2025.

## CONCLUSION

The Preliminary Injunction protects the Cities and Counties from the coercive impact of the DHS and DOT Standard Terms. The DHS Standard Terms are applied to "all new federal awards," and the DOT Standard Terms have already been applied to a vast array of agency operations, most of which appear to have no relation to immigration enforcement or sanctuary policies. The defendants' promise to apply the terms only after individualized, grant-by-grant assessment is empty rhetoric belied by the words of the Standard Terms and the defendants' own conduct. I will allow further briefing to understand if there is a substantive relationship between the HUD CoC grant agreements and the Cities and Counties' so-called sanctuary policies.

It appears that the defendants continue to seek an end run around the Preliminary Injunction. There is a way, which I have suggested, for defendants to lawfully seek to achieve their policy objectives without attempting to coerce the Cities and Counties. I suggest that they use it.

**IT IS SO ORDERED.**

Dated: June 23, 2025



William H. Orrick
United States District Judge

9

United States District Court
Northern District of California